# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

COIN CENTER, et al.,
*Plaintiffs-Appellees,*

v.

SECRETARY, U.S. DEPARTMENT OF THE TREASURY, et al.,
*Defendants-Appellants.*

Appeal from the U.S. District Court for the Northern District of Florida,
No. 3:22-cv-20375-TKW-ZCB (Wetherell, J.)

## BRIEF OF APPELLANTS COIN CENTER, ET AL.

J. Abraham Sutherland
106 Connally Street
Black Mountain, NC 28711
(805) 689-4577

Jeffrey M. Harris
Cameron T. Norris
Jeffrey S. Hetzel
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, Virginia 22209
(703) 243-9423
cam@consovoymccarthy.com

*Counsel for Coin Center et al.*

# CERTIFICATE OF INTERESTED PERSONS AND
# CORPORATE DISCLOSURE STATEMENT

Per Rule 26.1 and Circuit Rule 26.1, Appellant certifies that the following

have an interest in the outcome of this appeal:

1.  Andreessen Horowitz, *Amicus Curiae*

2.  Bank Policy Institute, *Amicus Curiae*

3.  Blockchain Association, *Amicus Curiae*

4.  Bonta, Christian, *Attorney for Plaintiffs-Appellants*

5.  Boynton, Brian M., *Attorney for Defendants-Appellees*

6.  Burnham, James, *Attorney for Amici Curiae Blockchain Association & DeFi Education Fund*

7.  Coin Center, *Plaintiff-Appellant*

8.  Consovoy McCarthy PLLC, *Attorneys for Plaintiffs-Appellants*

9.  Coogle, Christine L., *Attorney for Defendants-Appellees*

10. DeFi Education Fund, *Amicus Curiae*

11. Department of Treasury, *Defendant-Appellee*

12. Doe, John, *Plaintiff-Appellant*

13. Elliott, Stephen M., *Attorney for Defendants-Appellees*

14. Evangelista, Alessio, *Attorney for Amicus Curiae Andreessen Horowitz*

15. Gacki, Andrea M., *Defendant-Appellee*

16. Haas, Alexander, *Attorney for Defendants-Appellees*

17. Harris, Jeffrey M., *Attorney for Plaintiffs-Appellants*

18. Healy, Christopher, *Attorney for Defendants-Appellees*

19. Hetzel, Jeffrey S., *Attorney for Plaintiffs-Appellants*

20. Hinshelwood, Brad, *Attorney for Defendants-Appellees*

21. Hoffman, David, *Plaintiff-Appellant*

22. Jones Day, *Attorneys for Amici Curiae Blockchain Association & DeFi Education Fund*

23. Kelleher, Diane, *Attorney for Defendants-Appellees*

24. Kinchen, John, *Attorney for Amicus Curiae Bank Policy Institute*

25. Lea, Brian, *Attorney for Amici Curiae Blockchain Association & DeFi Education Fund*

26. Lehotsky Keller Cohn LLP, *Attorneys for Amicus Curiae Paradigm Operations LP*

27. Liu, Jessie K., *Attorney for Amicus Curiae Andreessen Horowitz*

28. Office of Foreign Assets Control, *Defendant-Appellee*

29. Norris, Cameron T., *Attorney for Plaintiffs-Appellants*

30. O'Sullivan, Patrick, *Plaintiff-Appellant*

31. Paradigm Operations LP, *Amicus Curiae*

32. Sasso, Michael, *Attorney for Plaintiffs-Appellants*

33. Sasso & Sasso, P.A., *Attorneys for Plaintiffs-Appellants*

34. Seira, Rodrigo, *Attorney for Amicus Curiae Paradigm Operations LP*

35. Skadden Arps, *Attorney for Amicus Curiae Andreessen Horowitz*

36. Smith, Bradley T., *Defendant-Appellee*

37. Smyser Kaplan & Veselka LLP, *Attorneys for Amicus Curiae Bank Policy Institute*

38. Sutherland, J. Abraham, *Attorney for Plaintiffs-Appellants*

39. Wetherell II, T. Kent, *District Court Judge*

40. Yarger, Katherine, *Attorney for Amicus Curiae Paradigm Operations LP*

41.  Yellen, Janet, *Defendant-Appellee*

Coin Center has no parent corporation or corporation that owns 10% or more of its stock. No publicly traded company or corporation has an interest in the outcome of this case or appeal. Per Circuit Rule 26.1-2(c), Plaintiffs-Appellants certify that the CIP contained in this brief is complete.

Dated: December 18, 2023
/s/ *Cameron T. Norris*
Counsel for Plaintiffs-Appellants

**STATEMENT REGARDING ORAL ARGUMENT**

Appellants respectfully request oral argument. This case raises important questions about an agency's power to regulate the American economy, including charitable contributions protected by the First Amendment, under a statute limited to foreign trade.

# TABLE OF CONTENTS

Certificate of Interested Persons and Corporate Disclosure Statement ..................... C-1

Statement Regarding Oral Argument ................................................................................. i

Table of Citations ........................................................................................................... iv

Introduction ...................................................................................................................... 1

Jurisdictional Statement ................................................................................................... 1

Statement of the Issues .................................................................................................... 1

Statement of the Case ...................................................................................................... 2

    I.      This case concerns transactions using a cryptocurrency software tool ............. 2

    II.     The statute allows the agency to ban transactions involving "property" in which a foreigner has an "interest." ........................................................... 8

    III.    The agency banned Americans' transactions with their own property ............ 13

    IV.    Plaintiffs are Americans banned from transacting with their own property ... 15

    V.     Plaintiffs challenged the ban and the district court ruled for the agency. ....... 17

Standard of Review ........................................................................................................ 21

Summary of Argument .................................................................................................... 21

Argument ........................................................................................................................ 23

    I.      The agency exceeded its statutory authority ...................................................... 24

        A.    An "interest" in "property" is a right to something that can be owned. .. 24

        B.    The agency banned transactions in which no foreigners have interests in property. ................................................................................................. 31

        C.    The district court erred in holding that an economic benefit is an "interest" in "property." ................................................................................ 33

        D.    Ambiguities should be resolved against the agency ...................................... 41

        E.    The narrow request for relief protects the agency's foreign-trade power. 44

II.      The agency violated the First Amendment. ...........................................45

III.     The agency acted arbitrarily and capriciously.......................................48

Conclusion................................................................................................................51

Certificate of Compliance ....................................................................................52

Certificate of Service ............................................................................................52

# TABLE OF CITATIONS

*primary authority

## Cases

*Ala. Ass'n of Realtors v. DHS,*
  141 S. Ct. 2485 (2021) ........................................................................ 22, 42

*Am.'s Cmty. Bankers v. FDIC,*
  200 F.3d 822 (D.C. Cir. 2000) .................................................................. 48, 49

*Americans for Prosperity Found. v. Bonta,*
  141 S. Ct. 2373 (2021) ....................................................................... 1, 46, 47

*Barnhill v. Johnson,*
  503 U.S. 393 (1992) ..................................................................................... 38

*Bd. of Regents v. Roth,*
  408 U.S. 564 (1972) ..................................................................................... 37

*Bidi Vapor v. FDA,*
  47 F.4th 1191 (11th Cir. 2022) ..................................................................... 48

*Bochese v. Town of Ponce Inlet,*
  405 F.3d 964 (11th Cir. 2005) ................................................................. 26, 37

*Catalyst Pharm. v. Becerra,*
  14 F.4th 1299 (11th Cir. 2021) ..................................................................... 21

*Christ the King Manor v. HHS,*
  730 F.3d 291 (3d Cir. 2013) ......................................................................... 50

*Citizens to Pres. Overton Park, Inc. v. Volpe,*
  401 U.S. 402 (1971) ..................................................................................... 48

*Citizens United v. FEC,*
  558 U.S. 310 (2010) ..................................................................................... 46

*Clark v. Martinez,*
  543 U.S. 371 (2005) ..................................................................................... 42

*Commerce v. New York,*
  139 S. Ct. 2551 (2019) ................................................................................. 49

*Conn. Bank Trust v. United States,*
465 F.2d 760 (2d Cir. 1972) ....................................................... 29

*\*Consarc Corp. v. Iraqi Ministry,*
27 F.3d 695 (D.C. Cir. 1994); ................................................ 36, 38

*Coppell v. Hall,*
74 U.S. 542 (1868) .......................................................................9

*\*Dames & Moore v. Regan,*
453 U.S. 654 (1981) ............................... 21, 27, 30, 32, 33, 35

*De Cuellar v. Brady,*
881 F.2d 1561 (11th Cir. 1989) ............................................. 29

*Dean Witter Reynolds, Inc. v. Fernandez,*
741 F.2d 355 (11th Cir. 1984) ........................................28, 33, 35

*DHS v. Regents of the Univ. of Cal.,*
140 S. Ct. 1891 (2020) ........................................................23, 48, 49

*Drye v. United States,*
528 U.S. 49 (1999) .............................................................22, 26, 37

*Epic Sys. Corp. v. Lewis,*
138 S. Ct. 1612 (2018) ............................................................. 43

*FEC v. Co. RFCC,*
533 U.S. 431 (2001) ............................................................23, 46

*FEC v. Mass. Citizens For Life,*
479 U.S. 238 (1986) ............................................................46, 47

*Field v. Mans,*
516 U.S. 59 (1995) .................................................................. 26

*Global Relief Found., Inc. v. O'Neill,*
315 F.3d 748 (7th Cir. 2002) ...........................................36, 38, 39

*Gonzales v. Oregon,*
546 U.S. 243 (2006) .............................................................. 42

*Hewitt v. IRS,*
21 F.4th 1336 (11th Cir. 2021) ............................................. 24

*Hollyfrontier Cheyenne Ref. v. Renewable Fuels Ass'n,*
  141 S. Ct. 2172 (2021) ................................................................. 43

*Holy Land Found. for Relief v. Ashcroft,*
  333 F.3d 156 (D.C. Cir. 2003) ...................................................36, 39

*In re Constr. Supervision Servs., Inc.,*
  753 F.3d 124 (4th Cir. 2014) ...................................................21, 25, 27

*King v. Burwell,*
  576 U.S. 473 (2015) ..................................................................... 43

*Kisor v. Wilkie,*
  139 S. Ct. 2400 (2019) ................................................................. 43

*Knowlton v. Comm'r,*
  791 F.2d 1506 (11th Cir. 1986) .................................................... 39

*Lonchar v. Thomas,*
  517 U.S. 314 (1996) ..................................................................... 38

*Loper Bright Enterprises v. Raimondo,*
  No. 22-451 (U.S.) ........................................................................ 43

*\*Meyer v. Grant,*
  486 U.S. 414 (1988) ...........................................................2, 23, 46, 47

*\*Meyer v. United States,*
  364 U.S. 410 (1960) ..........................................................22, 24, 25, 32

*Michigan v. EPA,*
  576 U.S. 743 (2015) ..................................................................... 48

*Motor Vehicle Mfrs. Ass'n v. State Farm,*
  463 U.S. 29 (1983) .................................................................2, 23, 48

*N.C. Dep't of Rev. v. Kaestner 1992 Family Trust,*
  139 S. Ct. 2213 (2019) ................................................................. 38

*NAACP v. Alabama,*
  357 U.S. 449 (1958) ..................................................................... 47

