# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

COIN CENTER, et al.,

Plaintiffs-Appellants,

v.

SECRETARY, U.S. DEPARTMENT OF THE TREASURY, et al.,

Defendants-Appellees.

On Appeal from the United States District Court
for the Northern District of Florida

## BRIEF FOR APPELLEES

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney*
*General*

JASON R. COODY
*United States Attorney*

SHARON SWINGLE
BRAD HINSHELWOOD
*Attorneys, Appellate Staff*
*Civil Division, Room 7256*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-7823*

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rule 26.1-1, counsel for Defendants-Appellees the Secretary of the U.S. Department of the Treasury, et al., certify that the following have an interest in the outcome of this appeal:

**Andreessen Horowitz**, Amicus Curiae

**Bank Policy Institute**, Amicus Curiae

**Blockchain Association**, Amicus Curiae

**Bonta, Christian**, Attorney for Plaintiffs-Appellants

**Boynton, Brian M.**, Attorney for Defendants-Appellees

**Burnham, James**, Attorney for Amici Blockchain Association & DeFi Education Fund

**Coin Center**, Plaintiff-Appellant

**Consovoy McCarthy PLLC**, Attorneys for Plaintiffs-Appellants

**Coogle, Christine L.**, Attorney for Defendants-Appellees

**DeFi Education Fund**, Amicus Curiae

**Department of Treasury**, Defendant-Appellee

**Doe, John**, Plaintiff-Appellant

**Elliott, Stephen M.**, Attorney for Defendants-Appellees

**Evangelista, Alessio**, Attorney for Amicus Curiae Andreessen Horowitz

**Gacki, Andrea M.,** Former Director of the Office of Foreign Assets Control

**Haas, Alexander**, Attorney for Defendants-Appellees

**Harris, Jeffrey M.**, Attorney for Plaintiffs-Appellants

**Healy, Christopher**, Attorney for Defendants-Appellees

**Hetzel, Jeffrey S.**, Attorney for Plaintiffs-Appellants

**Hinshelwood, Brad**, Attorney for Defendants-Appellees

**Hoffman, David**, Plaintiff-Appellant

**Jones Day**, Attorneys for Amici Blockchain Association & DeFi Education Fund

**Kelleher, Diane**, Attorney for Defendants-Appellees

**Kinchen, John**, Attorney for Amicus Curiae Bank Policy Institute

**Lea, Brian**, Attorney for Amici Blockchain Association & DeFi Education Fund

**Lehotsky Keller Cohn LLP**, Attorneys for Amicus Paradigm Operations LP

**Liu, Jessie K.**, Attorney for Amicus Andreessen Horowitz

**Office of Foreign Assets Control**, Defendant-Appellee

**Norris, Cameron T.**, Attorney for Plaintiffs-Appellants

**O'Sullivan, Patrick**, Plaintiff-Appellant

**Paradigm Operations LP**, Amicus Curiae

**Sasso, Michael**, Attorney for Plaintiffs-Appellants

**Sasso & Sasso, P.A.**, Attorneys for Plaintiffs-Appellants

**Seira, Rodrigo**, Attorney for Amicus Paradigm Operations LP

**Skadden Arps**, Attorney for Amicus Andreessen Horowitz

**Smith, Bradley T.**, Director of the Office of Foreign Assets Control

**Smyser Kaplan & Veselka LLP**, Attorneys for Amicus Bank Policy Institute

**Sutherland, J. Abraham**, Attorney for Plaintiffs-Appellants

**Swingle, Sharon**, Attorney for Defendants-Appellants

**Wetherell, Hon. T. Kent**, District Court Judge

**Yarger, Katherine**, Attorney for Amicus Paradigm Operations LP

**Yellen, Janet**, Secretary of the Treasury

## STATEMENT REGARDING ORAL ARGUMENT

The district court's decision should be affirmed largely for the reasons stated by the district court. The government stands ready to present oral argument if this Court believes that it would assist the Court's consideration of the issues.

# TABLE OF CONTENTS

**Page**

STATEMENT OF JURISDICTION ..................................................................1

STATEMENT OF THE ISSUES.....................................................................1

STATEMENT OF THE CASE .......................................................................2

    A.    Statutory Background.................................................................2

    B.    Factual Background ..................................................................4

        1.    Cryptocurrency Basics.................................................5

        2.    Cryptocurrency Mixing Services ..................................7

        3.    The Tornado Cash Mixing Service..............................9

        4.    Tornado Cash's Use of Relayers.................................13

    C.    The OFAC Designation..............................................................15

    D.    Prior Proceedings......................................................................16

    E.    Standard of Review....................................................................20

SUMMARY OF ARGUMENT......................................................................20

ARGUMENT.............................................................................................24

I.    The Agency Properly Concluded that Transactions with Tornado Cash Could Be Blocked Given Its Relationship to North Korea and Other Malicious Cyber Actors..............................................................24

    A.    Tornado Cash Provides Money Laundering Services to North Korea and Others .....................................................24

    B.    OFAC May Take Action to Address "Any Interest" Foreign Nationals Hold in the Tornado Cash Service..............................30

II.    Plaintiffs' Remaining Arguments Lack Merit.......................................41

A.      OFAC Properly Considered All Relevant Factors ....................................41

B.      The First Amendment Does Not Require Permitting Plaintiffs to
        Use the Tornado Cash Service.......................................................................44

CONCLUSION .................................................................................................................. 48

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**      **Page(s)**

*Americans for Prosperity Found. v. Bonta,*
141 S. Ct. 2373 (2021) .................................................. 45

*Arcara v. Cloud Books, Inc.,*
478 U.S. 697 (1986) ................................................. 23, 45

*Consarc Corp. v. Iraqi Ministry,*
27 F.3d 695 (D.C. Cir. 1994) ...................................... 36

*Dames & Moore v. Regan,*
453 U.S. 654 (1981) ................................................. 32, 40

*Davis v. United States,*
495 U.S. 472 (1990) ...................................................... 35

*De Cuellar v. Brady,*
881 F.2d 1561 (11th Cir. 1989) .............................. 31, 36

*Dean Witter Reynolds, Inc. v. Fernandez,*
741 F.2d 355 (11th Cir. 1984) ................................... 40

*Defenders of Wildlife v. U.S. Dep't of the Navy,*
733 F.3d 1106 (11th Cir. 2013) .................................. 20

*Department of Homeland Sec. v. Regents of the Univ. of Cal.,*
140 S. Ct. 1891 (2020) ................................................ 43

*Global Relief Found., Inc. v. O'Neill,*
315 F.3d 748 (7th Cir. 2002) ....................... 22, 33, 34, 38

*Holy Land Found. for Relief & Dev. v. Ashcroft,*
333 F.3d 156 (D.C. Cir. 2003) .............. 22, 33, 34, 38, 41

*Laperriere v. Vesta Ins. Grp.,*
526 F.3d 715 (11th Cir. 2008) ..................................... 33

*Mendoza v. Secretary, Dep't of Homeland Sec.,*
851 F.3d 1348 (11th Cir. 2017) ................................... 20

*Meyer v. Grant,*
486 U.S. 414 (1988) ...................................................... 47

*Muscarello v. United States,*
　524 U.S. 125 (1998) ........................................................... 40

*NAACP v. Alabama ex rel. Patterson,*
　357 U.S. 449 (1958) ........................................................... 45

*NLRB v. Bell Aerospace Co. Div. of Textron, Inc.,*
　416 U.S. 267 (1974) ........................................................... 35

*Real v. Simon,*
　510 F.2d 557 (5th Cir. 1975) ............................................39

*Regan v. Wald,*
　468 U.S. 222 (1984) ........................................................... 35

*Stanley v. City of Sanford,*
　83 F.4th 1333 (11th Cir. 2023) ...................................... 30

*Staples v. United States,*
　511 U.S. 600 (1994) ...........................................................40

*Turner Broad. Sys., Inc. v. FCC,*
　512 U.S. 622 (1994) ........................................................... 47

*United States v. Gonzales,*
　520 U.S. 1 (1997) .............................................................. 33

*United States v. O'Brien,*
　391 U.S. 367 (1968) ........................................................... 46

*United States v. Parr,*
　509 F.2d 1381 (5th Cir. 1975) ........................................ 38

*United States v. Wells,*
　519 U.S. 482 (1997).............................................................40

*Van Loon v. Department of the Treasury,*
　No. 1:23-CV-312-RP, 2023 WL 5313091 (W.D. Tex. Aug. 17, 2023) ............... 44-45

*Ward v. Rock Against Racism,*
　491 U.S. 781 (1989)............................................................47

**Statutes:**

International Emergency Economic Powers Act:

50 U.S.C. § 1701 *et seq.* ............................................................ 2

50 U.S.C. § 1701(a) ....................................................................... 1

50 U.S.C. § 1702(a)(1)(B) ................................. 1, 2, 18, 21, 25, 26, 29, 33

50 U.S.C. § 1702(b) ..................................................................... 43

50 U.S.C. § 1702(c) ..................................................................... 15

50 U.S.C. § 1704 ..................................................................... 3, 34

Pub. L. No. 77-354, tit. III, § 301,
55 Stat. 838, 839 (1941) .............................................................. 35

28 U.S.C. § 1291 ............................................................................. 1

28 U.S.C. § 1331 ............................................................................. 1

**Regulations:**

31 C.F.R. § 501.807 ......................................................................... 4

31 C.F.R. § 510.305 ......................................................................... 4

31 C.F.R. § 510.313 ........................................................... 4, 18, 23, 34

31 C.F.R. § 510.322 ......................................................................... 4

31 C.F.R. § 510.323 ....................................................................... 27

31 C.F.R. § 510.501 ..................................................................... 4, 43

31 C.F.R. § 510.513 ....................................................................... 18

31 C.F.R. § 578.305 ......................................................................... 4

31 C.F.R. § 578.309 ........................................................... 4, 18, 23, 34

31 C.F.R. § 578.313 ......................................................................... 4

31 C.F.R. § 578.314 ....................................................................... 27

31 C.F.R. § 578.404 ..................................................................... 4, 43

Exec. Order No. 13,466,
 73 Fed. Reg. 36,787 (June 26, 2008) ................................. 3