*Nationwide Mut. Ins. v. Darden,*
  503 U.S. 318 (1992) ..................................................................... 35

*Nguyen v. United States,*
556 F.3d 1244 (11th Cir. 2009) .................................................. 35

*Perez v. Mortg. Bankers Ass'n,*
575 U.S. 92 (2015) ................................................................... 43

*Preserve Endangered Areas v. USACE,*
87 F.3d 1242 (11th Cir. 1996) ................................................. 50

*\*Real v. Simon,*
510 F.2d 557 (5th Cir. 1975) ..................................... 28, 33, 43

*Regan v. Wald,*
468 U.S. 222 (1984) ................................................. 12, 30, 31

*Robinson v. California,*
370 U.S. 660 (1962) ................................................................ 49

*Romero v. DHS,*
20 F.4th 1374 (11th Cir. 2021) .............................................. 22, 42

*Salazar v. Buono,*
559 U.S. 700 (2010) ................................................................ 27

*Sandifer v. U.S. Steel Corp.,*
571 U.S. 220 (2014) ................................................................ 26

*SEC v. Chenery Corp.,*
318 U.S. 80 (1943) ............................................................. 49, 50

*Shalala v. Guernsey Mem'l Hosp.,*
514 U.S. 87 (1995) .................................................................. 43

*Shirras v. Caig,*
11 U.S. 34 (1812) .................................................................... 26

*Spence v. Zimmerman,*
873 F.2d 256 (11th Cir. 1989) ............................................. 26, 37

*Town of Castle Rock v. Gonzales,*
545 U.S. 748 (2005) ................................................................ 37

*Trustees of Dartmouth Coll. v. Woodward,*
17 U.S. 518 (1819) .................................................................. 37

*United States v. Apel,*
  571 U.S. 359 (2014) ........................................................ 43

*United States v. Green,*
  981 F.3d 945 (11th Cir. 2020) ...................................... 41

*United States v. Parr,*
  509 F.2d 1381 (5th Cir. 1975) ....................................... 39

*United States v. Willow River Co.,*
  324 U.S. 499 (1945) ................................................. 22, 37

*Van Loon v. Treasury,*
  No. 23-50669 (5th Cir.) ............................................... 20

*West Virginia v. EPA,*
  142 S. Ct. 2587 (2022) ................................................... 42

*Wright v. Ellison,*
  68 U.S. 16 (1863) ........................................................... 38

*Youngstown Sheet & Tube v. Sawyer,*
  343 U.S. 579 (1952) ...................................................... 36

*Ziglar v. Abbasi,*
  137 S. Ct. 1843 (2017) .................................................. 45

**Statutes**

11 U.S.C. §522(b)(3)(B) ................................................ 26

11 U.S.C. §725 ............................................................... 26

22 U.S.C. §9214(a) ......................................................... 12

22 U.S.C. §9214(c) ......................................................... 12

26 U.S.C. §2056 ............................................................. 26

28 U.S.C. §1291 ............................................................... 1

28 U.S.C. §1331 ............................................................... 1

5 U.S.C. §706 ........................................................... 23, 48

5 U.S.C. §706(2)(A) ................................................................ 23

5 U.S.C. §706(2)(B) ................................................................ 23

5 U.S.C. §706(2)(C). ............................................................... 23

*50 U.S.C. §1702(a)(1)(B) ............................................. 1, 9, 11, 24

50 U.S.C. §1702(b) .................................................................. 49

50 U.S.C. §1705(a) .................................................................. 12

50 U.S.C. §1705(b) .................................................................. 13

50 U.S.C. §1705(c) .............................................................. 12, 42

54 Stat. 179 (1940). ................................................................ 10

55 Stat. 839 (1941). ............................................................ 10, 29

International Emergency Economic Powers Act,
    91 Stat. 1625 (1977) ...................................................... 11

North Korea Sanctions and Policy Enhancement Act,
    130 Stat. 93 (2016) ........................................................ 12

Trading with the Enemy Act,
    40 Stat. 411 (1917) ................................................... 9, 10, 29

**Regulations**

31 C.F.R. §501.601 ................................................................. 13

31 C.F.R. §501.602. ................................................................ 13

31 C.F.R. §510.313 ................................................................. 42

31 C.F.R. §510.323 ................................................................. 43

31 C.F.R. §578.309 ................................................................. 42

31 C.F.R. §578.314 ................................................................. 43

31 C.F.R. §578.701 ................................................................. 13

31 C.F.R. Part 515 .................................................................. 28

*Blocking Property of the Gov't of North Korea,*
  81 Fed. Reg. 14,943 (Mar. 18, 2016) ............................... 12

*Cyber-Related Sanctions Regulations,*
  80 Fed. Reg. 18,077 (Apr. 2, 2015) ................................ 12

*Notice of OFAC Sanctions Action,*
  87 Fed. Reg. 49,652 (Aug. 11, 2022) .............................. 13

*Notice of OFAC Sanctions Action,*
  87 Fed. Reg. 68,578 (Nov. 15, 2022) ................... 6, 13, 14, 31

**Legislative Documents**

87 Cong. Rec. 9856 (1941) ............................................ 11

87 Cong. Rec. 9861 (1941) ............................ 11, 21, 29, 33

H.R. Rep. 65-85 (1917) ................................................. 9

H.R. Rep. 95-495 (1977) ......................................... 11, 30

*Report of the Special Committee on the Termination of the National Emergency,* S. Rep. No. 93-549 (1973). ........................................................ 11

S. Rep. 65-113 (1917) ................................................. 10

**Executive Documents**

*FAQ: Do OFAC Reporting Obligations Apply to "Dusting" Transactions?,*
  OFAC (Nov. 8, 2022), perma.cc/2357-L836 ....................... 14

*FAQ: What is Prohibited as a Result of OFAC's Designation of Tornado Cash?,*
  OFAC (Nov. 8, 2022), perma.cc/F94U-WHPH ................... 14, 31

*Letter from Hon. Wally Adeyemo, Dep. Sec'y of Treasury, to Hon. Sherrod Brown,*
  Dep't of Treasury (Nov. 28, 2023), *copy available at* perma.cc/G6J8-WY7J .............. 20

*Potential Options to Strengthen Counter-Terrorist Financing Authorities,*
  Dep't of Treasury (Nov. 28, 2023), *copy available at* perma.cc/3CVC-SMS2 ....... 21, 45

*Presidential Power to Regulate Domestic Litigation Involving Iranian Assets,*
  4A Op. O.L.C. 236 (1980) .................................... 30, 34

*Treasury Sanctions Individual, Banks and Trading Company*,
  Treasury (May 27, 2022), perma.cc/J6PZ-UNW4 .................................................12, 31

**Other Authorities**

31 C.J.S. Estates §9 ............................................................................................... 38

American Heritage Dictionary of the English Language (1970) ...........................24, 25

Anderson, *Present and Future Interests*,
  19 Seattle L. Rev. 101 (1995) ............................................................................. 25

Black's Law Dictionary (11th ed. 2019) ................................................................. 36

Black's Law Dictionary (4th ed. 1968) ................................................................... 25

Black's Law Dictionary (5th ed. 1979) ................................................................25, 32

Browder et al., *Basic Property Law* (5th ed. 1984) ............................................... 25

*Cybersecurity Advisory: Russian State-Sponsored and Criminal Cyber Threats to Critical
  Infrastructure*, CISA (May 9, 2022), perma.cc/C5TN-QL62......................... 16

Dolan et al., *Economics* (1986) ........................................................................... 34

Huberich, *The Law Relating to Trading with the Enemy* (1918) ...................9, 10, 42

Lourie, *The Trading with the Enemy Act*,
  42 Mich. L. Rev. 205 (1943) ............................................................................10, 21, 30

Popper, *Bitcoin Thieves Threaten Real Violence for Virtual Currencies*,
  N.Y. Times (Feb. 18, 2018), perma.cc/3KCU-3ELC.......................................4

Reeves, *46 Million Americans Now Own Bitcoin, as Crypto Goes Mainstream*,
  Newsweek (May 11, 2021), perma.cc/JW3L-59LB.........................................2

Singer et al., *Property Law* (2017) ...................................................................... 25

Sutton, *Treasury presses Congress for new power in crypto crackdown*,
  Politico (Nov. 28, 2023), perma.cc/K6A9-MN7J ............................................ 21

*TORN*, CoinMarketCap, perma.cc/Z6YV-WV4A .......................................... 8, 19

*Trading with the Enemy: Legislative and Executive Documents Concerning Regulation of
  International Transactions in Time of Declared National Emergency* (1976) ......... 9, 10, 29, 30

**INTRODUCTION**

This case is about administrative overreach. A federal agency known as the Office of Foreign Assets Control invoked a foreign-trade statute to ban Americans from using a popular cryptocurrency software tool. The foreign-trade statute allows the agency to ban transactions if they involve foreigners' "interests" in "property." But here, the agency banned transactions involving only Americans and their own property. Four Americans challenged the ban as unauthorized, unconstitutional, and arbitrary and capricious. The district court upheld the ban. This Court should reverse.

**JURISDICTIONAL STATEMENT**

The district court had jurisdiction under 28 U.S.C. §1331 because Plaintiffs sued under the Administrative Procedure Act. This Court has jurisdiction under 28 U.S.C. §1291 because Plaintiffs timely appealed a final judgment that disposed of all claims. The district court entered that judgment on October 30, 2023, and Plaintiffs timely appealed on November 6, 2023. Docs.75, 76.[1]

**STATEMENT OF THE ISSUES**

I.      The International Emergency Economic Powers Act of 1977 allows the Office of Foreign Assets Control to ban transactions that involve "*property* in which any foreign[er] has any *interest*." 50 U.S.C. §1702(a)(1)(B) (emphasis added). The agency invoked that statute to ban cryptocurrency transactions that involve only Americans' own

---

[1] "Doc." citations are to the district court docket entries. 3:22-cv-20375- TKW-ZCB (N.D. Fla.).

property. The district court upheld the ban because Americans' transactions could lead to indirect economic benefits to foreigners. It did not identify any involved "property" in the American transactions, let alone any property in which the foreigners would have an "interest" as that term has always been understood. Did it err?

**II.** First Amendment scrutiny applies when the government bans people from making charitable contributions, even if other "means" of similar expressive activity remain open. *Meyer v. Grant*, 486 U.S. 414, 424 (1988). The agency banned charitable contributions where no other means were feasible. The district court held that these charitable contributions were not protected by the First Amendment. Did it err?

**III.** It is arbitrary and capricious for an agency to not consider important factors, like how its decision upsets reliance and due-process interests. It must do so in the administrative record. *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43-44 (1983). The agency did not consider these factors in the administrative record. The district court held that it could make up for those omissions in extra-record, after-the-fact publications. Did it err?

## STATEMENT OF THE CASE

### I. This case concerns transactions using a cryptocurrency software tool.

Cryptocurrency is a digital system of money. Tens of millions of Americans use cryptocurrency because it allows them to participate in the economy on fair and equal terms and promotes economic freedom. *See* Reeves, *46 Million Americans Now Own Bitcoin, as Crypto Goes Mainstream*, Newsweek (May 11, 2021), perma.cc/JW3L-59LB.

This case involves transactions on a popular online cryptocurrency platform called Ethereum.