Exec. Order No. 13,694,
 80 Fed. Reg. 18,077 (Apr. 2, 2015) ..................... 2, 3, 24, 25, 42

Exec. Order No. 13,722
 81 Fed. Reg. 14,943 (Mar. 18, 2016) ........................ 3, 25, 42

Exec. Order No. 13,757,
 82 Fed. Reg. 1 (Jan. 3, 2017) .................................... 2, 3

**Rule:**

Fed. R. App. P. 4(a)(1)(B) .................................................. 1

**Other Authorities:**

15 Fed. Reg. 9040 (Dec. 19, 1950) ...................................... 35

28 Fed. Reg. 6974 (July 9, 1963) ....................................... 35

44 Fed. Reg. 75,352 (Dec. 19, 1979) .................................... 35

OFAC, *Frequently Asked Questions: Cyber-Related Sanctions*,
 https://perma.cc/5KQ5-25GE ...................................... 16, 44

Press Release, U.S. Attorney's Office (S. Dist. of N.Y.),
 *Tornado Cash Founders Charged with Money Laundering and Sanctions*
 *Violations* (Aug. 23, 2023), https://perma.cc/VA8W-HCQ5 ................. 11

Press Release, U.S. Dep't of the Treasury, *Treasury Designates*
 *DPRK Weapons Representatives* (Nov. 8, 2022),
 https://perma.cc/TGD5-8MXH ........................................ 15

Press Release, U.S. Dep't of the Treasury, *U.S. Treasury Sanctions*
 *Notorious Virtual Currency Mixer Tornado Cash* (Aug. 8, 2022),
 https://perma.cc/AY3X-Z8JG ........................................ 15

Antonin Scalia & Bryan A. Garner, *Reading Law:*
*The Interpretation of Legal Texts* (2012) ...............................................................33

## STATEMENT OF JURISDICTION

Plaintiffs' complaint invoked the district court's jurisdiction under 28 U.S.C. § 1331. Doc. 9 at 16. The district court entered final judgment in the government's favor on October 30, 2023. Doc. 75, at 1. Plaintiffs filed a notice of appeal on November 6, 2023. *See* Doc. 76; *see also* Fed. R. App. P. 4(a)(1)(B) (60-day time limit). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

Under the International Emergency Economic Powers Act, a component of the Department of the Treasury blocked the assets of "Tornado Cash," an entity that provides a cryptocurrency mixing service used by North Korea to launder stolen cryptocurrency and fund its weapons of mass destruction and missile programs. As relevant here, the authorities provided under the Act allow the Department to block "any property in which any foreign country or a national thereof has any interest." 50 U.S.C. § 1702(a)(1)(B). The issues presented are:

1) Whether the Department properly concluded Tornado Cash has "any interest" in the cryptocurrency mixing service it created, promotes, and manages.

2) Whether the district court correctly rejected plaintiffs' arbitrary and capricious and First Amendment challenges to the Department's order.

## STATEMENT OF THE CASE

### A.      Statutory Background

Under the International Emergency Economic Powers Act (IEEPA), 50 U.S.C.

§ 1701 *et seq.*, the President may exercise a variety of extraordinary economic powers

after he "declares a national emergency with respect to" "any unusual and

extraordinary threat, which has its source in whole or substantial part outside the

United States, to the national security, foreign policy, or economy of the United

States." *Id.* § 1701(a).  The President may

> investigate, block during the pendency of an investigation, regulate,
> direct and compel, nullify, void, prevent or prohibit, any acquisition,
> holding, withholding, use, transfer, withdrawal, transportation,
> importation or exportation of, or dealing in, or exercising any right,
> power, or privilege with respect to, or transactions involving, any
> property in which any foreign country or a national thereof has any
> interest by any person, or with respect to any property, subject to the
> jurisdiction of the United States.

*Id.* § 1702(a)(1)(B).

This appeal arises from actions taken in response to two national emergencies.

The first, declared in 2015, arises from "the increasing prevalence and severity of

malicious cyber-enabled activities originating from[] . . . outside the United States."

Exec. Order No. 13,694, 80 Fed. Reg. 18,077, 18,077 (Apr. 2, 2015).  Additional steps

related to that emergency were subsequently taken to address "the increasing use of

[significant malicious cyber-enabled activities] to undermine democratic processes or

institutions."  Exec. Order No. 13,757, 82 Fed. Reg. 1, 1 (Jan. 3, 2017).  As amended,

Executive Order 13,694 blocks the property and interests in property of "any person" determined by the Secretary of the Treasury to be "responsible for," "complicit in," or "directly or indirectly" "engaged" in certain cyber-enabled activities that threaten the United States' national security, foreign policy, and economy, *id.*, as well as any person determined "to have materially assisted, sponsored, or provided financial, material, or technological support for" such activities, *id.* at 2.

The second emergency, originally declared in 2008, *see* Exec. Order 13,466, 73 Fed. Reg. 36,787 (June 26, 2008), and subsequently amended, arises from "the Government of North Korea's continuing pursuit of its nuclear and missile programs," Exec. Order No. 13,722, 81 Fed. Reg. 14,943, 14,943 (Mar. 18, 2016). In 2016, the President issued an executive order taking further steps to deal with that emergency, blocking the property and interests in property of the Government of North Korea and the Workers' Party of Korea. *Id.* The order also blocks the property of persons determined by the Secretary of the Treasury "to have materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of" the Government of North Korea or other persons that materially supported it. *Id.* at 14,944.

Each of these executive orders delegates authority to the Secretary of the Treasury to issue "rules and regulations" and "to employ all powers granted to the President by IEEPA as may be necessary to carry out" their purposes. 80 Fed. Reg. at 18,079; 81 Fed. Reg. at 14,945; *see* 50 U.S.C. § 1704 (authorizing the President to

"issue such regulations, including regulations prescribing definitions, as may be necessary for the exercise of the authorities granted" by IEEPA). The Secretary has delegated authority to block persons under these orders to the Office of Foreign Assets Control (OFAC), a component within the Department of the Treasury. Pursuant to these authorities, OFAC has issued regulations implementing the relevant executive orders. The regulations define "person" as any "individual or entity." 31 C.F.R. §§ 510.322, 578.313. An "entity," in turn, is defined as any "partnership, association, trust, joint venture, corporation, group, subgroup, or other organization." *Id.* §§ 510.305, 578.305. And "interest," "when used with respect to property (*e.g.*, 'an interest in property'), means an interest of any nature whatsoever, direct or indirect." *Id.* §§ 510.313, 578.309.

The regulations also contain procedures for any blocked person to challenge their designation, *see* 31 C.F.R. § 501.807, and for OFAC to grant licenses to engage in certain transactions involving blocked property, *see id.* §§ 510.501, 578.404.

## B.    Factual Background

This case arises from OFAC's decision to designate Tornado Cash under Executive Orders 13,694 (as amended) and 13,722. Tornado Cash provides a service that North Korean hackers have relied upon to launder hundreds of millions of dollars in stolen cryptocurrency. North Korea uses this stolen money to fund its nuclear- and ballistic-missile programs.

### 1.    Cryptocurrency Basics

Cryptocurrency is a digital representation of monetary value recorded on decentralized registers known as "blockchains." Each blockchain has its own unique "crypto coin" (known as a "native" coin) that serves as the fundamental medium of exchange among that blockchain's users. Doc. 68-1, at 20. Crypto coins serve the same function as traditional fiat currencies (such as the U.S. dollar or the Japanese yen), and can be traded, transferred, and used for payment and investment. *Id.* at 19. Like traditional currencies, their prices vary based on global supply and demand. *Id.* at 21.

Crypto coins are usually stored in "wallets" that are the digital equivalent of bank accounts. Doc. 68-1, at 20. Each wallet is identified by a unique public key that functions like a bank-account number and is commonly referred to as the wallet's "address." *Id.* The owner of each wallet holds a private key to the wallet that functions like a password. *Id.* Anyone who possesses the private key can access the crypto coins in the wallet.

Cryptocurrency users frequently transfer funds from one digital wallet to another. *See* Doc. 68-1, at 20. To facilitate these transactions, cryptocurrencies rely on blockchain technology. A blockchain is a digital record of transactions—a ledger—that relies on a network of users to maintain the ledger's accuracy. *Id.*; *see id.* at 34-35. Each time a transaction that involves a given cryptocurrency occurs, certain information about the transaction—including the public key of the sending wallet, the

public key of the receiving wallet, and the amount of the transaction—is permanently recorded in that ledger after a validation process. *See id.* at 21.

Ethereum is a prominent cryptocurrency blockchain whose native crypto coin is called Ether. Doc. 68-1, at 25. There are two kinds of Ethereum accounts: externally owned accounts and smart contracts. *Id.* An externally owned account is a wallet that can be controlled by anyone with the corresponding private key. *Id.* If a person wants to initiate a transaction from a wallet they control, they broadcast the request to the Ethereum blockchain network and pay a transaction fee. *Id.* at 24-25. This fee, called "gas," is paid in Ether and is based on the amount of computing resources required to complete the transaction. *Id.* at 30. An individual known as a "validator" then verifies and executes the transaction by editing the ledger to reflect the new balances of the sending and receiving accounts. *Id.* at 24-25. To ensure that these edits are legitimate, only people who "stake," (*i.e.*, deposit) a significant amount of Ether as collateral may become validators. *Id.* at 24-25, 24 n.18.

A smart contract is a computer program uploaded onto a blockchain network. Doc. 68-1, at 21. The contract can be programmed to perform a variety of actions once the contract is triggered, from executing crypto transactions to transferring crypto assets to creating new smart contracts. *Id.* at 21, 25. For example, a "simple vendor smart contract could create and assign ownership of a digital asset" once the person triggering the contract sends Ether to a specified recipient wallet, just like a vending machine can be programmed to dispense a product once a certain amount of

6

money is inserted into it. *Id.* at 21. A person who wants to trigger a smart contract on the Ethereum network must likewise pay gas—that is, a transaction fee—in the form of Ether. *Id.* The more complex the contract, the more gas must be paid. *Id.*

### 2. Cryptocurrency Mixing Services

Cryptocurrencies such as Ethereum run on public blockchains whose ledgers are "transparent"—that is, accessible to and readable by anyone with an internet connection. Doc. 68-1, at 27. The ledger "do[es] not record real names or physical addresses[] . . . and thus confer[s] a degree of anonymity on users." *Id.* at 21. But "if the identity of a wallet owner becomes known, their transactions can be traced." *Id.* Indeed, the public nature of blockchain ledgers renders blockchain technology "well-suited to establishing historical claims and chains of strong correlation." *Id.* at 26-27. This feature of blockchain technology makes it hard for someone to secretly transfer crypto coins from one wallet to another, since such transactions will be publicly logged on the ledger.