*Ethereum*. Ethereum is a cryptocurrency platform. Doc.68-1 at 19-22. People use Ethereum to buy, hold, and transfer cryptocurrency assets. *Id.* at 24-25. Anyone can use Ethereum by generating a pseudonymous address, which is a long alphanumeric string. *Id.* at 155-58. With that address, he can send and receive crypto assets to other addresses. *Id.*

When a user transacts with Ethereum, the transaction is posted to a public ledger visible to anyone. *Id.* at 15. The public ledger displays the sender address, the recipient address, and the crypto asset exchanged. *Id.* at 16. Anyone can view every Ethereum transaction ever made on this public ledger. *Id.* at 158.

People can also publish software, or instructions written in computer code, to Ethereum addresses. *Id.* at 41, 156. Software can facilitate more advanced transactions, like coordinating payments over time or with multiple people. *Id.* at 156-57. Once the writers publish software to an address, anyone can use the software by sending or receiving a crypto asset from his personal address to the address that hosts the software. *Id.* Typically, once software is published, it can't be changed. *Id.*

*Privacy Tools*. Although personal addresses are usually pseudonymous, a person's real-world identity can sometimes be linked to his address. For example, if an employee asks an employer to pay him in crypto assets, he must share his address with the employer. Doc.36-2 at 3. The employer can then see all his other transactions. When

a user's address is shared, which is sometimes inevitable, "it becomes possible to trace that user's complete financial history." Doc.68-1 at 158. This exposure risks the user's safety and privacy. It allows malicious actors to discover charitable contributions, sensitive personal expenditures, or large portfolios of crypto assets, which can lead to threats or violence. *Id.* at 106; Popper, *Bitcoin Thieves Threaten Real Violence for Virtual Currencies*, N.Y. Times (Feb. 18, 2018), perma.cc/3KCU-3ELC.

To respond to this problem, users have created software tools that protect their safety and privacy while using Ethereum. These privacy tools generally allow users to clear the connection between their past and future transactions, so others cannot look at the public ledger to piece them together. Doc.68-1 at 158.

***Core Software Tool.*** This case is about one of those privacy software tools. The core software tool was first published to Ethereum in 2019. Doc.68-2 at 4. It was popularly referred to as "Tornado Cash." For the purposes of this litigation, the agency has started using the name "Tornado Cash" to refer to certain people, rather than to the software tool. Doc.68-1 at 30. Nobody besides the government calls these people "Tornado Cash." *See, e.g.*, *id.* at 115; 68-2 at 3, 98. To avoid confusion, Plaintiffs will avoid the term "Tornado Cash" altogether. Plaintiffs will refer to the privacy software tool at issue here as the "core software tool."

The core software tool performs a simple function: It allows a user to send a crypto asset from his more public address to the tool's address, then withdraw that asset to a new, more private address that's also his. Doc.68-1 at 159. It "simply execute[s]

'deposit' and 'withdrawal' operations." *Id.* at 51. But its software uses math that ensures that, when a user withdraws his asset from the tool to his new address, others viewing the public ledger cannot tell that the new address is his, so his privacy is maintained. *Id.* at 52.

In the course of using the core software tool, a user does not have to make a payment to anyone else, except the standard Ethereum fee that applies to all transactions, which everyone agrees is irrelevant in this case. *Id.* at 163-65. The user does not have to pay the people who wrote the original software or anyone affiliated with the software in any way. *Id.* The core software tool is free and its use doesn't require the involvement of others. *Id.*

The core software tool has been published to 20 Ethereum addresses and is available for anyone to read and use. *Id.* at 171-76. The 20 versions are identical except that each is designed for a different crypto asset. *Id.* One version allows deposits and withdrawals of 0.1 ETH, Ethereum's native crypto asset. The other 19 versions work with other amounts of ETH or three other crypto assets—DAI, USDC, and WBTC. Doc.68-1 at 41-44.

For all 20 addresses that host the core software tool, the software has been published permanently to those addresses and cannot be changed by anyone. *Id.* at 59, 162-66; Doc.68-2 at 3.

When referring to these addresses and the others involved in this case, Plaintiffs will identify them by their number in the table at the end of the amended complaint.

*See* Doc.9 at 41-44. The first listed address, "0x12D66f87A04A9E220743712cE6d-9bB1B5616B8Fc," is "Address 1," which hosts the 0.1 ETH version of the core software tool. *Id.* at 41. The addresses are also listed in the Federal Register. *See Notice of OFAC Sanctions Action*, 87 Fed. Reg. 68,578, 68,578-79 (Nov. 15, 2022). And twice in the administrative record. *See* Doc.68-1 at 16-19, 41-47.

Using one of the core software tool addresses shows the following two steps on the public ledger:

        Step 1: User's more public address —[0.1 ETH]→ Address 1

        Step 2: Address 1 —[0.1 ETH]→ User's more private address

Although this example shows 0.1 ETH going to Address 1, the transaction will look identical, albeit with different amounts of cryptocurrency, for Addresses 2-20.

***DAO & Software Writers***. Separate from the core software tool is a group called a decentralized autonomous organization, or a DAO. A DAO is a decentralized digital community that can vote to take certain actions together. Doc.68-1 at 142-52. Anyone can participate in a DAO by obtaining whatever crypto asset the DAO uses for voting power. *Id.*

This case involves one specific DAO, consisting of people who hold a crypto asset called a TORN token. *Id.* at 14. Like any other crypto asset, anyone can buy or sell TORN tokens. The agency says that some members of this DAO are foreigners, and Plaintiffs don't contest that.

The DAO does whatever the voting TORN token holders tell it to do. *Id.* at 38; 142-52. This DAO has focused on creating support tools related to the core software tool, then publishing them at new addresses. *Id.* at 35. For example, it published a tool that makes it easier to find the appropriate core software tool addresses, and another that helps record past activity on the service. *Id.* at 177. But the DAO could also go do something entirely unrelated, like start a new project to serve other crypto users. *See id.* at 145. Although TORN tokens give DAO participants the voting power to change or create their support tools, the tokens give them no power over the core software tool itself. *Id.* at 59, 162-66; Doc.68-2 at 3. The core software tool does not accept TORN tokens. Doc.68-1 at 41-43.

Another support tool that the DAO helped set up is called a "relayer." Relayers offer users of the core software an optional service. Doc.68-1 at 55. They can help users withdraw their assets to a new address in exchange for a small fee. *Id.* 167-69. For years, the core software tool operated without relayers. *Id.* 37. The DAO introduced relayers on March 2, 2022, a few months before the ban. *Id.* If at least four conditions are met, using a relayer can result in a payment from the relayer to the DAO. Namely, the user must opt to hire a relayer and pick one through the DAO's registry, which the agency has stressed was popular. But then the user must also use one of the minority of core software tool addresses that *can* result in such a payment, and do so under certain market conditions that allow such a payment. *Id.* at 55-58. If *all* these conditions are met, the relayer pays the DAO with TORN tokens equivalent to about 0.3% of the transaction.

*Id.* at 36. Using a relayer and paying the DAO requires transacting with Address 31, the ban on which is not challenged in this lawsuit. *Id.* at 16-18, 55-57.

As the core software tool got more popular between early 2021 and the summer of 2022, Doc.31-1 at 5, the price of TORN tokens fell—from over $400 to under $18. *TORN*, CoinMarketCap, perma.cc/Z6YV-WV4A.

The software writers who initially wrote the core software tool also created the DAO and held TORN, making them members of the DAO. Doc.68-1 at 30-39. The agency says that some of the software writers are foreigners, and Plaintiffs don't contest that either.

The DAO and the software writers are the only two "designated foreigners" whom the agency says have an interest in property in all banned transactions. Doc.74 at 14.

## II. The statute allows the agency to ban transactions involving "property" in which a foreigner has an "interest."

***Statutory Text***. The statutory provision at the center of this case was enacted in the International Emergency Economic Powers Act of 1977. The provision authorizes the President to [1] take eight different kinds of regulatory approaches, including an outright ban, [2] with respect to twelve categories of actions, including transactions, [3] involving foreigners' property interests, [4] within his jurisdiction. In full, it authorizes him to:

[1] investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit,

[2] any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving,

[3] any property in which any foreign country or a national thereof has any interest

[4] by any person, or with respect to any property, subject to the jurisdiction of the United States

50 U.S.C. §1702(a)(1)(B) (breaks and numbers added). The parties in this case agree about clauses [1], [2], and [4], but disagree about [3], the property-interest clause.

**Statutory History**. Before 1917, courts recognized a common-law "rule of international law forbidding trade between the citizens of belligeren[t]" nations. H.R. Rep. 65-85 (1917) (published in *Trading with the Enemy: Legislative and Executive Documents Concerning Regulation of International Transactions in Time of Declared National Emergency* 180 (1976) (*TWEA Documentary History*)). When two nations were at war, their citizens "ipso facto" could not "trade" with each other. *Coppell v. Hall*, 74 U.S. 542, 554 (1868); *see also* Huberich, *The Law Relating to Trading with the Enemy* 7-10 (1918) (documenting practice).

In 1917, to formalize and adjust that longstanding ban on trading with foreign enemies, Congress passed the Trading with the Enemy Act. 40 Stat. 411 (1917). As relevant here, the Trading with the Enemy Act allowed the President to ban transfers of "evidences of indebtedness or of the ownership of property between the United States and any foreign country … or between residents of … foreign countries." 40

Stat. 415. As it was understood at the time, this clause allowed the President to ban Americans from "actually transferring physical property" or "credits and money" with foreigners. S. Rep. 65-113 (1917) (published in *TWEA Documentary History* 159). Congress created the "Office of Alien Property Custodian" to collect foreigners' money and property subject to the Act. 40 Stat. 415.

Through amendments in 1940 and 1941, Congress turned that clause into the language now at issue. First, Congress amended the language to cover "evidences of indebtedness or evidences of ownership of property in which any foreign state or … national … has any interest." 54 Stat. 179 (1940). And then, Congress made that language more concise with the exact language used today: "any property in which any foreign country or a national thereof has any interest." 55 Stat. 839 (1941).

Congress included foreigners' "*interests*" in property rather than the original "ownership" to address a specific problem. Germany had been structuring legal entities in America, like subsidiary corporations, to serve as "instrumentalities" that would hold property on Germans' behalf. *See* Lourie, *The Trading with the Enemy Act*, 42 Mich. L. Rev. 205, 210 (1943); *TWEA Documentary History*, 294. German parent corporations had legal interests in the "American" subsidiaries' property, but they did not outright *own* that property. The new language captured this property interest. *See* Huberich, at 67 (original version did "not go behind the corporate charter, no matter how many German stockholders there may be"). It also confirmed control over stocks in general. *See* *TWEA Documentary History*, 284. The other changes were apparently stylistic, in part

10

because the earlier language had been rushed. *See* 87 Cong. Rec. 9856 (1941); *Lourie*, 206-14; *TWEA Documentary History*, 264-70.

When the final language was introduced, everyone understood it to limit the Executive Branch to "deal only with foreign property." 87 Cong. Rec. 9861 (1941) (Rep. O'Hara). "There is no question," explained one drafter, that "[t]he entire bill covers nothing but aliens and alien property." *Id.* (Rep. Gwynne). "It deals with alien property." *Id.* (Rep. Hancock). The clause limits the Act's reach to "real and personal property belonging to aliens." *Id.* It covers only "property *belonging to* aliens[.]" *Id.* (Rep. Gwynne) (emphasis added).