Cryptocurrency mixing services anonymize otherwise public transactions by "obfuscat[ing] the source or owner of particular units of cryptocurrency." Doc. 68-1, at 26. They achieve this by "collect[ing], pool[ing], and . . . shuffl[ing] the cryptocurrencies deposited by many users." *Id.* at 27. The funds are then withdrawn to new wallets usually controlled by the original depositors. *Id.* Mixing services make it possible to transfer cryptocurrency on public blockchains (such as Ethereum) from one wallet to another in a manner that is much harder to trace.

Unsurprisingly, mixing services "are a go-to tool for cybercriminals" seeking to launder stolen cryptocurrency from dirty wallets to clean ones. Doc. 68-1 at 27. In 2022, "crypto addresses tied to illicit activity transferred nearly 10 percent of their funds to mixers" and "account[ed] for 23 percent of funds sent to mixers" that year. *Id.* North Korean hackers are especially active perpetrators of cybercrime and frequently use mixers. *Id.* at 27-28. The Lazarus Group—an organization "led" by North Korea's "primary intelligence agency"—has "concentrated its efforts on cryptocurrency crime" and earned "immense[] profit[s]" as a result. *Id.* at 28. Since 2018, "the group has stolen and laundered massive sums of virtual currencies every year, typically in excess of $200 million." *Id.* Its most successful hacks have netted hundreds of millions of dollars—estimated at over $600 million in one instance and over $250 million in two others. *Id.* at 28, 67-68.

North Korean hackers have become increasingly reliant on mixing services to launder stolen cryptocurrency. Doc. 68-1, at 29. "More than 65 percent" of funds stolen by North Korea were laundered through mixers in 2021, "up from 42 percent in 2020 and 21 percent in 2019." *Id.* By using these money-laundering tools to "pool and scramble cryptocurrencies from thousands of addresses," North Korean hackers can "obscure the origins of their ill-gotten" gains, making it easier for them to cash out stolen cryptocurrency into traditional fiat currency. *Id.* (describing North Korea's typical money-laundering process). North Korea uses this stolen money to support its weapons of mass destruction and ballistic missile programs. *Id.* at 28.

### 3. The Tornado Cash Mixing Service

Tornado Cash "provides cryptocurrency mixing services" to its users via smart contracts deployed on a variety of blockchain networks, including Ethereum. Doc. 68-1, at 30, 49-50. The Lazarus Group used the Tornado Cash service to launder over $600 million worth of Ether that it stole in a single cryptocurrency heist. *Id.* at 66-71. Tornado Cash also facilitated the laundering of another $100 million in cryptocurrency stolen in a different heist for which the Lazarus Group was likely responsible. *Id.* at 73-74. Overall, at least $1 billion worth of cryptocurrencies of criminal origin have passed through the Tornado Cash mixing service. *Id.* at 49.

The Tornado Cash mixing service works by allowing customers to deposit their cryptocurrency into a so-called "pool." Doc. 68-1, at 52. A pool is a smart contract wallet that automatically carries out certain transactions when prompted by its user. *Id.* Money deposited into the pool is "mixed" with cryptocurrency belonging to other Tornado Cash customers. *Id.* Most pools are designed to work with a pre-set amount and type of cryptocurrency—for example, the "1 ETH Pool Contract" is for deposits and withdrawals of 1 Ether, the "10 ETH Pool Contract" is for deposits and withdrawals of 10 Ether, and so on. *Id.* at 41 & n.77, 42; *accord id.* at 50.

After making a deposit in a Tornado Cash pool, the depositor receives a digital note entitling its holder to withdraw the same amount of cryptocurrency from the pool at some future date. Doc. 68-1, at 52. Crucially, deposited cryptocurrency can be withdrawn to a different wallet. *Id.* "[E]ven though these deposit and withdrawal

events occur publicly" on the cryptocurrency's public ledger, "any public link between the deposit and withdrawal addresses is severed." *Id.* This gives Tornado Cash's customers "the ability to obfuscate their transactions—regardless of the source of funds, illicit or otherwise." *Id.* at 49.

These deposit and withdrawal operations do not achieve anonymization by themselves; the effectiveness of Tornado Cash also depends on "a critical mass of users concurrently depositing and withdrawing transactions to obfuscate links between deposit and withdrawal addresses." Doc. 68-1, at 51. As a post on plaintiff Coin Center's website explained, "[a] key principle of Tornado Cash pools is that a user's privacy is derived in large part from the simultaneous usage of the pool by many other users." *Id.* at 52. If only one user deposited and then withdrew funds from a pool, "simple inference would make it obvious where the withdrawn tokens came from." *Id.* Thus, "the larger the anonymity set, the better it is for the users," *id.* at 37, a point Tornado Cash itself emphasized on its own website and in online posts, *see id.* at 51 (Tornado Cash website explaining that "maintain[ing] a large number of active deposits" increases anonymity for all users); *id.* at 53 (post by Tornado Cash explaining that anonymity depends in large part on the "total amount of deposits made").

Tornado Cash was established by a core developer group that designs and updates the service's smart contracts. Doc. 68-1, at 31-32. The group "actively promote[s] the platform's popularity in an attempt to increase [its] user base," *id.* at

30, posts job advertisements, *id.* at 31, and encourages investment in Tornado Cash, *id.* at 39. The group includes founders Alexey Pertsev, Roman Semenov, and Roman Storm. *Id.* at 30. Pertsev is a Russian national linked to a Russian company that has provided "material and technological support to . . . Russia's primary security agency." *Id.* at 64. In August 2022, he was arrested on money-laundering charges by Dutch law enforcement. *Id.* And in 2023, the United States indicted Semenov and Storm for conspiracy to commit money laundering and other related charges. Press Release, U.S. Attorney's Office (S. Dist. of N.Y.), *Tornado Cash Founders Charged with Money Laundering and Sanctions Violations* (Aug. 23, 2023), https://perma.cc/VA8W-HCQ5.

Tornado Cash's operations are controlled by a "decentralized autonomous organization" (DAO). Doc. 68-1, at 33. The DAO's most significant responsibility is to approve new smart contracts written by the core developer group. *Id.* The DAO is made up of individuals who hold an asset that Tornado Cash calls TORN. *Id.* at 32-33. TORN is a crypto token created by Tornado Cash. *Id.* at 20, 60. A crypto token is a digital asset created to serve a specific purpose. *Id.* at 20. Whereas crypto coins are analogous to fiat currency, crypto tokens are analogous to other forms of assets. *Id.* Some crypto tokens resemble deeds that confer ownership rights over physical or virtual objects. *Id.* Others resemble vouchers that their owners may redeem for products or services, such as exclusive perks in a video game. *Id.*

TORN is a "governance token" that resembles stock issued by a public corporation. Doc. 68-1, at 22. Each token confers a specified amount of voting

power over Tornado Cash's governance decisions. *Id.* TORN thus gives its holders the right to influence the ongoing development and maintenance of the Tornado Cash mixing service. *Id.* at 33. This right may be exercised by any TORN holder willing to "lock" their TORN—essentially, registering it so that it may not be sold until the holder unlocks the TORN. *See id.* at 38.

Although Tornado Cash asserts that "TORN is not a fundraising device or investment opportunity," Doc. 68-1, at 34, the tokens can be bought, sold, and transferred according to their market value—just like shares of stock, *id.* at 22, 30. "[A]s of October 1, 2022, TORN tokens are available for trade and were trading at $6.37." *Id.* at 65. Moreover, TORN generates value for its holders in at least two ways. First, TORN holders "receive a portion" of Tornado Cash's user fees "based on the amount of TORN they have staked." *Id.* at 60. Second, the success of Tornado Cash's mixing service "increases the economic value" of each TORN token. *Id.* at 58.

Tornado Cash's reliance on TORN as an "incentive mechanism" to gain customers for its mixing service illustrates TORN's value. Doc. 68-1, at 37; *see id.* at 54, 60-61. As discussed above, the success of Tornado Cash depends on the existence of a critical mass of customers. *See id.* at 51. Tornado Cash therefore gave TORN as a reward to early users to increase its userbase. *Id.* at 39. The value of the average distribution made during that period was estimated at over $23,000 in 2021. *Id.* Tornado Cash has also awarded TORN to customers as a reward for depositing

their cryptocurrency into a Tornado Cash mixing pool and keeping it there because this increases anonymity for users.  *Id.* at 54; *see id.* at 51.

### 4.    Tornado Cash's Use of Relayers

Mixing services such as Tornado Cash may not completely obscure the relationship between depositing and withdrawing accounts because many blockchain networks levy transaction fees on their users, and the source of those fees can sometimes be traced.  Doc. 68-1, at 55; *see supra* pp. 6-7 (describing Ethereum's "gas" fees).  Before a user can withdraw Ether that was deposited into a Tornado Cash pool, the recipient wallet for the withdrawal must first contain enough "Ether to pay the Ethereum network to process the smart contract's operations."  Doc. 68-1, at 55.  Because any transfer into the wallet receiving the withdrawal will itself be recorded on Ethereum's blockchain ledger, "sending Ether to the withdrawal account prior to withdrawal [from Tornado Cash] might create a link between the user's deposit and withdrawal accounts"—the existence of which the Tornado Cash service is designed to obscure.  *Id.*

As initially constituted, the Tornado Cash service did not have a built-in mechanism for addressing this "fee payment dilemma."  Doc. 68-1, at 55.  In February of 2022, however, the Tornado Cash DAO voted to institute changes to the service that allow transactions withdrawing funds from Tornado Cash pool to be executed using "relayers" registered with Tornado Cash.  *Id.* at 37, 57.  Relayers are middlemen who "allow users to process withdrawals without needing to pre-fund

their withdrawal accounts." *Id.* at 55. Relayers "manage the entire withdrawal" by paying the required transaction fees from their own cryptocurrency holdings, rather than requiring Tornado Cash users to do so. *Id.* Relayers then deduct those fees— and fees assessed by Tornado Cash and relayers' own transaction fees—from the amount withdrawn. *Id.* The remaining cryptocurrency after fees is sent to the account receiving the withdrawal. *Id.* Because relayers help users "pay fees for . . . withdrawals from a pool while maintaining anonymity," they "form an essential and necessary part of the Tornado Cash ecosystem." *Id.* Nearly 84% of all Tornado Cash transactions involve relayers. *Id.* at 55 & n.113.