In 1977, Congress replaced the relevant portion of the Trading with the Enemy Act with the International Emergency Economic Powers Act. 91 Stat. 1625 (1977). It transplanted the clause concerning "property in which any foreign country or a national thereof has any interest." *Id.* at 1626. The new IEEPA intentionally reduced the Executive Branch's ability to affect domestic affairs. *See* H.R. Rep. 95-495, at 4-11 (1977); *Report of the Special Committee on the Termination of the National Emergency*, S. Rep. No. 93-549, at 185 (1973). Because the property-interest clause was never understood to give the Executive power over domestic affairs, Congress kept this language the same. *See* 50 U.S.C. §1702(a)(1)(B).

The Act also eliminated a neighboring provision that President Roosevelt had used to regulate Americans' own transactions. *Report of the Special Committee*, 15. After that, everyone agreed that the Act gave the Executive no "authority to regulate purely

domestic transactions." H.R. Rep. No. 95-459, at 11. "The grant of authorities in IEEPA," all agreed, "does not include the power to ... regulate purely domestic transactions." *Regan v. Wald*, 468 U.S. 222, 228 n.8 (1984).

In 2016, Congress enacted the North Korea Sanctions and Policy Enhancement Act to mandate the use of the powers under this provision to certain relations with North Korea. 130 Stat. 93 (2016); 22 U.S.C. §9214(a), (c). But it did not change the scope of the property-interest clause, which is all that's at issue in this case. *See id.* §9214(c).

***Delegation to OFAC.*** The President has delegated some of his authority under IEEPA to the Secretary of the Treasury. *Cyber-Related Sanctions Regulations*, 80 Fed. Reg. 18,077 (Apr. 2, 2015); *Blocking Property of the Gov't of North Korea*, 81 Fed. Reg. 14,943 (Mar. 18, 2016). The Secretary exercises her delegated powers through the Office of Foreign Assets Control.

OFAC, therefore, can prohibit transactions involving "property" in which foreigners have "interests." For example, the agency recently banned transactions with an aviation company. The corporation was foreign and the agency banned transactions with the agency's own property, like buying flights from them or selling them supplies. *Treasury Sanctions Individual, Banks and Trading Company*, Treasury (May 27, 2022), perma.cc/J6PZ-UNW4.

If someone willfully engages in a banned transaction, he commits a federal felony punishable by a $1,000,000 fine and 20 years in prison. 50 U.S.C. §1705(a), (c). Other

violations result in large civil fines and reporting obligations. §1705(b); 31 C.F.R. §§578.701, 501.601-02.

### III. The agency banned Americans' transactions with their own property.

Pursuant to these authorities, the agency took the action challenged in this case. It banned transactions with 91 addresses, including the 20 addresses that host the core software tool, thereby making it a crime for Americans to send or receive anything from those addresses. *Notice of OFAC Sanctions Action*, 87 Fed. Reg. 68,578, 68,578-68,579 (Nov. 15, 2022).

The agency took the challenged action in November 2022. *Id.* But this was not its first attempt to ban the core software tool. The agency had initially tried to do so in August. *Notice of OFAC Sanctions Action*, 87 Fed. Reg. 49,652 (Aug. 11, 2022). In its initial action, the agency banned transactions with 37 addresses, including the same 20 addresses that host the core software tool, under a different rationale. *Id.* After Plaintiffs sued, the agency withdrew that action and replaced it with the current one, based on a different administrative record. *See* 87 Fed. Reg. 68,578.

The 91 banned addresses host a wide range of different software tools. Most importantly, they include the 20 addresses—Addresses 1-20—that host the core software tool. 87 Fed. Reg. 68,578-79. They also include nine addresses—Addresses 21-29—that host other, ancillary tools that the DAO has no control over and that cannot generate a payment to the DAO. They include 34 addresses that host support tools that

13

*can* be changed by the DAO or include payments to the DAO. And they include 28 addresses that host nothing, perhaps designated by OFAC in error. *See* Doc.9 at 41-44; 87 Fed. Reg. 68,578-79.

It is now a federal felony for an American to deposit and withdraw his own property from any of these 91 addresses, including the 20 core software tool addresses. The agency made clear that it was banning all transactions with the 91 addresses, including an American's basic use of the core software tool to deposit and withdraw only his own money by himself, as diagrammed above. *See FAQ: What is Prohibited as a Result of OFAC's Designation of Tornado Cash?*, OFAC (Nov. 8, 2022), perma.cc/F94U-WHPH. It also said that if anyone sends a crypto asset through the core software tool to an American recipient's address without the recipient's consent or knowledge, the recipient is still liable—a phenomenon known as "dusting." *FAQ: Do OFAC Reporting Obligations Apply to "Dusting" Transactions?*, OFAC (Nov. 8, 2022), perma.cc/2357-L836.

To explain why it had the statutory authority to ban transactions with all 91 addresses, the agency said that two foreigners had interests in property in the banned transactions: (1) the DAO that is affiliated with support tools, but has no power over the core software tool, and (2) the software writers who wrote the original lines of code constituting the core software tool and who also helped create the DAO. Doc.68-1 at 30. These are the only two "foreign nationals" whom the agency argues have interests in property in Americans' transactions with the core software tool.

The agency proposed at least four theories as to why these two foreign nationals might have an "interest" in "property" in Americans' transactions with the core software tool. They might have an interest in property in Americans' transactions because the software tools are colloquially called "smart contracts," and *legal* contracts can give rise to property rights. Doc.68-1 at 58. Or because a subset of a subset of a subset of a subset of users of the core software tool can choose to cause a separate relayer to pay a 0.3% fee to the DAO, and that mere possibility gives the DAO a property interest in every transaction. *See* Doc.68-1 at 60-62. Or because some put their "efforts" into writing the software. Doc.68-1 at 58-60. Or because they hold TORN tokens whose value likely correlates to the popularity of such transactions, so they will enjoy indirect economic benefits from the transactions. *Id.* at 58-59.

The agency's administrative record did not explain why it withdrew its August action and replaced it with a new one in November. *See generally id.* at 2-76. It also did not say that it considered the due-process interests of Americans who were dusted, reliance interests of Americans who lost access to funds, or the chilling effects of its action on the writing and publishing of code. *Id.* And the ban included no exception for First-Amendment-protected uses of the core software tool.

## IV. Plaintiffs are Americans banned from transacting with their own property.

All four Plaintiffs are Americans who use Ethereum and would use or receive assets that went through the core software tool. None would deal with the DAO or

software writers. None would use the DAO's support tools. *See* Doc.36-2 at 4; 36-3 at 5; 36-4 at 4; 36-5 at 4.

Patrick O'Sullivan lives in Florida. Doc.36-2 at 3. His employer pays him in crypto assets, so he needs privacy tools to protect himself. *Id.* 3-4. He would deposit his own asset from his publicly known address to one of the core software tool addresses, like Address 1, then withdraw that same asset to a new, more private address also under his control. *Id.*

David Hoffman lives in New York. Doc.36-4 at 3. He routinely uses crypto assets and is well-known in the crypto economy; he would use the core software tool the same way as O'Sullivan. *Id.* at 3-4. After the agency announced its ban, someone used the tool to send a crypto asset to Hoffman's publicly known address, triggering potential liability without his consent or affirmative act of any kind. *Id.* at 3.

John Doe is an American human rights advocate. Doc.36-3 at 3. He has used the core software tool to organize donations to provide emergency aid to Ukraine. *Id.* at 3. Doe and his donors all used the core software tool in making those donations to protect their identities from Russians who monitor public ledgers and would retaliate against them. *Id.* at 3-4; *see also Cybersecurity Advisory: Russian State-Sponsored and Criminal Cyber Threats to Critical Infrastructure*, CISA (May 9, 2022), perma.cc/C5TN-QL62. He and his donors would continue providing aid using the core software tool. Doc.36-3 at 3-4. No other means allows them to donate safely, so they stopped. *Id.* at 4.

Coin Center is a leading cryptocurrency nonprofit based in Washington, D.C. Doc.36-5 at 3. Coin Center receives contributions from donors who use the core software tool to preserve their privacy. *Id.* at 3-4. Coin Center and its donors would have continued to use and benefit from the core software tool, but cannot do so because of the agency's action. *Id.* at 4.

## V. Plaintiffs challenged the ban and the district court ruled for the agency.

***Legal Claims.*** Plaintiffs brought three claims. They argued that the agency's ban exceeded its statutory authority because the banned transactions did not involve "property" in which the designated foreigners had an "interest." Doc.9 at 32-33. They claimed that the agency violated the First Amendment by banning Americans like John Doe from making charitable donations. *Id.* at 37-38. And they claimed that the agency acted arbitrarily and capriciously because, as relevant here, it failed to consider several important factors, including how its action would subject people like Hoffman to liability for acts that he could not prevent. *Id.* at 36-37.

***Limited Relief.*** Rather than asking the district court to set aside the ban on transactions with all 91 addresses, Plaintiffs asked the district court to set aside the ban only for transactions with the core software tool. *Id.* at 41-42. Most importantly, they challenged the ban on using the 20 addresses that host the core software tool. And to be comprehensive, they also challenged the ban on nine support tools, also beyond anyone's reach, that the agency has never offered any independent reason for banning.

They do not challenge the ban on the 34 addresses that host support tools that can be changed by the DAO or include payments to the DAO. *Id.* at 42-44. And they do not challenge the ban on the 28 addresses that host nothing. *Id.*

Under Plaintiffs' request for relief, the agency's ban on transactions with the entire DAO ecosystem will remain in place. A ruling that the agency exceeded its statutory authority will mean that Americans can once again use the 29 challenged tools. But because the remaining addresses are not challenged, it will remain a felony to convey any sort of payment or property interest to the two designated foreigners.

***District Court's Decision****.* The district court granted summary judgment for the agency on all three claims. Doc.74.

On the statutory-authority claim, the court held that the statutory text authorized the agency to ban all of Plaintiffs' transactions with the core software tool. Seemingly omitting the word "property" from the Act, it described as a "faulty premise" the notion "that the 'interest' required under the IEEPA is 'property interest' … in the technical legal sense." *Id.* at 12. "The operative language in the IEEPA," the district court said, "is 'any interest,' not 'property interest.'" *Id.* Throughout its opinion, it never identified any "property" involved in the banned transactions. *See id.*

The court interpreted an "interest" to encompass indirect economic benefits. *Id.* 12-15. It never defined "interest," except circularly to say that it includes "an interest of any nature whatsoever, direct or indirect." *Id.* at 13. It held that the designated foreigners had an "interest" in Americans' use of the core software tool because the latter

would benefit the former. Americans' use of the core software tool, it said, might increase the value of TORN tokens held by the designated foreigners. *Id.* at 14. It adopted a four-step causal chain and concluded that, absent the core software tool, the TORN tokens "would not function" and "would be less valuable." *Id.*

Specifically, the court reasoned that "[1] the more users that submit virtual currency to the [core software tool] to be mixed, [2] the larger the pool becomes, [3] the more effective the virtual currency may be mixed, [4] thereby increasing the value of … TORN tokens." *Id.* at 14 (quoting Doc.68-1 at 59). Because TORN tokens are used in connection with support tools that will be less popular if nobody used the core software tool, the court thought that demand for the TORN token likely correlates with use of the core software tool. (It doesn't. *See TORN*, CoinMarketCap, perma.cc/Z6YV-WV4A; Doc.31-1 at 5). In the district court's view, its hypothetical supply-and-demand analysis revealed an indirect economic benefit that satisfied the Act. Doc.74 at 15-16.