When a Tornado Cash customer initiates a relayer-assisted withdrawal of cryptocurrency from a Tornado Cash mixing pool, that transaction triggers a particular Tornado Cash smart contract that governs relayer transactions. Doc. 68-1 at 55. The contract uses an algorithm to select a relayer from a list of registered Tornado Cash relayers, and allows the relayer to consummate the withdrawal. *Id.* at 55-56. Anyone can become a relayer for Tornado Cash by acquiring and "staking" a certain amount of TORN. *Id.* at 57. Once that occurs, the relayer is added to the list of registered relayers. *Id.* at 55. Each time the relayer processes a transaction, a portion of the relayer's staked TORN is used to pay fees assessed by Tornado Cash, and those fees "are subsequently distributed among" certain "DAO members." *Id.* at 56.

### C.    The OFAC Designation

In November 2022, OFAC designated Tornado Cash pursuant to Executive Orders 13,694, as amended, (relating to certain cyber activities that threaten the United States) and 13,722 (relating to North Korea's nuclear and missile programs). Doc. 68-1 at 2-6.[1]  OFAC identified Tornado Cash as an entity with an organizational structure consisting of the core developer group and the Tornado Cash DAO.  *Id.* at 2.  As a result of this designation, "all real, personal, and any other property and interests in property" of Tornado Cash that are subject to the jurisdiction of the United States are "blocked."  *Id.* at 5.  Blocked property "may not be transferred, paid, exported, withdrawn[,] or otherwise dealt in."  *Id.*  Furthermore, "any transaction or dealing by a U.S. person or within the United States in" blocked property "is prohibited."  *Id.*[2]

---

[1] OFAC originally designated Tornado Cash only under Executive Order 13,694.  *See* Press Release, U.S. Dep't of the Treasury, *U.S. Treasury Sanctions Notorious Virtual Currency Mixer Tornado Cash* (Aug. 8, 2022), https://perma.cc/AY3X-Z8JG. The November designation rescinded this initial designation and redesignated Tornado Cash under both Executive Orders 13,694 and 13,722.  *See* Press Release, U.S. Dep't of the Treasury, *Treasury Designates DPRK Weapons Representatives* (Nov. 8, 2022), https://perma.cc/TGD5-8MXH.

[2] In addition to the administrative record supporting this decision publicly filed in district court, OFAC also provided an *ex parte* classified addendum to the administrative record with additional information justifying its decision.  The district court did not rely on that addendum in ruling on plaintiffs' claims, Doc. 74 at 1 n.1; 19 n.13, but we note that the material is available for the Court's review if necessary. *See* 50 U.S.C. § 1702(c).

OFAC issued several Frequently Asked Questions (FAQs) informing the public about the scope of this designation and the way OFAC would enforce it. FAQ 1079 reminded users with cryptocurrency in a Tornado Cash mixing pool that they can request a specific license to retrieve funds that may still be held in those pools. OFAC, *Frequently Asked Questions: Cyber-Related Sanctions*, https://perma.cc/5KQ5-25GE. OFAC has a "favorable licensing policy towards such applications" as long as they "d[o] not involve . . . sanctionable conduct." *Id.* FAQ 1078 addressed "dusting" transactions, in which individuals send "unsolicited and nominal amounts of virtual currency or other virtual assets from Tornado Cash smart contracts" to other people, and explained that OFAC "will not prioritize enforcement" against individuals who receive such unsolicited cryptocurrency. *Id.* And FAQ 1076 states that the designation only prohibits "engaging in any transaction with Tornado Cash or its blocked property." *Id.* The designation does not prohibit "interacting with open-source code itself." *Id.* For example, "U.S. persons would not be prohibited . . . from copying the open-source code" of a Tornado Cash smart contract "and making it available online for others to view." *Id.*

## D. Prior Proceedings

Plaintiffs are three U.S.-based individuals who have used Tornado Cash in the past and a cryptocurrency nonprofit—Coin Center—that has received donations from donors using Tornado Cash. Doc. 9, at 9-15. They brought suit under the Administrative Procedure Act, challenging in part OFAC's designation of Tornado

16

Cash.  Specifically, plaintiffs challenged OFAC's inclusion of 29 of the 90 wallet

addresses associated with Tornado Cash that OFAC included to identify blocked

property covered by the order.  *Id.* at 26; *see id.* at 41-44.  Plaintiffs alleged that these

29 addresses constitute the "core of the Tornado Cash Tool."  *Id.* at 26.  Plaintiffs

made clear that their challenge did not extend to other addresses that OFAC

identified, including addresses used (in addition to the 29 challenged addresses) when

a relayer withdraws cryptocurrency from a Tornado Cash pool.  *See, e.g.*, Doc. 36-1, at

23-24, 31-32, 34-35.  In declarations submitted at summary judgment, the individual

plaintiffs stated that they previously used or would like to use the Tornado Cash

service without relayers.  Doc. 36-2, at 4; Doc. 36-3, at 5; Doc. 36-4, at 4; Doc. 36-5,

at 4.  Plaintiffs thus argued that Tornado Cash has no "interest" in their use of the

service without relayers, because those uses of the service "do *not* involve registered

relayers or payments to the DAO" and Tornado Cash has no "positive law" or "state-

law" interest in such uses.  Doc. 36-1, at 29, 32, 34.  Plaintiffs further argued that the

designation was arbitrary and capricious in various respects and violated their First

Amendment rights.  Doc. 9, at 34-38.

The district court granted summary judgment to the government.  The court

rejected plaintiffs' argument that OFAC exceeded its statutory authority by including

the 29 challenged addresses in the designation.  The court noted that IEEPA broadly

applies to "'*any* interest'" held by a foreign country or foreign national," not solely to a

"'property interest' or 'ownership interest' in the technical legal sense."  Doc. 74, at 12

(quoting 50 U.S.C. § 1702(a)(1)(B)).  It further observed that OFAC regulations have recognized that the term "interest" means "an interest of any nature whatsoever, direct or indirect."  *Id.* at 13 (quoting 31 C.F.R. §§ 510.513, 578.309).  The court thus concluded that the central question was "whether members of the Tornado Cash entity (i.e., its founders, developers, and DAO) have 'an interest of any nature whatsoever' in that tool."  *Id.* at 14.

In answering this question, the district court focused on the role of TORN— Tornado Cash's governance token.  Doc. 74, at 14; *see supra* pp. 11-13 (describing TORN).  As the district court explained, TORN holders "have an indirect beneficial 'interest' in the use of the core software tool and the service as a whole because that increases the value of the TORN" by making the mixing service more effective, akin to the interest a stockholder has in the success of the overall enterprise.  Doc. 74, at 14.  And the court emphasized that this interest existed regardless of whether a particular transaction generated relayer fees for TORN holders, because "TORN had substantial value before relayers (and the fees they paid) were added to the Tornado Cash service," which "supports the inference that increased use of the service will increase the value of the TORN held by Tornado Cash's founders, developers, and DAO."  *Id.* at 15.  That constitutes "an 'interest' for purposes of the IEEPA."  *Id.*  And a "Tornado Cash transaction between two Americans" no less implicates that interest because it "provides indirect benefits to foreigners by increasing the value of the TORN held by the Tornado Cash founders, developers, and DAO."  *Id.*  In sum,

"the administrative record establishes that the Tornado Cash entity has an 'interest' in all of the smart contracts that make up its service (including the [challenged wallet addresses]) because without those contracts, the service and the TORN held by the founders, developers, and DAO would not function and would be less valuable." *Id.* at 14.

The district court likewise rejected plaintiffs' other challenges. As relevant here, the court noted that OFAC had provided guidance about its enforcement priorities and also allowed individuals to apply for licenses to "recover assets that are still held in Tornado Cash pools," which demonstrated "that OFAC considered the relevant reliance interests and took steps to mitigate any negative consequences innocent Tornado Cash users may face as a result of the designation." Doc. 74, at 19-20. The district court also rejected plaintiffs' First Amendment arguments. The court explained that plaintiffs had cited no "authority supporting the existence of a First Amendment right to use a particular service or type of currency to make donations for charitable or other purposes." *Id.* at 20. The court observed that the designation "did not compel private associations to disclose anything about their donors or members" and "does not preclude Plaintiffs (or anyone else) from spending money or donating money for political ends" or "preclude organizations from accepting anonymous donations." *Id.* at 21. Indeed, as the district court noted, one of plaintiffs' own declarations indicated that "there are other privacy tools that are

available to Plaintiffs" aside from Tornado Cash. *Id.* at 22. Thus, "the designation of Tornado Cash did not implicate Plaintiffs' First Amendment rights." *Id.*

### E.  Standard of Review

This Court reviews a grant of summary judgment de novo. *Mendoza v. Secretary, Dep't of Homeland Sec.*, 851 F.3d 1348, 1352 (11th Cir. 2017) (per curiam). In considering a claim that an agency action was arbitrary and capricious under the Administrative Procedure Act, this Court considers whether "(1) the agency 'relied on factors which Congress has not intended it to consider,' (2) the agency 'failed to consider an important aspect of the problem,' (3) the agency explained its decision in a way 'that runs counter to the evidence,' or (4) the action 'is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Id.* at 1353 (quoting *Defenders of Wildlife v. U.S. Dep't of the Navy*, 733 F.3d 1106, 1115 (11th Cir. 2013)). That review is "'exceedingly deferential'" and in conducting it the Court "examine[s] whether the agency came to a rational conclusion and do[es] not substitute [its] own judgment for that of the agency." *Id.* at 1352-53 (quoting *Defenders of Wildlife*, 733 F.3d at 1115).