The district court did not rely on any other relationship between the designated foreigners and the banned transactions to satisfy the property-interest clause. It did not address the agency's "smart contracts are legal contracts" theory or its theory that past efforts gave rise to a property interest. It also disavowed the agency's theory that "relayers" provided the necessary interest. *Id.* at 15. Instead, "the service has intrinsic value even without relayers" because "TORN had substantial value before relayers (and the fees they paid) were added to the Tornado Cash service in March 2022." *Id.*

The district court said its interpretation of "interest"—as encompassing indirect economic benefits revealed by supply-and-demand analysis—was unambiguous. Because the Act is a criminal statute, the rule of lenity "could be implicated." *Id.* at 16. But "there is nothing ambiguous about the phrase 'any interest.'" *Id.* at 17.

On the First Amendment claim, the district court held that the ban did not trigger First Amendment scrutiny because there is no right to make charitable contributions by any "particular" means. *Id.* at 20-22.

And on the arbitrary-and-capricious claim, the district court seemed to agree that the agency was required to consider the factors that Plaintiffs identified. *Id.* at 19-20. But it held that the agency considered these factors because it referenced them in publications made on its website after the designation, not in the administrative record. *Id.*

***Appeal***. Plaintiffs timely appealed. Doc.76. A similar case challenging the same action is on appeal in the Fifth Circuit. *See Van Loon v. Treasury*, No. 23-50669 (5th Cir.).

***Legislative Proposal***. As this case was being litigated, Treasury sent a letter to Congress with a "legislative proposa[l]." *Letter from Hon. Wally Adeyemo, Dep. Sec'y of Treasury, to Hon. Sherrod Brown*, Dep't of Treasury (Nov. 28, 2023), *copy available at* perma.cc/G6J8-WY7J. The proposal asked Congress to fill the "existing gap/risk" regarding its authority so that it could ban transactions without having to show that they involved "a designated person's property or interest in property." The letter said:

> Decentralized finance activities, including, for example, the Tornado Cash mixing service, are increasingly employing 'smart contract' software that purports to reside on blockchains autonomously. This poses challenges,

including in the recent Tornado Cash litigation, where plaintiffs argued that the smart contracts do not constitute property or an interest in property that can be blocked by OFAC. To resolve this issue, legislation could explicitly authorize OFAC to designate particular blockchain nodes or networks, *rather than requiring that they be a designated person's property or interest in property.*

*Potential Options to Strengthen Counter-Terrorist Financing Authorities*, Dep't of Treasury 4 (Nov. 28, 2023), *copy available at* perma.cc/3CVC-SMS2 (emphasis added); *see also* Sutton, *Treasury presses Congress for new power in crypto crackdown*, Politico (Nov. 28, 2023), perma.cc/K6A9-MN7J. Congress has not acted.

## STANDARD OF REVIEW

This Court reviews appeals from summary judgment, including in challenges to agency actions, de novo. *Catalyst Pharm. v. Becerra*, 14 F.4th 1299, 1306 (11th Cir. 2021). This Court's review is "in effect, a direct review of the agency's decision." *Id.*

## SUMMARY OF ARGUMENT

**I.** The agency exceeded its statutory authority. IEEPA authorizes the agency to ban transactions involving "property" in which the designated foreigners have an "interest." "Property" is something that can be owned. An "interest" is a legal right. And "an interest in property is a 'legal share in something; all or part of a legal or equitable claim to or right in property.'" *In re Constr. Supervision Servs., Inc.*, 753 F.3d 124, 128 (4th Cir. 2014). This Court and the Supreme Court have long interpreted this language that way. *See Dames & Moore v. Regan*, 453 U.S. 654, 675 (1981). Congress and the public have too. 87 Cong. Rec. 9861-62; Lourie, 213.

21

Everybody agrees that no designated foreigner has a legal or equitable right in anything involved in the banned transactions, let alone in anything that can be owned. The banned transactions involve Americans moving their own assets back and forth. They give no money to the designated foreigners. And the designated foreigners have no control or rights with respect to the software tool or the Americans' assets.

To uphold the ban, the district court rewrote the Act. It eliminated the word "property" altogether. And it defined "interest" to include indirect economic benefits. That ruling contradicted all authorities and evidence on the meaning of those words. *E.g.*, *Meyer v. United States*, 364 U.S. 410 (1960). It also defied a long line of cases holding that indirect economic benefits do not give rise to any sort of legal interests. *E.g.*, *United States v. Willow River Co.*, 324 U.S. 499, 503 (1945). It purported to find support in three out-of-circuit cases saying that the Act protects "beneficial interests," but it did not realize that a beneficial interest is a term of art, mostly from trusts and estates law, that does not have anything to do with ordinary economic benefits. *Drye v. United States*, 528 U.S. 49, 54 (1999).

For the district court's interpretation to be correct, it must be unambiguous. The rule of lenity applies here because the Act imposes criminal penalties. *Romero v. DHS*, 20 F.4th 1374, 1383 (11th Cir. 2021). If it didn't apply, then the major-questions doctrine would. *Ala. Ass'n of Realtors v. DHS*, 141 S. Ct. 2485, 2489 (2021)

And although the agency has warned about the foreign-trade implications of a decision going against it, Plaintiffs have requested narrow relief to ensure that no transactions with foreigners will become legal as a result of a ruling in their favor.

**II.** The agency violated the First Amendment. The First Amendment protects the right to make expressive contributions. *FEC v. Co. RFCC*, 533 U.S. 431, 440 (2001). The agency infringed the First Amendment because it banned John Doe and his donors from making charitable contributions. The district court said the agency didn't implicate the First Amendment because it left open alternative means. The Supreme Court disagrees. *Grant*, 486 U.S. at 424.

**III.** The agency acted arbitrarily and capriciously. The agency must consider important aspects of the problem. *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1914 (2020). It must do so in the administrative record. *State Farm*, 463 U.S. at 43-44. When Plaintiffs identified important aspects of the problem, the agency did not dispute that those aspects are important, and it could not point to anything in its administrative record showing that it considered them. The district court ruled for the agency based on publications outside the record, which violated a fundamental tenet of administrative law.

## ARGUMENT

Under the APA, courts must "hold unlawful and set aside" agency action that is "in excess of statutory jurisdiction, authority, or limitations"; is "contrary to constitutional right"; or is "arbitrary [or] capricious." 5 U.S.C. §706(2)(A)-(C). Courts "may not

supply a reasoned basis for the agency's action that the agency itself has not given." *Hewitt v. IRS*, 21 F.4th 1336, 1342 (11th Cir. 2021).

## I.    The agency exceeded its statutory authority.

### A.    An "interest" in "property" is a right to something that can be owned.

The International Emergency Economic Powers Act authorizes the agency to ban, upon enumerated conditions, transactions involving "property" in which a foreigner has an "interest." Specifically, it authorizes the agency to ban transactions involving:

> any ***property*** in which any foreign country or a national thereof has any ***interest***

50 U.S.C. §1702(a)(1)(B) (emphasis added). An interest in property is a legal right to something that can be owned. It describes outright ownership of land or other assets, but also other legal rights with respect to property, like a life estate. *Meyer*, 364 U.S. at 413 n.3. Text, precedent, and history confirm this reading.

***Text.*** "Property" is anything that can be owned. Shortly before Congress enacted the Act, the Supreme Court defined "property" as "objects or rights which are susceptible of ownership." *Id.* Dictionaries contemporary with the Act define it the same way: "[s]omething tangible or intangible to which its owner has legal title," *Property*, American Heritage Dictionary of the English Language 1049 (1970), or "everything which is the

subject of ownership," *Property*, Black's Law Dictionary 1382 (4th ed. 1968); *accord Property*, Black's Law Dictionary 1095 (5th ed. 1979) ("everything which is or may be the subject of ownership"). Property includes things like real estate, personal belongings, and financial assets.

An "interest" is a right. Contemporary dictionaries define it as a "legal share in something." *Interest*, American Heritage Dictionary 683. It refers to "any right in the nature of property." *Interest*, Black's Law Dictionary 950 (4th ed. 1968); *accord Interest*, Black's Law Dictionary 729 (5th ed. 1979) ("The most general term that can be employed to denote a right, claim, title, or legal share in something."). "The term 'interest' refers to the extent of ownership, that is, to the estate or the quality and quantum of ownership by [some] person, of particular property." *Meyer*, 364 U.S. at 413 n.3.

When used in conjunction, the terms have a long-established meaning—a legal right to something that can be owned. "[A]n interest in property is a 'legal share in something; all or part of a legal or equitable claim to or right in property.'" *In re Constr. Supervision Servs., Inc.*, 753 F.3d at 128. Lawyers are familiar with many "interests in property" from law school. *See, e.g.*, Anderson, *Present and Future Interests*, 19 Seattle L. Rev. 101 (1995) (diagramming 17 property interests); Browder et al., *Basic Property Law* 199 (5th ed. 1984) (explaining historical roots of property interests). For example, an owner of a house has a fee simple interest in the house, a tenant has a possessory interest, and a mortgagee has a security interest. Singer et al., *Property Law* 781, 837, 957 (2017).

Because an interest in property is a legal right, it must come from positive law, like state statutes or common law. "[P]roperty interests ... are created by 'existing rules or understandings that stem from an independent source such as state law." *Spence v. Zimmerman*, 873 F.2d 256, 258 (11th Cir. 1989). An interest in property must be a "right or interest protected by law." *Drye*, 528 U.S. at 56. For someone to have a "property interest" in something, he must have a "legally cognizable" claim to the property. *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 981 (11th Cir. 2005); *accord Shirras v. Caig*, 11 U.S. 34, 47 (1812) (Marshall, C.J.) (determining "interest in ... property" based on positive law).

Congress commonly relies on this familiar concept when it refers to someone's "interest" in "property." *E.g.*, 26 U.S.C. §2056 (governing taxability of inherited "*interest[s] in property*"); 11 U.S.C. §725 (governing distribution by estate trustee of "any *property* in which [another entity] has an *interest*"); 11 U.S.C. §522(b)(3)(B) (governing distribution in bankruptcy of "*property* in which the debtor had … an *interest* as a tenant by the entirety or joint tenant").

When Congress enacted this Act, it meant the same thing. Words in statutes should be given their "ordinary, contemporary, common meaning." *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014). And "[w]here Congress uses terms that have accumulated settled meaning under ... the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms." *Field v. Mans*, 516 U.S. 59, 69 (1995). Under the plain text of the Act, therefore, the agency can ban Americans from doing things like selling a house to a foreign owner,

renting it to a foreign tenant, mortgaging it to a foreign mortgagee, or otherwise dealing in foreigners' "legal or equitable claim[s] to or right[s] in property." *In re Constr. Supervision Servs., Inc.*, 753 F.3d at 128. But it cannot ban Americans from transacting only with fellow Americans or with their own property.

***Precedent.*** When this Court and the Supreme Court have interpreted the Act's language, the caselaw has taken as a given that a foreigner's "interest" in "property" arises when he has a legal right to something. These decisions interpret the property-interest language to require the agency to identify some actual property over which a foreigner has legal rights.