### SUMMARY OF ARGUMENT

Tornado Cash provides a cryptocurrency mixing service that North Korea has used extensively to launder stolen cryptocurrency. North Korea uses the stolen cryptocurrency to fund its weapons of mass destruction and missile programs. The President has determined that the actions and policies of the North Korean

government, as well as malicious cyber-enabled activities, pose unusual and extraordinary threats to the national security, foreign affairs, or economy of the United States, and has accordingly exercised authority under IEEPA to address national emergencies related to those threats. As part of that exercise of authority, the President has blocked property associated with those threats, and his authority to do so under IEEPA extends to "any property in which any foreign country or a national thereof has any interest." 50 U.S.C. § 1702(a)(1)(B). OFAC here determined that Tornado Cash is an entity properly subject to the President's orders and has accordingly designated Tornado Cash as an entity whose property and interests in property are blocked under the relevant executive orders.

That designation properly includes blocking all transactions with the cryptocurrency mixing service Tornado Cash operates. That mixing service is property, and Tornado Cash has an interest in that property in multiple respects. Many users of the Tornado Cash service make use of a "relayer" to process the transaction, and such relayer-aided transactions generate a fee that goes to Tornado Cash. In addition, Tornado Cash has an interest in that service because Tornado Cash has created a "governance token" called TORN. TORN is much like stock in Tornado Cash. It can be traded on exchanges, it allows its holders to vote on decisions made by Tornado Cash, and only holders of TORN can receive a share of the fees from relayer transactions. In addition, like stock, the value of TORN is correlated with the success and widespread adoption of Tornado Cash.

Plaintiffs assert that they would not use relayers for their transactions, and urge on that basis that OFAC lacked authority to block their particular uses of the Tornado Cash service. They argue that an "interest" is limited to a "legal right to something that can be owned," *e.g.*, Br. 24, and that because no payment to Tornado Cash would result from their relayer-free transactions, Tornado Cash lacks the requisite "interest" in their prospective uses of the service.

That contention fails. As two other courts of appeals have recognized, IEEPA's application to "any interest" covers not only a "'legally enforceable' interest" but also a "beneficial interest, or an interest not defined in traditional common law terms." *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 162-63 (D.C. Cir. 2003); *accord Global Relief Found., Inc. v. O'Neill*, 315 F.3d 748, 753 (7th Cir. 2002). That understanding accords not only with the broad sweep of the term "any," but also with the purpose of IEEPA, which is "'to give the President means to control assets that could be used by enemy aliens,'" a risk "at least as much raised" where a country holds some "interest not defined in traditional common law terms as it is by a legal interest which might be a pure fiction." *Holy Land*, 333 F.3d at 163 (quoting *Global Relief*, 315 F.3d at 753). Nothing in IEEPA suggests that North Korea or other foreign entities posing threats to national security can circumvent IEEPA by converting their property interests into creative new forms. *Global Relief*, 315 F.3d at 753. That understanding is also consistent with longstanding executive practice; for many decades, the Executive Branch has likewise recognized that the term "any

interest" covers all interests of any type, defining that term in regulations to cover "an interest of any nature whatsoever, direct or indirect." 31 C.F.R. §§ 510.313, 578.309.

Plaintiffs' other arguments likewise fail. The agency here properly considered all relevant factors in determining that Tornado Cash should be blocked given the President's determinations in the emergency declarations giving rise to the blocking order. There is no disagreement over whether Tornado Cash assisted or provided support for North Korea and for other malicious cyber actors, and the factors plaintiffs contend that OFAC ignored do not bear on that determination. Similarly, plaintiffs' First Amendment arguments—which hinge on one plaintiff's assertion that he used the Tornado Cash service to anonymously donate cryptocurrency to Ukraine—are insubstantial. The order does not compel Tornado Cash to disclose any user of its service or compel plaintiffs to reveal any activities they may be engaged in, so plaintiffs' reference to compelled disclosure cases is inapposite. Moreover, where the service plaintiffs are no longer able to use has been blocked for reasons wholly unrelated to any First Amendment-protected conduct, they have no plausible claim that their First Amendment rights have been burdened. *See Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 706-07 (1986). And even if First Amendment scrutiny were appropriate, the order here would easily satisfy the standard governing incidental burdens on speech created by generally applicable regulations.

# ARGUMENT

## I. The Agency Properly Concluded that Transactions with Tornado Cash Could Be Blocked Given Its Relationship to North Korea and Other Malicious Cyber Actors

### A. Tornado Cash Provides Money Laundering Services to North Korea and Others

The President has authority to declare national emergencies related to national security, foreign policy, and economic threats outside the United States. In the exercise of that authority, a national emergency has been declared to address threats posed by North Korea, including its use of cryptocurrency theft and money laundering to fund its missile and weapons of mass destruction development programs. A national emergency has also been declared to address "the increasing prevalence and severity of malicious cyber-enabled activities originating from[] . . . outside the United States." 80 Fed. Reg. at 18,077.

Once a national emergency has been declared, the President has broad authority under IEEPA to control foreign property: the President may "investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or

with respect to any property, subject to the jurisdiction of the United States." 50 U.S.C. § 1702(a)(1)(B).

Exercising the President's delegated authority under IEEPA, OFAC here designated Tornado Cash under these declarations for having provided material assistance to North Korea and to malicious cyber-enabled activities. Tornado Cash provides a cryptocurrency mixing service that North Korea has used extensively to launder stolen cryptocurrency. North Korea then uses the stolen cryptocurrency to fund its weapons of mass destruction and missile programs.

In designating Tornado Cash, the agency explained that Tornado Cash is an entity subject to blocking under IEEPA—in other words, a "partnership, association, trust, joint venture, corporation, group, subgroup, or other organization." 80 Fed. Reg. at 18,078; 81 Fed. Reg. at 14,945. That entity has two basic parts. The first is Tornado Cash's Russian founders and other associated developers "who together launched the Tornado Cash mixing service, developed new Tornado Cash mixing service features, created the TORNADO CASH Decentralized Autonomous Organization (DAO), and actively promote the platform's popularity in an attempt to increase its user base." Doc. 68-1, at 30. The second is the DAO itself, "which is responsible for voting on and implementing new features created by the developers." *Id.*

Both the founders and the DAO hold TORN, which is the "governance token" of Tornado Cash. Doc. 68-1, at 30. That token is akin to stock in a company.

Like stock, TORN can grant its holders voting rights on decisions made by Tornado Cash, such as whether to implement new types of smart contracts, and a TORN holder's voting power is proportional to the amount of TORN they hold. *Id.* at 30, 32, 38. Like stock, TORN can be traded on secondary exchanges at fluctuating market prices. *Id.* at 30, 59. And like stock, "value generated through use of the Tornado Cash mixing service accrues to holders of TORN through distribution of fees" from relayer transactions (akin to a dividend) "and an increase in the value of TORN." *Id.* at 63; *see id.* at 30, 35-36.

Tornado Cash has created and manages a service, which for clarity we refer to as the "Tornado Cash service." As explained in greater detail above, that service consists of a variety of "smart contracts" programmed to operate in tandem to allow customers to deposit cryptocurrency and subsequently withdraw that cryptocurrency in a manner that obscures the owner of the cryptocurrency, making it an especially attractive tool for laundering stolen cryptocurrency. *See supra* pp. 9-14; Doc. 68-1, at 49-54. That service, the contractual terms of which are embodied in and executed by Tornado Cash's smart contracts, constitutes "property." *See* Doc. 68-1, at 21, 58-62; Doc. 74, at 14 (noting that Tornado Cash's "interest" is in "all of the smart contracts that make up its service"). This is true in several independent respects, as plaintiffs do not dispute. Consistent with IEEPA's inclusion of "*any* property" in which a foreign country or national has an interest, 50 U.S.C. § 1702(a)(1)(B) (emphasis added), OFAC regulations define "property" to include "services of any nature whatsoever"

26

and "contracts of any nature whatsoever," both of which describe the Tornado Cash smart contracts that perform the transaction-obscuring service that Tornado Cash provides, 31 C.F.R. §§ 510.323, 578.314.

As particularly relevant here, the agency explained that Tornado Cash has an "interest" in that property in multiple respects. Tornado Cash receives fees when users conduct withdrawals using registered relayers, and Tornado Cash distributes those fees to members of the DAO. Doc. 68-1, at 50-52. In addition, the value of TORN is related to the success and widespread adoption of Tornado Cash, much like the value of stock is related to the success of a company's products or services. Indeed, the very nature of the Tornado Cash service makes that interest especially apparent. As discussed above, users make use of the Tornado Cash service to deposit cryptocurrency into a pool and then withdraw it into a different account in an effort to obscure the owner of the cryptocurrency. *See supra* pp. 9-11. But as a post on plaintiff Coin Center's own website succinctly explained, "[a] key principle of Tornado Cash pools is that a user's privacy is derived in large part from the simultaneous usage of the pool by many other users," because otherwise someone monitoring deposits and withdrawals from Tornado Cash pools could easily determine "where the withdrawn tokens came from." Doc. 68-1, at 52.

Tornado Cash itself recognized the same principle. In online posts, Tornado Cash emphasized that "maintain[ing] a large number of active deposits" increases anonymity for all users, Doc. 68-1, at 51, and that anonymity is largely derived from

the "total amount of deposits made," *id.* at 53. And Tornado Cash took actions confirming this premise, using TORN as an "incentive mechanism" to encourage more people to deposit cryptocurrency into its pools and to keep it there longer to increase the effectiveness of its service. *Id.* at 37; *see id.* at 54, 60-61. Thus, Tornado Cash distributed TORN to early users as an incentive to increase its userbase, *id.* at 39, and awarded TORN to customers as a reward for depositing their cryptocurrency into a Tornado Cash mixing pool and keeping it there, *id.* at 51, 54. And more generally, Tornado Cash made considerable efforts to create, improve, and promote the Tornado Cash service, underscoring Tornado Cash's interest in that service. *Id.* at 58-60.