The Supreme Court and this Court have both held that when a foreigner is a party to a damages lawsuit, he lacks an "interest" in "property" in that lawsuit. In *Dames & Moore v. Regan*, the Supreme Court held that a ban on *in personam* damages lawsuits between Americans and Iran exceeded the "terms of IEEPA." 453 U.S. at 675. It reasoned from property law: Technically, *in personam* lawsuits are "not in themselves transactions involving [foreign] property or efforts to exercise any rights with respect to such property" because a party has no legal rights to any property in the lawsuit itself. *Id.* An *in personam* lawsuit "might eventually be reduced to judgment and that judgment might be executed upon" for property, but only then would the lawsuit involve a property interest. *Id.*; *see Salazar v. Buono*, 559 U.S. 700, 712 (2010) (a party to a lawsuit obtains a "cognizable interest" in that lawsuit only when it "obtains a judgment in its favor"). Given that the foreigner owns no "particular property" in the lawsuit itself, the Court

held that the attempt to ban such lawsuits exceeded the Act's property-interest clause. *Dames & Moore*, 453 U.S. at 675.

Similarly, in *Dean Witter Reynolds, Inc. v. Fernandez*, this Court held that the Act did not reach a damages lawsuit by Cuban nationals against Americans for hundreds of thousands of dollars. *See* 741 F.2d 355, 356-59 (11th Cir. 1984) (interpreting same property-interest requirement in regulation issued under the Act, 31 C.F.R. Part 515). The property-interest requirement reaches "only those judicial acts that *transfer a property interest*." *Id.* at 361-62. But it is "not until after judgment that a transfer of property became possible," so a lawsuit itself does not involve a foreigner's property interest. *Id.* at 361-62 (emphasis added).

Similarly, the old Fifth Circuit and this Court have held that a foreigner's interest in an estate depends on technical rules of property law. In *Real v. Simon*, the old Fifth Circuit held that, under the identical provision in the old Trading with the Enemy Act, state property law controlled whether a foreigner had an "interest" in "property" in an estate. 510 F.2d 557 (5th Cir. 1975). After a Cuban died, his four American heirs claimed ownership of his stock portfolio. Treasury declared by regulation that the dead Cuban retained a property interest in his assets, so it could prevent their use. *Id.* at 562. But under state property law, ownership of the decedent's stock portfolio passed to his four American heirs. *Id.* at 559. After all, once a "decedent has died," he "is no longer a person capable of owning any property interests." *Conn. Bank Trust v. United States*, 465

F.2d 760, 763 (2d Cir. 1972). Because Treasury's position that "the dead can reach beyond the grave to possess their worldly goods" had "no basis in law," the Court ruled that transactions involving the stock portfolio did not involve a foreigner's interest in property. *Simon*, 510 F.d at 563.

The result changes only when property law compels it. In *De Cuellar v. Brady*, after a Cuban man died, Americans claimed his bond account. 881 F.2d 1561, 1564 (11th Cir. 1989). But a contract clause in the bond account gave the Cuban government the right to reclaim the funds when certain conditions were met. *Id.* Because the Cuban government enjoyed an "undisputed reversionary interest" in that account, transactions with that account would involve a foreigner's property interest. *Id.* at 1567.

The technical mode of analysis in these binding precedents assumes that an "interest" in "property" means a legal right to property. If it meant an economic benefit, the careful hairsplitting of legal rights in each of these cases would make little sense.

**History.** The history behind the Act confirms its meaning. The Act derives from the Trading with the Enemy Act, which Congress enacted in 1917. 40 Stat. 411. It was originally understood to apply to commercial transactions involving "alien property." *TWEA Documentary History*, 159-60. When the 1941 Congress first introduced the language we know today—transactions involving "any property in which any foreign country or a national thereof has any interest," 55 Stat. 839—that language was understood to apply to foreigners' legal property. The property-interest clause refers to "all kinds of real and personal property belonging to aliens." 87 Cong. Rec. 9861 (Rep. Hancock).

"The entire bill," explained one of its principal drafters, "covers nothing but aliens and alien property." *Id.* (Rep. Gwynne). It "deal[s] only with foreign property." *Id.* (Rep. O'Hara). Sure enough, after it was made law, the public understood this provision to "exten[d] only to foreign-owned property." Lourie, 213. No indirect, supply-and-demand analysis was suggested.

When Congress transplanted this same language into the Act in 1977, it agreed that the provision was limited to transactions involving foreigners' rights to legal property. After narrowing a separate provision, Congress agreed that the Act gave the Executive *no* "power to regulate purely domestic transactions," like those of Americans that merely affect foreigners. H.R. Rep. No. 95-459, at 15. Courts shared this understanding. "The grant of authorities in IEEPA does not include the power to ... regulate purely domestic transactions." *Wald*, 468 U.S. at 228 n.8. The Act merely "put control of *foreign assets* in the hands of the President." *Dames & Moore*, 453 U.S. at 673 (emphasis added).

The Executive long respected the requirement that it identify a foreigner's legal property interest—in its words, a foreigner's "actual assertion of rights or privileges with respect to property"—in banned transactions. *Presidential Power to Regulate Domestic Litigation Involving Iranian Assets*, 4A Op. O.L.C. 236, 241-42 (1980). The agency's very name is the Office of *Foreign Assets* Control. It replaced the Office of *Alien Property* Custodian. *See TWEA Documentary History*, 159. And usually, when the agency bans transactions under the Act, it is straightforward that the transactions involve foreigners'

property interests. *See, e.g.*, *Treasury Sanctions Individual, Banks and Trading Company*, perma.cc/J6PZ-UNW4 (banning transactions involving foreign corporation's property).

\* \* \*

By giving the agency jurisdiction over transactions involving property in which a foreigner has an interest, the Act draws a sensible line. It allows the President to regulate all trade with foreigners—even when the foreigner isn't the outright owner but has other legal rights with respect to the traded property. Yet Americans can rest assured that, in their "purely domestic transactions," *Wald*, 468 U.S. at 228 n.8, they are beyond the Executive's foreign-trade powers.

### B.     The agency banned transactions in which no foreigners have interests in property.

Because an "interest" in "property" is a legal right to something that can be owned, the agency exceeded its authority. The banned transactions involve no such legal rights, and nobody has argued otherwise.

The agency banned Americans from using the core software tool with their own property. 87 Fed. Reg. 68,578-79; *FAQ: What is Prohibited as a Result of OFAC's Designation of Tornado Cash?*, perma.cc/F94U-WHPH. Plaintiffs detailed how they would do this. For example, Patrick O'Sullivan's use would "consist of [his] public address sending [his] crypto asset, such as 0.1 ETH, then [his] private address withdrawing that same

31

0.1 ETH." Doc.36-2 at 3. Nothing would be sent to a "software writer or DAO member. The only payment that [O'Sullivan] would make would be the standard Ethereum transaction fee associated with any transaction," which everybody agrees has no relevance here. *Id.*

The agency banned this basic use of the core software tool by Americans like Plaintiffs. Their banned transactions look like this:

American user's more public address —[0.1 ETH]→ Address 1

Address 1 —[0.1 ETH]→ American user's more private address

Nobody disputes that this transaction is banned. Or that it results in no payment to the designated foreigners.

What is the foreigner's "interest" in "property" in this transaction? The only property involved is the user's own crypto asset. But the user does not transfer ownership of that asset, or any other legal or equitable rights therein, to anyone else—let alone the designated foreigners. He retains complete ownership and control over his asset. Doc.68-1 at 162-65. Therefore, the transaction does not involve any "property" in which a designated foreigner has any "interest." It involves nothing "susceptible of ownership" over which any foreigner has any "quality [or] quantum of ownership." *Meyer*, 364 U.S. at 413 n.3. The designated foreigners have no "right, claim, title, or legal share," *Interest*, Black's Law Dictionary 729 (5th ed. 1979), in the crypto asset or anything else in the transaction. The transaction involves no "particular property" of the foreigners. *Dames & Moore*, 453 U.S. at 675. It does not involve anything "belonging to aliens."

32

87 Cong. Rec. 9861 (Rep. Gwynne). Any suggestion otherwise has "no basis in law." *Simon*, 510 F.2d at 563.

The transaction is therefore beyond "[t]he terms of the IEEPA." *Dames & Moore*, 453 U.S. at 675.

## C. The district court erred in holding that an economic benefit is an "interest" in "property."

In order to uphold the agency's ban, the district court had to rewrite the Act.

**1.** First, the district court removed the word "property." It rejected the notion "that the 'interest' required under the IEEPA is 'property interest' or 'ownership interest' in the technical legal sense." Doc.74 at 12. "The operative language in the IEEPA," the district court said, "is 'any interest,' not 'property interest.'" *Id.* The district court did not think that the transaction needed to relate to "property" at all—whether in the "technical legal sense" or any other. It never identified any involved "property," and it treated the Act as if that word did not exist.

But the word property "cannot be meaningless, else [it] would not have been used." *United States v. Butler*, 297 U.S. 1, 65 (1936). Any court upholding a ban under the Act must identify some foreigner's "particular property." *Dames & Moore*, 453 U.S. at 675. The agency can ban only those transactions "that transfer a property interest." *Fernandez*, 741 F.2d at 361-62. In the Executive Branch's own words, "[i]n the absence of 'property' or an 'interest' in property, the statute confers no power…. [It] does not confer plenary power upon the President to regulate all things foreign." *Presidential Power*

33

*to Regulate Domestic Litigation Involving Iranian Assets*, 4A Op. O.L.C. at 241-42. By failing to identify any property and departing from this consensus, the district court erred.

Second, the district court interpreted an "interest" to encompass indirect economic benefits. Instead of looking for legal rights, it looked for supply-and-demand economic effects. It homed in on the fact that the designated foreigners—the DAO and the software writers—hold TORN tokens, which are separate crypto assets. Doc.74 at 6. The banned transactions do not involve any TORN tokens because the core software tool does not accept them. Doc.68-1 at 49, 41-43. But the district court focused on how the non-TORN uses of the core software tool might affect the price of TORN tokens. Based on a four-step causal chain, it concluded that absent the core software tool, the TORN tokens "would not function" and "would be less valuable." Doc.74 at 14.

In economic terms, the district court essentially said that the core software tool and the TORN tokens are "complementary." *See* Dolan et al., *Economics* 58 (1986) (explaining complementary goods). Just like buying coffee benefits dairy farmers because it may increase demand for milk, using the core software tool benefits the designated foreigners because it may increase demand for the TORN token.

In the district court's view, that possible indirect economic benefit satisfied the Act. The district court did not rely on any other relationship between the designated foreigners and the banned transactions. Doc.74 at 12-18. It never even defined the word "interest," except to say that it includes "an interest of any nature whatsoever, direct or

indirect." *Id.* at 13. This definition "is completely circular and explains nothing." *Nationwide Mut. Ins. v. Darden*, 503 U.S. 318, 323 (1992).

All told, the district court rewrote the statute to allow the agency to ban any transaction that economically benefits a foreigner. Under its reading, the Act would allow the agency to prohibit:

> transactions involving … any **benefits to** ~~property in which~~ any foreign country or a national thereof ~~has any interest~~ …

Courts are "not authorized to rewrite, revise, modify, or amend statutory language in the guise of interpreting it." *Nguyen v. United States*, 556 F.3d 1244, 1256 (11th Cir. 2009).