As the district court explained, all of this demonstrates that TORN holders have an interest "in the use of the core software tool and the service as a whole because that increases the value of the TORN" by making the mixing service more effective. Doc. 74, at 14. And that interest is present for all transactions using the Tornado Cash service—not just those that generate relayer fees. Even a "transaction between two Americans" using Tornado Cash affects that interest "by increasing the value of the TORN held by the Tornado Cash founders, developers, and DAO." *Id.* at 15. The fact that "TORN had substantial value" even "before relayers (and the fees they paid) were added to the Tornado Cash service" underscores that TORN has value independent of those fees that is tied to the Tornado Cash service itself, and

that "increased use of the service will increase the value of the TORN held by Tornado Cash's founders, developers, and DAO." *Id.* at 15.

Moreover, that interest is plainly held by foreign countries and nationals—a point no one disputes. Tornado Cash's founders and developers, as well as members of the DAO, include foreign nationals who continue to own TORN. Doc. 68-1, at 64-65. Indeed, OFAC's decision also relied on evidence that North Korea itself owns TORN as a result of its longstanding use of the platform for money laundering. *Id.* at 63.

The agency's designation of Tornado Cash thus falls squarely within IEEPA's application to "any property in which any foreign country or a national thereof has any interest." 50 U.S.C. § 1702(a)(1)(B). The "property" is the Tornado Cash service, which consists of the smart contracts Tornado Cash has created and implemented. Tornado Cash also has an "interest" in that property in multiple ways. The founders and DAO, all of whom hold TORN, receive fees from relayer transactions. In addition, the overall use of the service makes it more effective and affects the value of the TORN the founders and DAO hold. And a "foreign country" and "national[s]" of a foreign country have that interest because foreign national founders and developers hold TORN and because other members of the DAO are also foreign nationals, to say nothing of North Korea itself.

## B. OFAC May Take Action to Address "Any Interest" Foreign Nationals Hold in the Tornado Cash Service

Plaintiffs dispute little of the agency's reasoning. They do not dispute that North Korea and other malicious actors have used Tornado Cash to launder stolen cryptocurrency, including to fund North Korea's missile and weapons of mass destruction programs, and do not challenge OFAC's decision to designate Tornado Cash. They do not dispute that the Tornado Cash service is property.[3] And they accept that the agency may block transactions using relayers, which in addition to relayer-specific contracts also make use of the same basic set of contracts—what plaintiffs refer to as the "core software tool"—as non-relayer transactions.

Plaintiffs contend only that they should remain free to use the Tornado Cash service without the use of relayers. They do not dispute that Tornado Cash has an "interest" in relayer transactions because of the fees those transactions generate. *See, e.g.*, Br. 44. But they posit that an "interest" under the statute is defined by "technical rules of property law," Br. 28, such that an "interest" is limited to a "legal right to something that can be owned," Br. 24, 25, 31. Plaintiffs thus contend that when they use the Tornado Cash service to deposit funds to a Tornado Cash pool and then withdraw those funds without a relayer, that "transaction does not involve any 'property' in which a designated foreigner has any 'interest,'" because plaintiffs do not

---

[3] Amici argue that it is not, *see* Andreesen Horowitz Amicus Br. 15-20; Blockchain Ass'n Amicus Br. 15-16, but this Court "will not consider arguments raised only by amici," *Stanley v. City of Sanford*, 83 F.4th 1333, 1344 (11th Cir. 2023).

pay a fee to any foreigner or "transfer ownership" of their cryptocurrency or "other legal or equitable rights" to a foreigner. Br. 32. That contention misunderstands the agency's order and the scope of the President's authority under IEEPA.

**1.** At the outset, plaintiffs' theory mischaracterizes why their transactions are covered by IEEPA. As just discussed, the "property" at issue here is the Tornado Cash service itself, and plaintiffs have not challenged OFAC's determination that the service is "property" under IEEPA. *See, e.g.*, Doc. 74 at 14 (explaining that Tornado Cash has an interest in "all of the smart contracts that make up [the Tornado Cash] service (including the core software tool"). Plaintiffs therefore may not engage in transactions involving that property, regardless of whether plaintiffs' particular transactions generate a payment to Tornado Cash or provide a traceable benefit to Tornado Cash at all, and regardless of the status of plaintiffs' property that is also involved in the transaction.

This Court has recognized the point before. In *De Cuellar v. Brady*, this Court considered whether an American holding bonds issued by Cuba that were secured by a "sinking fund" held in the United States could redeem those bonds. 881 F.2d 1561, 1563-64 (11th Cir. 1989). This Court held that OFAC properly treated that transaction as blocked because Cuba retained an "undisputed reversionary interest" to receive whatever amount remained in the fund after the bonds were redeemed. *Id.* at 1567. Of course, the redemption would have *diminished* Cuba's interest in the fund by reducing the amount available for a potential remainder, but that did not matter;

IEEPA applies even in circumstances where the foreign country or national would receive no benefit from the blocked action.

**2.** Plaintiffs' confusion notwithstanding, the key question in this appeal is whether Tornado Cash has "any interest" in the property at issue—namely, the Tornado Cash service. As discussed, OFAC properly determined that Tornado Cash has an interest in that service. That interest is reflected in TORN—Tornado Cash's equivalent of stock—which looks quite similar to the interest any shareholder has in the success of the products or services of the enterprise. That interest is further evidenced by the efforts Tornado Cash made to create, improve, and promote the Tornado Cash service. And no authority supports plaintiffs' contention that OFAC must demonstrate that Tornado Cash holds some particular form of legal or equitable interest in the Tornado Cash service.

Congress drafted IEEPA to allow the President flexibility to address emergencies imperiling national security. The statute thus grants the President "broad authority" to regulate property in which foreign countries or nationals have an interest in the manner that best furthers the United States' foreign-relations and national-security interests, such as "in negotiating the resolution of a declared national emergency." *Dames & Moore v. Regan*, 453 U.S. 654, 672, 673 (1981). That intent is reflected in the capacious language Congress chose in defining the coverage of the statute. Congress granted the President a host of authorities, such as nullifying, voiding, preventing, or prohibiting any "transactions involving" such property, the

"use" of property, or "exercising any right, power, or privilege with respect to" such property. 50 U.S.C. § 1702(a)(1)(B). These powers may be applied to "*any* property in which *any* foreign country or a national thereof has *any* interest." *Id.* (emphasis added). "Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" *United States v. Gonzales*, 520 U.S. 1, 5 (1997); *accord Laperriere v. Vesta Ins. Grp.*, 526 F.3d 715, 726 (11th Cir. 2008) ("[T]he term 'any' in a statute has a 'broad,' 'powerful,' and 'expansive' meaning; 'it does not mean "some" or "all but a few," but instead means "all."'"); Doc. 74, at 13. And the term "interest," too, "is a general word that is 'to be accorded [its] full and fair scope [and is] not to be arbitrarily limited.'" Doc. 74, at 13 (alterations in original) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 101 (2012)).

In keeping with that broad language, courts have consistently recognized that IEEPA reaches not only a "'legally enforceable' interest" but also a "beneficial interest, or an interest not defined in traditional common law terms." *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 162-63 (D.C. Cir. 2003); *accord Global Relief Found., Inc. v. O'Neill*, 315 F.3d 748, 753 (7th Cir. 2002). As those courts have explained, the text of IEEPA "imposes no limit on the scope of the interest," and "[t]he interest need not be a legally protected one in order to be caught within the net" of IEEPA. *Holy Land*, 333 F.3d at 162-63; *Global Relief*, 315 F.3d at 753 (emphasizing that "the focus must be on how assets could be controlled and used, not

on bare legal ownership"). Thus, in those cases, Hamas had an "interest" in property that was owned and possessed by organizations in the United States, despite the fact that Hamas had no legal claim to that property all. *See Holy Land*, 333 F.3d at 162-63; *Global Relief*, 315 F.3d at 752-53.

Those courts stressed that that understanding also follows from IEEPA's basic purpose—"'to give the President means to control assets that could be used by enemy aliens'"—and "[t]hat risk is at least as much raised" where a country holds some "interest not defined in traditional common law terms as it is by a legal interest which might be a pure fiction." *Holy Land*, 333 F.3d at 163 (first alteration in original) (quoting *Global Relief*, 315 F.3d at 753). If "enemy aliens" could transform their property interests into creative new forms to avoid sanctions, it would subvert the entire purpose of the sanctions regime Congress established. "Nothing in the text of the IEEPA suggests that the United States' ability to respond to an external threat can be defeated so easily." *Global Relief*, 315 F.3d at 753.

This approach also comports with decades of Executive Branch practice. Acting under Congress's express delegation to prescribe "regulations, including regulations prescribing definitions," 50 U.S.C. § 1704, the Department of the Treasury has defined the term "interest," "when used with respect to property," as meaning "an interest of any nature whatsoever, direct or indirect," 31 C.F.R. §§ 510.313, 578.309. The Department has defined the term in that manner since shortly after the phrase "any property in which any foreign country or a national thereof has any interest" was

added to the Trading With the Enemy Act—IEEPA's predecessor—in 1941. *See* Pub. L. No. 77-354, tit. III, § 301, 55 Stat. 838, 839 (1941) (amending Trading With the Enemy Act); *see also Regan v. Wald*, 468 U.S. 222, 232-33, 232, 232 n.16, 233 n.17 (1984) (referring to the "sweeping statutory language" of the Trading With the Enemy Act and noting that IEEPA "tracks the language" of that statute). The first general regulations governing foreign assets control after the 1941 amendment adopted substantively the same definition present today, *see* 15 Fed. Reg. 9040, 9042 (Dec. 19, 1950), and the Department subsequently repeated that definition in issuing regulations specific to Cuba, *see* 28 Fed. Reg. 6974, 6977 (July 9, 1963). Congress adopted the statutory language from the Trading With the Enemy Act unchanged when enacting IEEPA, and continued in effect preexisting sanctions regimes, including the definition of "interest" in the Cuban asset regulations. *See Wald*, 468 U.S. at 225, 233-34 (holding that Cuban assets regulation defining "interest" continued in effect after enactment of IEEPA). And the Department adopted the same definition shortly after IEEPA's enactment. *See* 44 Fed. Reg. 75,352, 75,352 (Dec. 19, 1979) (same definition in regulations governing sanctions on Iran). That longstanding and consistent interpretation, and Congress's reenactment of the same language unchanged after that interpretation was adopted, further reinforces that the phrase "any interest" really means "any interest," not simply ones defined in the narrow legal terms plaintiffs posit. *See, e.g., Davis v. United States*, 495 U.S. 472, 484 (1990); *NLRB v. Bell Aerospace Co. Div. of Textron, Inc.*, 416 U.S. 267, 274-75 (1974).