The district court's interpretation is also incompatible with past cases. The foreigners who had money at stake in ongoing lawsuits, for example, would plainly expect an "increase in value" from those lawsuits. *But see Dames & Moore,* 453 U.S. at 673; *Fernandez,* 741 F.2d at 356-59.

Worse, the district court found that its interpretation of "interest" in "property" was *unambiguous*. After acknowledging that the rule of lenity "could be implicated here," the district court concluded that "there is nothing ambiguous about the statutory phrase 'any interest.'" Doc.74 at 17.

Under the district court's interpretation, the agency would have broad power over the internal American economy. Complementary goods are everywhere. No less than use of the core software tool might increase the value of TORN tokens, driving

cars increases the value of Saudi oil. And buying iPhones increases the value of Taiwanese semiconductors. The President could take over the American steel industry because foreign construction companies sell buildings whose price correlates with steel supply. *But see Youngstown Sheet & Tube v. Sawyer*, 343 U.S. 579 (1952). In fact, in most of these examples, the domestic activities benefit foreign industry more than using the core software tool helps foreign TORN holders. And the district court itself offered no limiting principle. Its interpretation, if allowed to stand, would give the administrative state a blank check to criminalize disfavored economic activity.

**2.** The district court invoked three cases from other circuits that it said supported its interpretation, but they do not. The district court's three out-of-circuit cases said, in applying the property-interest clause, that "beneficial rather than legal interests matter." *Global Relief Found., Inc. v. O'Neill*, 315 F.3d 748, 753 (7th Cir. 2002); *see also Consarc Corp. v. Iraqi Ministry*, 27 F.3d 695 (D.C. Cir. 1994); *Holy Land Found. for Relief v. Ashcroft*, 333 F.3d 156 (D.C. Cir. 2003). The district court thought that the supply-and-demand economic benefits it identified gave the designated foreigners an "indirect beneficial 'interest'" in the transactions so as to fall within this description. Doc.74 at 14.

Two problems. First, the term "beneficial interest" does not mean what the district court assumed. A "beneficial interest" is a legal term of art. It means a "right or expectancy in something (such as a trust or estate), as opposed to legal title to that thing." *Beneficial Interest*, Black's Law Dictionary (11th ed. 2019). For example, when someone creates a trust and instructs the trustee to pay her relative regular distributions

from that trust, then her relative's legal right to those payments is a "beneficial interest." *Drye*, 528 U.S. 49.

The bar for a "beneficial interest" is high, and economic benefits don't count. "Not all economic interests are 'property rights.'" *Willow River Co.*, 324 U.S. at 503. Typically, "any benefit ... reaped by [a] third party is merely 'incidental,' and the third party has no legally enforceable right." *Bochese*, 405 F.3d at 982. For example, a state does not have a "beneficial interest" in a college intended to benefit the state's economy and well-being. *Trustees of Dartmouth Coll. v. Woodward*, 17 U.S. 518, 639 (1819). A power company has no beneficial interest in the upstream water that it would not function without. *Willow River Co.*, 324 U.S. at 503-10. Even a third party guaranteed a payment by contract has no beneficial interest in that contract unless "a direct and primary object of the contracting parties was to confer a benefit on the third party." *Bochese*, 405 F.3d at 982.

Even in the due-process context, where courts have taken the broadest conceivable approach to defining property interests, indirect economic benefits fall short. "The indirect nature of a benefit [is] fatal to [a] due process claim." *Town of Castle Rock v. Gonzales,* 545 U.S. 748, 767 (2005). Absent a legal right, a "benefit will not create a protectible property interest." *Spence*, 873 F.2d at 258. Any "property interest" requires "more than a unilateral expectation" of a benefit. *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972). It requires a legal right.

Second, the district court took too much from these courts' statement that a qualifying interest may be beneficial "rather than legal." *Global Relief Found.*, 315 F.3d at 753. "Interests in property" are sometimes "classified as legal or equitable." 31 C.J.S. Estates §9. Beneficial interests are not "legal" only in the sense that they are "equitable"—*i.e.*, they originated in courts of equity. *See N.C. Dep't of Rev. v. Kaestner 1992 Family Trust*, 139 S. Ct. 2213, 2225 (2019).

But equity has rules. "The rules of equity are as fixed as those of law." *Wright v. Ellison*, 68 U.S. 16, 22 (1863). Equity is "governed by rules and precedents no less than the courts of law." *Lonchar v. Thomas*, 517 U.S. 314, 323 (1996). Equity is "rigorous" and "requir[es] not just a possibility of acquiring title, but a concrete right." 31 C.J.S. Estates §9. Therefore, "an equitable estate is considered, to all intents and purposes, as a legal estate." *Id.* And all "interests in property," whether they come from law or equity, are creatures of preexisting law. *Barnhill v. Johnson*, 503 U.S. 393, 398 (1992). No preexisting law, including from the rules of equity, gives the foreigners a beneficial interest in the banned transactions.

The three out-of-circuit cases themselves are consistent with the property-law approach. *Consarc Corp. v. Iraqi Ministry* held that Iraq had an "interes[t] in property" in $6.4 million in its own bank account, so the agency could regulate transactions involving that account. 27 F.3d at 701-02. That $6.4 million obviously constituted "property." As to Iraq's "interest" in that property, the plaintiff argued that Iraq lost its legal interest

in the money when it automatically conveyed the money to the American account beneficiary. *Id.* at 702-03. But the D.C. Circuit explained that Iraq retained a property because the conveyance was a "letter of credit," which "remains wholly executory until the beneficiary has strictly complied with its terms." *Id.* at 702. The beneficiary failed to comply, so Iraq retained its property interest in the money. The court also said that Iraq "still held a reversionary interest in the funds" because the plaintiff had to make a timely demand that it failed to make. *Id.*

The other two—*Global Relief Foundation* and *Holy Land*—held that foreign terrorist organizations could not evade the Act by "controll[ing]" an entity incorporated in America. *Global Relief Found.*, 315 F.3d at 753. Again, the funds plainly satisfied the "property" requirement. And the courts held that the foreign organizations had interests because they controlled the funds and directed their distribution (to themselves). *Id.* at 753. The organization was effectively a "subsidiary." *Id.*; *accord Holy Land*, 33 F.3d at 163. The conclusion that effective control gives someone a property interest has a strong positive-law pedigree. At the least, the foreign organizations had "de facto ownership," which means plenary control of property nominally owned by someone else. *See United States v. Parr*, 509 F.2d 1381, 1386 (5th Cir. 1975); *accord Knowlton v. Comm'r*, 791 F.2d 1506, 1508 (11th Cir. 1986) ("one acquires property when one obtains … control over it"). Here, the district court never began to suggest that the designated foreigners control the property involved in Plaintiffs' transactions.

**3.** The district court rightly did not accept the government's alternative theories. First, the government had argued that the designated foreigners had a property interest in the transactions because the transactions depend on computer code, computer code is colloquially referred to as a "smart contract," and a *legal* "contract" can create property interests. Doc.68-1 at 58. The district court gave this theory no attention. A "smart contract" is just a metaphor for the code's ability to execute rules, not a legal term. *Id.* at 193 ("a so-called 'smart contract'"). No legal contract involving the designated foreigners is made when an American uses the core software tool.

Second, the government had argued that the designated foreigners had a property interest in the transactions based on an optional support service called a "relayer." A subset of users of the core software tool would opt to hire a support service called a "relayer" to make the withdrawal process smoother. *Id.* at 55. A subset of relayer transactions use relayers registered with the DAO. A subset of those transactions use addresses that *can* trigger a small spin-off payment from the relayer to the DAO—just nine of the 20 addresses. *See id.* at 57-58. And a subset of those transactions actually trigger the payment to the DAO—those that occur under sufficiently "liqui[d]" market conditions. *See id.* at 58. The payment, when it occurs, is 0.3% of the transaction. *See id.* at 57. And under Plaintiffs' narrow request for relief, that payment would remain impossible because it requires transacting with Address 31. *See id.*; Doc.9 at 42.

The district court did not adopt the relayer theory. Doc.74 at 15. It recognized that "the core software tool does not directly generate fees for TORN holders when

the tool is used without the involvement of a registered relayer." *Id.* Therefore, the foreigners' property interest in the banned transactions consists only of "the indirect interest that TORN holders … have in the increased use and popularity of the Tornado Cash service as a whole." *Id.* It emphasized that "TORN had substantial value before relayers (and the fees they paid) were added to the Tornado Cash service," so the property interest preceded the relayers. *Id.*

Finally, the district court did not adopt the government's theory that the foreign software writers had a property interest in the core software tool because they wrote the original code. The government never pointed to any legal rights, intellectual or otherwise, that the foreigners had with respect to the code. *See* Doc.68-1 at 58-59. The software writers made the code free and open-source to everyone, so they abandoned any rights they ever could have had long before the agency acted. *Id.* 58-59, 100-03, 162-76; Doc.68-2 at 3; *United States v. Green*, 981 F.3d 945, 956 (11th Cir. 2020).

### D. Ambiguities should be resolved against the agency.

Although the district court's interpretation is unambiguously wrong, it needs to be unambiguously right.

**1.** The rule of lenity applies here. "It is well-established that when we are faced with a statute that has both criminal and noncriminal applications, we must interpret the statute consistently in both contexts. Moreover, and importantly here, whether we encounter such a statute in a criminal or noncriminal context, the rule of lenity applies."

*Romero*, 20 F.4th at 1383 (cleaned up). Any other approach would render "every statute a chameleon, its meaning subject to change depending on the [case]." *Clark v. Martinez*, 543 U.S. 371, 380 (2005). Violating the Act carries criminal penalties. *See* §1705(c) (20 years). Lenity applied to this provision's predecessor in 1917. *See* Huberich, 48. The district court seemed to agree that the rule of lenity applies. Doc.74 at 16.

If lenity didn't apply, the major-questions doctrine would. An interpretation that would grant "highly consequential power" triggers the major-questions doctrine. *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022). The "logic" of the district court's interpretation would allow the agency to take actions of vast "economic and political significance." *Gonzales v. Oregon*, 546 U.S. 243, 267-68 (2006). Because the district court relied on indirect economic benefits, it would read the Act to allow the agency to criminalize the use of most goods and services in our global economy. *See Ala. Ass'n of Realtors*, 141 S. Ct. at 2489 (major-questions doctrine applied because "the Government's read of §361(a) would give the CDC a breathtaking amount of authority" to regulate other matters, like "grocery delivery"). That broad power requires clearer language from Congress.

**2.** The agency invoked its regulations interpreting "interest" and "property interest." Its regulations just define "interest" as "an interest of any nature whatsoever, direct or indirect." 31 C.F.R. §§510.313, 578.309. And they define "property" and "property interest" to include various enumerated forms of *legal* property, including "property,

real, personal, or mixed, tangible or intangible, or interest or interests therein, present, future, or contingent." 31 C.F.R. §§510.323, 578.314.