As these points illustrate, the agency's longstanding definition of "interest" does not meaningfully differ from the statutory language, and both are plainly broad enough to apply here. But to the extent there is any remaining doubt about whether "any interest" means "an interest of any nature whatsoever, direct or indirect," this Court should respect the agency's definition and its application here. Given Congress's express delegation to the President to promulgate definitional regulations, this Court and others have recognized that the agency's interpretation of the statutory text is entitled to deference. *See, e.g.*, *Consarc Corp. v. Iraqi Ministry*, 27 F.3d 695, 701 (D.C. Cir. 1994); *De Cuellar*, 881 F.2d at 1565.[4]

**3. a.** Plaintiffs' contrary arguments fail. They begin by misconstruing the nature of Tornado Cash's "interest" in the Tornado Cash service. Plaintiffs do not dispute that the effectiveness of the Tornado Cash service depends on widespread use of the service. They likewise do not disagree that the value of TORN is related to the success of the Tornado Cash service, and they do not question the evidence that Tornado Cash promoted its service for precisely this reason. But they contend that this simply reflects that TORN and Tornado Cash are "complementary goods," akin to when "buying coffee benefits dairy farmers because it may increase demand for

---

[4] Plaintiffs suggest that this argument was forfeited. Br. 43. Even assuming the deference due an agency could be forfeited—and forfeited in a circumstance where Congress has expressly granted the agency the authority to define terms by regulation—the government raised this point in its motion for summary judgment and again in its reply, quoting *Consarc* both times. *See* Doc. 57 at 19; Doc. 66 at 9-10.

milk," and that such "indirect economic benefits" or "supply-and-demand economic effects" do not qualify as an "interest" in property. Br. 34; *accord* Br. 35-36.

That argument ignores what the agency and the district court actually said about the nature of the property at issue and the relationship between Tornado Cash and TORN. As discussed, Tornado Cash has a property interest in the Tornado Cash service and its constituent contracts. An increased user base is essential to the functionality of the Tornado Cash service and the corresponding value of TORN, which is Tornado Cash's equivalent of stock. Tornado Cash's actions demonstrated that it understood that promoting the use of its service and increasing its user base would be to its advantage, as it used TORN as a reward to encourage use of its service. And as the district court observed, TORN's "substantial value" even before the addition of relayer services illustrates that Tornado Cash has an interest in its service writ large and that "increased use of the service will increase the value" of TORN. Doc. 74 at 15. In short, more than substantial evidence supports OFAC's conclusion that there is a direct connection between the use of Tornado Cash's service and the value of TORN. That conclusion is no different from recognizing that a company has an interest in the use of a service it creates and promotes because use of the service will affect the company's stock price. The relationship between a company's service and its stock cannot reasonably be described as a relationship between "[c]omplementary goods" or as reflecting "indirect economic benefits." Br. 35.

**b.** Plaintiffs fail to make sense of the cases and longstanding practice rejecting their view that only certain legally enforceable interests fall within the President's authority under IEEPA. They describe the D.C. and Seventh Circuit decisions rejecting their view as reflecting a "property-law approach" to assessing interests and as resting on a "positive-law" view of "effective control" or "'de facto ownership.'" Br. 38-39 (quoting *United States v. Parr*, 509 F.2d 1381, 1386 (5th Cir. 1975)). But neither case demanded a showing that Hamas's "interest" met these or any other common-law standards of ownership or control or suggested that such a showing was necessary. They instead accepted that Hamas had no legal entitlement or legal relationship to the property and applied a practical approach to determine that Hamas nevertheless had an "interest," even if "not defined in traditional common law terms." *Holy Land*, 333 F.3d at 162-63; *see Global Relief*, 315 F.3d at 752-53. Plaintiffs cannot derive from these cases a rule based on "property law" or technical conceptions of a "beneficial interest" under trust law (Br. 36-38), where both courts regarded Hamas as having no legally enforceable interest at all. Indeed, in this respect application of the statute in these circumstances is even more straightforward than either *Holy Land* or *Global Relief*: those cases required looking through legal formalities to determine whether Hamas had an interest in property formally held in the United States by U.S. entities. Here, by contrast, Tornado Cash undoubtedly has an interest in the Tornado Cash service that it created, advertised, and profited from.

38

Plaintiffs' invocation of the history of IEEPA (Br. 29-31) ignores the Congressional action and longstanding executive practice described above. And in any event, plaintiffs' citation of statements of individual legislators disclaiming power to regulate "purely domestic" transactions, *e.g.*, Br. 30—in other words, transactions in which no foreign country or individual has any interest in any property—simply begs the question presented here, which is whether these transactions are properly described as "purely domestic." As discussed, plaintiffs' transactions here are not purely domestic when they use the Tornado Cash service—a mixing service operated by a designated foreign national. Doc. 74, at 15.

Plaintiffs' other cases do not endorse their conception of the interests covered by IEEPA, much less suggest that those interests "depend[] on technical rules of property law." Br. 28. In *Real v. Simon*, the Fifth Circuit held that a Cuban national who had died no longer had an interest in his American brokerage account, and thus that the account was no longer subject to a blocking order after his death and could be received by his heirs (all of whom the court concluded were U.S. persons). 510 F.2d 557, 561-65 (5th Cir. 1975). The Court emphasized that there was "no contention . . . that the Cuban government has any right or claim to this property" and likewise no "assertion that any person in Cuba has any interest in the property." *Id.* at 561. That death terminates an interest has no bearing on what qualifies as an "interest" in the first place.

Both *Dames & Moore v. Regan*, 453 U.S. 654, and *Dean Witter Reynolds, Inc. v. Fernandez*, 741 F.2d 355 (11th Cir. 1984), simply establish that litigation of an *in personam* claim is not itself a "transaction[] involving [foreign] property" or an "effort[] to exercise any rights with respect to such property" under IEEPA. *Dames & Moore*, 453 U.S. at 675; *accord Fernandez*, 741 F.2d at 362. Those cases accordingly address the "any property" component of the statutory definition, emphasizing that *in personam* litigation "does not focus on any particular property within the jurisdiction" and is instead "an effort to establish liability and fix damages" abstracted from any property. *Dames & Moore*, 453 U.S. at 675; *accord Fernandez*, 741 F.2d at 362. Those cases thus have no bearing on the scope of the phrase "any interest," but instead reinforce the point that the interest must be in some identifiable property.

Finally, plaintiffs err in asserting that the rule of lenity and the major questions doctrine have any bearing here. Br. 41-42. As for the rule of lenity, plaintiffs have identified no ambiguity that would call into question the agency's interpretation, much less the sort of "grievous ambiguity" for which the Court "can make no more than a guess as to what Congress intended" that is required to invoke the rule. *Muscarello v. United States*, 524 U.S. 125, 138-39 (1998) (first quoting *Staples v. United States*, 511 U.S. 600, 619 n.17 (1994); and the quoting *United States v. Wells*, 519 U.S. 482, 499 (1997)). Plaintiffs' fundamental objection appears to be that Congress plainly used broad language to grant the President authority to deal as completely as possible with emergencies that might arise, but as the district court observed, the fact that statutory

language is broad does not make it ambiguous.  Doc. 74, at 17 & n.11.  As for the major questions doctrine, plaintiffs offer no basis to doubt that Congress contemplated that the authority it granted would be used in circumstances like these, where North Korea and other malevolent actors have used the Tornado Cash service to launder funds and profit from its continued use, presenting a threat to the national security, foreign relations, or economy of the United States.  The very purpose of IEEPA was to provide the President authority to restrict property to address those threats.  *Id.* at 17-18; *Holy Land*, 333 F.3d at 163.

## II.     Plaintiffs' Remaining Arguments Lack Merit

Aside from their broad legal challenges, plaintiffs contend that OFAC's order is arbitrary and capricious and violates their First Amendment rights.  The district court properly rejected these arguments.

### A.     OFAC Properly Considered All Relevant Factors

Plaintiffs largely abandon the arbitrary-and-capricious challenges they advanced in district court.  Plaintiffs now contend only that the agency failed to properly consider the effects on individuals who might receive "unsolicited funds" from Tornado Cash pools, the "reliance interests" of Americans who had already deposited funds in pools but not withdrawn them, and "the effects of its action on future attempts to write software code."  Br. 49.  These arguments fail.

Plaintiffs misunderstand the analysis the agency was required to undertake in these circumstances.  Here, the President determined that malicious cyber-enabled

activities and North Korea posed threats to the United States that warranted

emergency action under IEEPA. The executive orders relating to those emergencies

stated that "[a]ll property and interests in property" of persons designated pursuant to

the orders are blocked, including the property of designated persons who assist or

provide support for North Korea or malicious cyber-enabled activities. 80 Fed. Reg.

at 18,077-78; 81 Fed. Reg. at 14,943-44. OFAC's task was thus to determine whether,

under IEEPA and the Executive Orders, Tornado Cash had materially assisted or

provided support to or in support of North Korea and malicious cyber activities, and

plaintiffs do not question OFAC's determinations on that score. *See* Doc. 68-1, at 65-

74. Moreover, as explained above, the nature of Tornado Cash's interest in property

is such that every transaction making use of the Tornado Cash service affects that

interest. That interest—and the national-security threat it poses—exist regardless of

plaintiffs' motivations for using the service and regardless of whether particular

transactions are solicited or unsolicited. Plaintiffs offer no basis to suggest that the

agency was required to separately consider allowing malicious actors to gain value

from those transactions notwithstanding the undisputed national-security threat. Nor

do plaintiffs cite a case where a court has questioned the breadth of a designation

order designed to address an emergency under IEEPA based on any of the factors

they have articulated. And given the nature of Tornado Cash and the Tornado Cash

service, as well as the detailed record supporting the order here, plaintiffs cannot

seriously dispute that the agency has explained why an order precluding all uses of the service was necessary.