But the agency forfeited *Chevron* deference to these regulations by not addressing its two steps until its reply. *See Hollyfrontier Cheyenne Ref. v. Renewable Fuels Ass'n*, 141 S. Ct. 2172, 2180 (2021); Doc.57. Anyway, *Chevron* wouldn't apply because the Supreme Court has "never held that the Government's reading of a criminal statute is entitled to any deference." *United States v. Apel*, 571 U.S. 359, 369 (2014). *Chevron* also yields to the major-questions doctrine and the rule of lenity. *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1630 (2018); *King v. Burwell*, 576 U.S. 473, 485 (2015).[2]

The government also argued that its interpretative regulations simply control. Doc.57 at 19. But "[i]nterpretive rules don't have the force and effect of law and are not accorded that weight in the adjudicatory process." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 97 (2015); *accord Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1995). The old Fifth Circuit already did not defer to the agency's regulations interpreting property interests under the predecessor Act. *Simon*, 510 F.2d at 564-65.

As for the government's made-for-litigation interpretations of its own regulations, *Auer* deference would not apply if the government had sought it. *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2414-18 (2019) (no deference to in-litigation position or interpretation of "common-law property term").

---

[2] Plaintiffs preserve (and have preserved) the argument that *Chevron* deference is invalid. *See Loper Bright Enterprises v. Raimondo*, No. 22-451 (U.S.).

### E. The narrow request for relief protects the agency's foreign-trade power.

The agency will say that, if it loses, then America's foreign enemies will be empowered. Plaintiffs agree that the agency should prevent Americans from trading with foreign enemies. Their requested relief is thus narrow and will fully honor the agency's power over foreign trade.

The agency will point to the foreign DAO and North Korea. But as to the DAO, the agency banned *all* payments to them by listing addresses that Plaintiffs do not challenge. Any actual payment to the DAO must go through an unchallenged address. *See* Doc.68-1 at 45, 57; Doc.9 at 42-44. A payment to a registered relayer—which can lead to a payment to the DAO—must go through Address 31, which is also unchallenged. *Id.* Those payments will therefore remain illegal. Plaintiffs also do not challenge the agency's ban on transactions with the addresses over which the DAO has any control. No transactions that the DAO could even conceivably alter will be affected by this lawsuit. Doc.9 at 41-44; Doc.68-1 at 57, 154-85. And as to North Korea, it is illegal to use the core software tool or anything else to make any payment to North Korea. 81 Fed. Reg. 14,945. Meanwhile, North Koreans themselves can use the tool regardless of what happens in this lawsuit because the tool is published permanently. Doc.68-1 at 165-68.

Every time that it has been pressed to identify how Plaintiffs' requested relief will permit trading with the foreign DAO, North Korea, or any other foreign enemies, the

government has been unable to substantiate the concern. Trading with those foreigners is not affected under Plaintiffs' requested relief. Plaintiffs' requested relief—that the Court set aside the sanction as to Addresses 1-29 only—will instead return power to Americans to use their own property without involving foreigners. And the agency, which can ban transactions without notice or comment, will be free to take any further actions once this Court has confirmed the Act's boundaries.

Ultimately, neither the agency nor the courts will get the last say on the statutory-authority question. If Congress agrees with the agency, it can authorize this action by amending the Act. *See Potential Options to Strengthen Counter-Terrorist Financing Authorities*, Dep't of Treasury 4, *copy available at* perma.cc/3CVC-SMS2. Until then, "national-security concerns must not become a talisman used to ward off inconvenient claims." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1862 (2017). "Liberty and security can be reconciled; and in our system they are reconciled within the framework of the law." *Id.*

## II.   The agency violated the First Amendment.

Although the Court need not reach other claims if it rules for Plaintiffs on statutory-authority grounds, the agency's action also violated the First Amendment.

Plaintiff John Doe used the core software tool to contribute to Ukraine and to help others make similar donations. Doc.36-3 at 3-4. He and his donors sent their crypto assets through the core software tool to a frontline-aid provider and would like to do so again. *Id.* "Spending for political ends ... fall[s] within the First Amendment's

protection of speech and political association." *FEC v. Co. RFCC*, 533 U.S. at 440; *accord Citizens United v. FEC*, 558 U.S. 310, 339 (2010). The First Amendment guarantees a right to make charitable contributions privately, against "[g]overnment infringement" of all "forms." *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2382 (2021). All agree that a charitable contribution to Ukraine is otherwise legal and First-Amendment protected activity.

The agency banned all uses of the core software tool, including charitable dona-tions. If Doe and his fellow donors made another donation with the core software tool, they would be felons. The agency therefore triggered at least exacting scrutiny because it "outright ban[ned]" protected activity. *Citizens United*, 558 U.S. at 337. It also made it impossible for Doe and his fellow donors to donate privately by forbidding their only feasible means of doing so. *See Bonta*, 141 S. Ct. at 2382.

The district court held that the agency did not trigger any scrutiny because no-body has a First Amendment right to use a "particular" means for protected activity. Doc.74 at 20. But "[t]he First Amendment protects [citizens'] right not only to advocate their cause but also to select what they believe to be the *most effective means* for so doing." *Grant*, 486 U.S. at 424 (emphasis added). When the government "restricts access to the most effective, fundamental, and perhaps economical avenue" of First Amendment ac-tivity, it violates the First Amendment. *Id.*; *accord FEC v. Mass. Citizens For Life*, 479 U.S. 238 (1986). Otherwise, the government could ban email because it allows communica-tion by letter, or ban charitable donations by credit card because it allows donations by

cash. Or, as in *Grant*, it could ban gathering petitions through hired helpers because it allows gathering petitions through volunteers. *Grant*, 414 U.S. at 422. It is irrelevant that people "remain free to employ *other means* to disseminate their ideas." *Id.* at 424. Because the First Amendment doesn't tolerate government-selected means, all of these actions must trigger scrutiny.

The district court distinguished *Grant* by noting that it was "a free speech case," not a "freedom of association" case. Doc.74 at 21. But *Grant* applied to all "First Amendment expression." 486 U.S. at 424. Freedom of association is just one application of free speech. *NAACP v. Alabama*, 357 U.S. 449, 460 (1958). And charitable contributions *are* free speech. *FEC v. Mass. Citizens for Life, Inc.*, 479 U.S. at 258.

The district court also hypothesized that the donors could use other means to donate. Doc.74 at 21-22. But because of Russian retaliation for any donations that could become public, the core software tool was their *only* option. Doc.36-3 at 3-5. "As a result of Defendants' criminalization," all "donations have stopped." *Id.* at 4. The district court therefore erred in holding that the ban did not trigger at least exacting scrutiny.

The district court did not address exacting scrutiny. It requires the agency to "demonstrate its need for [its action] in light of any less intrusive alternatives." *Bonta*, 141 S. Ct. at 2386 (controlling op. of Roberts, C.J.). The agency failed exacting scrutiny because it never demonstrated why it couldn't have exempted or treated differently

domestic uses of the core software tool, or even just those that involve protected associations. Such alternatives were "not even considered." *Id.*

## III. The agency acted arbitrarily and capriciously.

Congress gives agencies the power to act on the condition that they do so in a deliberative, transparent, and rational manner. When an agency fails to consider "important aspect[s] of the problem," it acts arbitrarily and capriciously and must revisit its decision. *Regents of the Univ. of Cal.*, 140 S. Ct. at 1910. For example, agency actions are arbitrary and capricious when the agency fails to consider how its action will affect people who had reliance interests in the status quo, *id.* at 1914, downsides of its action such as "economic costs," *Michigan v. EPA*, 576 U.S. 743, 752 (2015), or other factors that should have been "relevant" to its decision, *Bidi Vapor v. FDA*, 47 F.4th 1191, 1202-04 (11th Cir. 2022).

Whether an agency considered all important aspects of the problem must be decided based on the contents of the "record of the rulemaking proceedings." *State Farm*, 463 U.S. at 43-44; *see also* 5 U.S.C. §706 (review based on "the whole record"). "[A] court can only uphold the decision of an administrative agency on those grounds 'upon which the record discloses that its action was based.'" *Am.'s Cmty. Bankers v. FDIC*, 200 F.3d 822, 835 (D.C. Cir. 2000). "Post hoc rationalizations … have traditionally been found to be an inadequate basis for review." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419 (1971) (cleaned up). Strict adherence to the record rule ensures that

the agency considers these aspects before making its decision and that its decisionmaking process can be "scrutinized by courts and the interested public" *Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019); *accord SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943).

Here, Plaintiffs identified three important aspects of this decision. The agency failed to consider the fact that, by banning all transactions with the core software tool, it subjected Americans like Hoffman to lifetime reporting and potential criminal liability for receiving unsolicited funds, absent any volitional act as due process requires. Doc.36-4 at 3; *Robinson v. California*, 370 U.S. 660 (1962). It failed to consider the reliance interests of innocent Americans who had deposited their funds at a core-software-tool address but not yet withdrawn them, leaving them forced to plead for a license, lose their money forever, or commit a felony. *Regents of the Univ. of Cal.*, 140 S. Ct. at 1914. And it failed to consider the effects of its action on future attempts to write software code, an interest specifically protected by the Act. 50 U.S.C. §1702(b). The government has not disputed that these aspects of the ban are "important." Doc.57 at 35-36.

But the government failed to cite any evidence in the administrative record to show that the agency took account of these considerations. Instead, the government invoked only post-designation publications that it put on its website. *Id.* (citing website FAQs). The district court accepted these as just as good. Doc.74 at 19-20. But post-hoc publications are no substitute for the record. *Am.'s Cmty. Bankers*, 200 F.3d at 835. The

agency's failure to address these concerns in the administrative record is especially egregious given that this was the agency's second bite at the apple and these concerns were widely expressed by the public in the interim.

Judicial review must "be based on the administrative record that was already in existence before the agency, not … post-hoc rationalizations made after the disputed action." *Christ the King Manor v. HHS*, 730 F.3d 291, 305 (3d Cir. 2013) (cleaned up). Allowing the agency to rely on these post-hoc extra-record publications would dishonor the rule that its action may be upheld only "on the record the agency presents to the reviewing court." *Preserve Endangered Areas v. USACE*, 87 F.3d 1242, 1246 (11th Cir. 1996). In fact, earlier in this case, the agency successfully prevented Plaintiffs from introducing a declaration to help explain cryptocurrency concepts because it argued that the district court's review could never "go beyond the administrative record" (except under two exceptions it has already disavowed here). Doc.30 at 3-4. That rule applies to the agency's sources, too. In fact, it applies more strongly against the agency. *Chenery*, 318 U.S. at 88. This Court should not excuse the agency's failure.

## CONCLUSION

The Court should reverse and remand with instructions that the district court grant summary judgment for Plaintiffs.

Respectfully submitted,

*/s/ Cameron T. Norris*

J. Abraham Sutherland
106 Connally Street
Black Mountain, NC 28711
(805) 689-4577

Jeffrey M. Harris
Cameron T. Norris
Jeffrey S. Hetzel
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, Virginia 22209
(703) 243-9423
cam@consovoymccarthy.com

*Counsel for Coin Center et al.*

## CERTIFICATE OF COMPLIANCE

This brief complies with Rule 32(a)(7) because it contains 12,890 words, excluding the parts that can be excluded. It also complies with Rule 32(a)(5)-(6) because it's prepared in a proportionally spaced face using Microsoft Word 2016 in 14-point Garamond font.

Dated: December 18, 2023                    /s/ Cameron T. Norris

## CERTIFICATE OF SERVICE

I e-filed this brief, which will email everyone requiring notice.

Dated: December 18, 2023                    /s/ Cameron T. Norris