Plaintiffs' assertion of "reliance interests" is especially misguided.  The Supreme Court has explained that "[w]hen an agency changes course" from an earlier policy, the agency may have an obligation to consider interests that have developed in reliance on that policy.  *Department of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020).  Here, plaintiffs do not contend that they developed reliance interests on any past OFAC action.

Similarly, plaintiffs' assertion that there will be some unspecified effect on "future attempts to write software code" from the order here (Br. 49) is unpersuasive. Even assuming that writing software code falls within one of the exceptions to the President's authority under IEEPA, *see* 50 U.S.C. § 1702(b), the order here does not preclude anyone from writing or sharing computer code.  The order here instead sanctions a particular entity—Tornado Cash.

In any event, OFAC has addressed the concerns that plaintiffs raise.  OFAC issued its designation against the backdrop of its longstanding license regulations, which allow individuals to request permission to engage in transactions that would otherwise be prohibited under the relevant authority.  *See* 31 C.F.R. §§ 510.501, 578.404.  And in guidance OFAC published concurrently with its designation of Tornado Cash, OFAC pointed to that license process and explained that it would look favorably on requests for a license to withdraw funds already in Tornado Cash pools

43

as of the date of the agency's initial designation of Tornado Cash in August 2022.

*Frequently Asked Questions: Cyber-Related Sanctions, supra* (FAQ 1079). That same

guidance also addressed the unsolicited receipt of cryptocurrency from a Tornado

Cash pool (a phenomenon referred to as "dusting"). OFAC explained that although

those transactions violate the relevant regulations, OFAC would "not prioritize

enforcement" against people who receive "unsolicited and nominal amounts of virtual

currency or other virtual assets from Tornado Cash smart contracts." *Id.* (FAQ 1078).

And to restate the obvious, the guidance makes clear that the designation of Tornado

Cash does not prohibit "interacting with open-source code itself." *Id.* For example,

"U.S. persons would not be prohibited . . . from copying the open-source code" of a

Tornado Cash smart contract "and making it available online for others to view." *Id.*

(FAQ 1076).

### B. The First Amendment Does Not Require Permitting Plaintiffs to Use the Tornado Cash Service

Plaintiff John Doe asserts that OFAC's order has barred him from using the

Tornado Cash service to make donations to the Ukrainian war effort, and thus

violates the First Amendment because it "infringes on associational privacy by

outlawing the use of an essential privacy tool and forcing users of that tool to disclose

their activities to the federal government and the public." Doc. 9, at 38.

That claim is insubstantial, as both courts to consider it have recognized. Doc.

74 at 20-22; *Van Loon v. Department of the Treasury*, No. 1:23-CV-312-RP, 2023 WL

5313091, at *11-12 (W.D. Tex. Aug. 17, 2023). To begin, the order here does not compel Tornado Cash to disclose any user of its service or compel plaintiffs to reveal any activities they may be engaged in. Nor does the order bar plaintiffs from making contributions to Ukraine or for any other purpose; they simply may not use Tornado Cash to do so. The district court thus correctly observed that plaintiffs' reliance on compelled-disclosure cases like *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958), and *Americans for Prosperity Foundation v. Bonta*, 141 S. Ct. 2373 (2021), is misplaced because those cases "involve government action that compelled private associations to disclose their major donors or members." Doc. 74, at 20-21.

Plaintiffs now refashion their claim as a broader assertion that Doe's inability to use the Tornado Cash service to make donations burdens his First Amendment rights by limiting his ability to engage in political speech. Br. 45-47. As an initial matter, plaintiffs cite no case "supporting the existence of a First Amendment right to use a particular service or type of currency to make donations for charitable or other purposes," Doc. 74, at 20, particularly where the service they are no longer able to use has been blocked for reasons wholly unrelated to any First Amendment-protected conduct. No case holds or suggests that an order closing down a particular bank or money transfer service for fraud or other misconduct would implicate the First Amendment rights of customers who prefer to use that bank or service to make donations. *See Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 706-07 (1986) (observing that "every civil and criminal remedy imposes some conceivable burden on First

45

Amendment protected activities" and that First Amendment scrutiny applies "only where it was conduct with a significant expressive element that drew the legal remedy in the first place[] . . . or where a statute based on a nonexpressive activity has the inevitable effect of singling out those engaged in expressive activity").

Even assuming that the designation of Tornado Cash implicates a First Amendment interest, the burden on speech would be at most an incidental one created by a generally applicable and content-neutral regulation. A regulation creating an incidental burden on speech is constitutional "if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *United States v. O'Brien*, 391 U.S. 367, 377 (1968). No one disputes that the order was within the constitutional power of the government and that the interest—addressing threats to the national security and national economy—is an important one unrelated to any First Amendment-protected activity. And because this Court would decide the First Amendment question only after concluding that the blocking order here was authorized by IEEPA, it follows that this restriction is sufficiently tailored—as discussed above, the scope of the order was necessary to meet the threat from North Korea and other malicious actors by depriving them of their interests in the Tornado Cash service to the greatest extent possible, and the order leaves open myriad other

options for Doe to make donations. *See Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 662 (1994) (explaining that "the requirement of narrow tailoring is satisfied 'so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation'" (alteration in original) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989))).

This also illustrates the error in plaintiffs' reliance on *Meyer v. Grant*, 486 U.S. 414 (1988). *Meyer* did not involve incidental burdens on speech created by an otherwise neutral regulation, instead addressing a statute that solely regulated "core political speech" by barring the use of paid circulators to collect signatures for a ballot initiative. *Id.* at 421-22. That analysis has no relevance to the incidental burdens on speech that would be at issue here.

# CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

JASON R. COODY
*United States Attorney*

SHARON SWINGLE

*s/ Brad Hinshelwood*
BRAD HINSHELWOOD
*Attorneys, Appellate Staff*
*Civil Division, Room 7256*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-7823*
*bradley.a.hinshelwood@usdoj.gov*

March 2024

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,026 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Brad Hinshelwood*
Brad Hinshelwood

**ADDENDUM**

# TABLE OF CONTENTS

50 U.S.C. § 1702 ...........................................................................................A1

**50 U.S.C. § 1702**

## § 1702. Presidential Authorities

(a) In general

(1) At the times and to the extent specified in section 1701 of this title, the President may, under such regulations as he may prescribe, by means of instructions, licenses, or otherwise—

(A) investigate, regulate, or prohibit—

(i) any transactions in foreign exchange,

(ii) transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof,

(iii) the importing or exporting of currency or securities,

by any person, or with respect to any property, subject to the jurisdiction of the United States;

(B) investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States; and,

(C) when the United States is engaged in armed hostilities or has been attacked by a foreign country or foreign nationals, confiscate any property, subject to the jurisdiction of the United States, of any foreign person, foreign organization, or foreign country that he determines has planned, authorized, aided, or engaged in such hostilities or attacks against the United States; and all right, title, and interest in any property so confiscated shall vest, when, as, and upon the terms directed by the President, in such agency or person as the President may designate from time to time, and upon such terms and conditions as the President may prescribe, such interest or property shall be held, used, administered, liquidated, sold, or otherwise dealt with in the interest of and for the benefit of the United States, and such designated agency or person may perform any and all acts incident to the accomplishment or furtherance of these purposes.

(2) In exercising the authorities granted by paragraph (1), the President may require any person to keep a full record of, and to furnish under oath, in the

form of reports or otherwise, complete information relative to any act or transaction referred to in paragraph (1) either before, during, or after the completion thereof, or relative to any interest in foreign property, or relative to any property in which any foreign country or any national thereof has or has had any interest, or as may be otherwise necessary to enforce the provisions of such paragraph. In any case in which a report by a person could be required under this paragraph, the President may require the production of any books of account, records, contracts, letters, memoranda, or other papers, in the custody or control of such person.

(3) Compliance with any regulation, instruction, or direction issued under this chapter shall to the extent thereof be a full acquittance and discharge for all purposes of the obligation of the person making the same. No person shall be held liable in any court for or with respect to anything done or omitted in good faith in connection with the administration of, or pursuant to and in reliance on, this chapter, or any regulation, instruction, or direction issued under this chapter.

(b) Exceptions to grant of authority

The authority granted to the President by this section does not include the authority to regulate or prohibit, directly or indirectly—

(1) any postal, telegraphic, telephonic, or other personal communication, which does not involve a transfer of anything of value;

(2) donations, by persons subject to the jurisdiction of the United States, of articles, such as food, clothing, and medicine, intended to be used to relieve human suffering, except to the extent that the President determines that such donations (A) would seriously impair his ability to deal with any national emergency declared under section 1701 of this title, (B) are in response to coercion against the proposed recipient or donor, or (C) would endanger Armed Forces of the United States which are engaged in hostilities or are in a situation where imminent involvement in hostilities is clearly indicated by the circumstances; or

(3) the importation from any country, or the exportation to any country, whether commercial or otherwise, regardless of format or medium of transmission, of any information or informational materials, including but not limited to, publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds. The exports exempted from regulation or prohibition by this paragraph do not include those which are otherwise controlled for export under section 4604 of this title, or under section 4605 of this title to the extent

that such controls promote the nonproliferation or antiterrorism policies of the United States, or with respect to which acts are prohibited by chapter 37 of title 18; or

(4) any transactions ordinarily incident to travel to or from any country, including importation of accompanied baggage for personal use, maintenance within any country including payment of living expenses and acquisition of goods or services for personal use, and arrangement or facilitation of such travel including nonscheduled air, sea, or land voyages.

(c) Classified information

In any judicial review of a determination made under this section, if the determination was based on classified information (as defined in section 1(a) of the Classified Information Procedures Act) such information may be submitted to the reviewing court ex parte and in camera. This subsection does not confer or imply any right to judicial review.