# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

COIN CENTER, et al.,
*Plaintiffs-Appellants,*

v.

SECRETARY, U.S. DEPARTMENT OF THE TREASURY, et al.,
*Defendants-Appellees.*

On Appeal from the United States District Court for the
Northern District of Florida, No. 3:22-cv-20375-TKW-ZCB (Wetherell, J.)

## REPLY BRIEF OF APPELLANTS COIN CENTER, ET AL.

J. Abraham Sutherland
106 Connally Street
Black Mountain, NC 28711
(805) 689-4577

April 1, 2024

Jeffrey M. Harris
Cameron T. Norris
Jeffrey S. Hetzel
Consovoy McCarthy PLLC
1600 Wilson Boulevard, Suite 700
Arlington, Virginia 22209
(703) 243-9423
cam@consovoymccarthy.com

*Counsel for Coin Center et al.*

# TABLE OF CONTENTS

Certificate of Interested Persons ........................................................................ii

Table of Authorities ......................................................................................iii

Introduction & Summary of Argument ...........................................................1

Argument ......................................................................................................4

    I.    The agency exceeded its statutory authority. ......................................6

        A.    The agency can ban only transactions involving a designated foreigner's interest in property. ................................................6

        B.    The agency banned transactions in which no designated foreigner has an interest in property. ..................................... 15

        C.    The agency's legitimate foreign policy prerogatives will remain intact. ......................................................................... 20

    II.    The agency violated the First Amendment. ..................................... 22

    III.    The agency acted arbitrarily and capriciously. ................................. 24

Conclusion ................................................................................................. 26

Certificate of Compliance ........................................................................... 27

Certificate of Service .................................................................................. 27

## CERTIFICATE OF INTERESTED PERSONS

Per Rule 26.1 and Circuit Rule 26.1, Appellants certify that the prior certificates of interested persons filed by the parties and amici are accurate.

Dated: April 1, 2024

_/s/ Cameron T. Norris_
Counsel for Appellants

# TABLE OF AUTHORITIES

## Cases

*Ala. Ass'n of Realtors v. DHS*,
141 S. Ct. 2485 (2021) (per curiam) ................................................8

*Americans for Prosperity Found. v. Bonta*,
141 S. Ct. 2373 (2021) ........................................................... 24

*Arcara v. Cloud Books*,
478 U.S. 697 (1986) ............................................................. 23

*Bidi Vapor v. FDA*,
47 F.4th 1191 (11th Cir. 2022) ............................................. 24

*Bochese v. Town of Ponce Inlet*,
405 F.3d 964 (11th Cir. 2005) ............................................. 13

*Calcutt v. FDIC*,
598 U.S. 623 (2023) (per curiam) ..................................... 3, 26

*Catalyst Pharm. v. Becerra*,
14 F.4th 1299 (11th Cir. 2021) ...............................................6

*Clement v. U.S. Attorney Gen.*,
75 F.4th 1193 (11th Cir. 2023) ........................................... 26

*Consarc Corp. v. Iraqi Ministry*,
27 F.3d 695 (D.C. Cir. 1994)......................................... 12, 13

*Cornelius v. NAACP*,
473 U.S. 788 (1985) ............................................................. 23

*Dames & Moore v. Regan*,
453 U.S. 654 (1981) ......................................................... 9, 11

*De Cuellar v. Brady*,
881 F.2d 1561 (11th Cir. 1989).....................................9, 11, 19

*Dean Witter Reynolds, Inc. v. Fernandez*,
741 F.2d 355 (11th Cir. 1984) ............................................. 19

*DHS v. Regents of Univ. of Cal.,*
140 S. Ct. 1891 (2020) ................................................. 25

*Drye v. United States,*
528 U.S. 49 (1999) ................................................. 10, 13

*Epic Sys. Corp. v. Lewis,*
584 U.S. 497 (2018) ................................................. 15

*Fla. Right to Life v. Lamar,*
273 F.3d 1318 (11th Cir. 2001) ................................. 23, 24

*Global Relief Found., Inc. v. O'Neill,*
315 F.3d 748 (7th Cir. 2002) ................................... 13

*Hollyfrontier Cheyenne Ref. v. Renewable Fuels,*
141 S. Ct. 2172 (2021) ........................................... 15

*Holy Land Found. for Relief v. Ashcroft,*
333 F.3d 156 (D.C. Cir. 2003) ............................... 13, 14

*In re Constr. Supervision Servs.,*
753 F.3d 124 (4th Cir. 2014) .................................... 8

*In re Gateway Radiology Consultants,*
983 F.3d 1239 (11th Cir. 2020) ................................ 25

*Kroner v. Comm'r,*
48 F.4th 1272 (11th Cir. 2022) ................................ 11

*Loper Bright Enterprises v. Raimondo,*
No. 22-451 (U.S.) ................................................... 14

*\*Meyer v. Grant,*
486 U.S. 414 (1988) ............................................... 23

*\*Meyer v. United States,*
364 U.S. 410 (1960) ............................................... 10

*Michigan v. EPA,*
576 U.S. 743 (2015) ............................................... 25

*N.C. Dep't of Rev. v. Kaestner 1992 Family Trust,*
 588 U.S. 262 (2019) ................................................................ 13

*Nationwide Mut. Ins. v. Darden,*
 503 U.S. 318 (1992) ................................................................ 12

*Nealy v. Warner Chappell Music,*
 60 F.4th 1325 (11th Cir. 2023) ............................................. 13

*NLRB v. Noel Canning,*
 573 U.S. 513 (2014) ................................................................ 10

*Pulsifer v. United States,*
 144 S. Ct. 718 (2024) ................................................................ 8

*Real v. Simon,*
 510 F.2d 557 (5th Cir. 1975) .................................................... 9

*Regan v. Wald,*
 468 U.S. 222 (1984) .................................................................. 6

*Romero v. DHS,*
 20 F.4th 1374 (11th Cir. 2021) ................................................ 8

*SEC v. Chenery Corp.,*
 318 U.S. 80 (1943) .................................................................. 26

*Shirras v. Caig,*
 11 U.S. 34 (1812) .................................................................... 10

*Spence v. Zimmerman,*
 873 F.2d 256 (11th Cir. 1989) ............................................... 19

*United States v. Apel,*
 571 U.S. 359 (2014) ................................................................ 14

*United States v. Takhalov,*
 827 F.3d 1307 (11th Cir. 2016) ................................................ 8

*United States v. Willow River Co.,*
 324 U.S. 499 (1945) ................................................................ 19

*Ziglar v. Abbasi*,
    582 U.S. 120 (2017) ...................................................................... 2, 22

**Statutes**

50 U.S.C. §1702(a)(1)(B) ...................................................................... 4, 7

50 U.S.C. §1705 ...................................................................................... 4, 8

55 Stat. 839 (1941) ....................................................................................... 4

**Regulations**

26 C.F.R. §25.2701-6 ................................................................................ 14

31 C.F.R. §510.313 .................................................................................... 14

31 C.F.R. §510.323 .................................................................................... 14

*Notice of OFAC Sanctions Action*,
    87 Fed. Reg. 68,578 (Nov. 15, 2022) ........................................... 4, 7

**Legislative Documents**

87 Cong. Rec. 9861 (1941) ................................................................ 4, 10

**Executive Documents**

*FAQ: Can U.S. Persons Engage in Transactions Involving Identified Tornado Cash Virtual
    Currency Wallet Addresses Absent a Specific License from OFAC?*,
    OFAC (Sept. 13, 2022), perma.cc/6WCZ-73BL ..................................... 16

*FAQ: Who Is the Tornado Cash "Person" that OFAC Designated?*,
    OFAC (Nov. 8, 2022). perma.cc/7G88-DMGW .............................................. 5

*Potential Options to Strengthen Counter-Terrorist Financing Authorities*,
    Dep't of Treasury (Nov. 28, 2023), *copy available at* perma.cc/3CVC-SMS2 ....... 3, 22

*Presidential Power to Regulate Domestic Litigation Involving Iranian Assets*,
    4A Op. O.L.C. 236 (1980) ............................................................ 7, 10

**Other Authorities**

Black's Law Dictionary (10th ed. 2014) ..................................................... 14

Black's Law Dictionary (4th ed. 1968) ........................................................... 9, 12

TORN, CoinMarketCap, perma.cc/Z6YV-WV4A ........................................... 18

## INTRODUCTION & SUMMARY OF ARGUMENT

When an American sends his own money, in his own control, to himself, he isn't trading with foreign enemies' "interests in property." But for the federal government to be right here, he must be doing so *unambiguously*.

Not only do Plaintiffs have the better reading of the statute; the government doesn't even try something that could be called statutory interpretation. Plaintiffs' statutory claim turns on the meaning of one requirement: an "interest" in "property." Plaintiffs interpret an "interest in property" to mean a legal or equitable right to something that can be owned. They base their interpretation on dictionaries, binding precedent, hundreds of years of background law, and interpretations by the other branches. Blue-Br.24-31. The government, by contrast, never even defines an interest in property. It asks for "flexibility"—permission to get *out of* the text. Red-Br.32. It finds support in none of the traditional textual tools, which are conspicuously missing from its brief. And yet it asserts, as it must, that Congress endorsed its boundless interpretation with "no ambiguity." Red-Br.40.

The government needs a boundless interpretation because the transactions at issue in this case are purely American; they simply do not involve the required foreigner's interest in property. As the district court recognized, these transactions have an American send his own money, in crypto, to privacy software that nobody else can control, then take it back, without paying any foreigner ever. The government tries to distract from the purely American transactions at issue by talking about transactions

that are irrelevant to this case. It describes transactions involving addresses controlled by the designated foreign group called a "DAO," but transactions with those addresses will all remain banned after this case. It describes payments to the DAO and trades with the DAO's special "TORN" token, but those payments and trades will remain banned after this case. None of the transactions at issue in this case interact with the designated foreign DAO or any other designated foreigner in any way. Once the government finally gets to the transactions at issue in this case, it—like the district court—finds nothing remotely resembling a foreigner's interest in property. The best it can say is that these purely American transactions could trigger market events that culminate in the foreigners' TORN tokens' price going up. This Court would have to rewrite centuries of law (and the English language) for that economic effect to be an "interest in property."

Although the rule-of-law stakes here are high, the foreign-policy stakes are low. Pressed to "identify how Plaintiffs' requested relief will permit trading with the foreign DAO, North Korea, or any other foreign enemies," Blue-Br.44-45, the government points to nothing. This case does not implicate foreign trade at all. The Court can rule for Plaintiffs just by holding that when an American uses his own property, beyond the control of any foreigner, such that nothing whatsoever goes to any foreigner, the agency can't ban it. So while "national-security concerns must not become a talisman used to ward off inconvenient claims," *Ziglar v. Abbasi*, 582 U.S. 120, 143 (2017), those concerns

are not even present. And Congress, of course, remains free to enact Treasury's proposed amendment that would eliminate the interest-in-property requirement. *See Potential Options to Strengthen Counter-Terrorist Financing Authorities*, Dep't of Treasury 3 (Nov. 28, 2023), *copy available at* perma.cc/3CVC-SMS2. But the question for an Article III court is not whether Congress *should* ban these transactions; the question is whether it already did.

The agency's ban also missteps in two other ways. First, it violates the First Amendment because it bans making private charitable contributions with the software. The government downplays the ban by comparing it to "closing down a … bank." Red-Br.45. But here, the government left the "bank" open and made it a felony for users like Plaintiff John Doe to use it for expressive activities, which the First Amendment doesn't allow. And second, the agency took its "unprecedented" action, Andreessen-Br.14, without considering important aspects of the problem, like its effect on Americans' already-deposited and now-locked funds, or its potential for abuse by third parties who can implicate Americans in banned transactions without any volitional act. Blue-Br.48-50. The government did not consider these factors in the administrative record, so it asks this Court to create a new exception to the "simple but fundamental" rule that agency actions must be upheld based on the contents of the administrative record. *Calcutt v. FDIC*, 598 U.S. 623, 624 (2023) (per curiam). This Court should not do so. It should reverse.

## ARGUMENT

The government's brief muddies the factual waters, so it's important to briefly recap the essentials: The International Emergency Economic Powers Act allows the Office of Foreign Assets Control to ban transactions that involve a designated foreigner's "interest" in "property." 50 U.S.C. §1702(a)(1)(B). The Act took that language from the Trading with the Enemies Act, which first used it in 1941. *See* 55 Stat. 839 (1941). Congress understood the Act to reach transactions with "real and personal property belonging to aliens." 87 Cong. Rec. 9861 (1941). Once the agency bans a transaction, engaging in that transaction becomes a 20-year felony. 50 U.S.C. §1705.

The agency invoked this statute here to ban Americans from engaging in certain transactions on the cryptocurrency platform Ethereum. *Notice of OFAC Sanctions Action*, 87 Fed. Reg. 68,578, 68,578-68,579 (Nov. 15, 2022). It banned Americans from transacting with a set of 20 addresses that host the "core software tool," which is a popular tool that restores users' privacy while using Ethereum. Doc.74 at 7; Blue-Br.4-6; B.A.-Br.4-12. The core software tool allows Americans to send their own money in and out of it. Doc.68-1 at 41-44. When Americans use the core software tool, nobody else can control the tool or the money going through it. *Id.* at 161. This case concerns only transactions with the core software tool. The agency also banned Americans from transacting with a separate set of 34 addresses, which host an ecosystem of support tools. Blue-Br.6-8, 13-14. Those support tools can be controlled by or used to pay a foreign group called a "DAO," which includes some foreign software writers. *Id.* This case does

not concern those 34 addresses. (The government banned 91 addresses in total, but the remaining ones aren't important here either. *See* Blue-Br.17-18.)

In order to justify the ban, the agency said that these two groups of foreign persons—the DAO and the software writers—had an "interes[t] in property" in *every* transaction that it banned. *FAQ: Who Is the Tornado Cash "Person" that OFAC Designated?*, OFAC (Nov. 8, 2022). perma.cc/7G88-DMGW. The government sometimes calls these two groups of designated foreigners "Tornado Cash," but nobody else ever used that name for anything but the software. *See* B.A.-Br.2; Andreessen-Br.9.

Plaintiffs are Americans who want to engage in transactions using the core software tool, not the DAO-affiliated support tools. Like thousands of other users, they want to use the core software tool to maintain their privacy while using crypto. B.A.-Br.7; Doc.36-2 at 3-4. Their planned transactions consist of sending their own crypto to one of the core software tool addresses, then taking it back, including to use in sensitive charitable donations. Doc.36-2 at 3-4; Doc.36-3 at 3-4. Everybody agrees that the foreign DAO and software writers have no control over the core software tool. Doc.74 at 7; Doc. 68-1 at 157-66; Doc.68-2 at 3. And everybody agrees that Plaintiffs' solitary, American-only transactions cannot generate a payment to the foreign DAO or software writers. Doc.74 at 15; Blue-Br.40.

The agency exceeded its statutory authority, violated the First Amendment, and acted arbitrarily and capriciously when it nevertheless banned Americans from transacting with the core software tool. On "de novo" review, *Catalyst Pharm. v. Becerra*, 14 F.4th 1299, 1306 (11th Cir. 2021), this Court should reverse and remand.

## I. The agency exceeded its statutory authority.

An "interest in property" means a legal or equitable right to something that can be owned. The agency banned transactions in which no foreigners have any interests in property. It banned purely American transactions, well beyond its legitimate foreign-policy prerogatives.

### A. The agency can ban only transactions involving a designated foreigner's interest in property.

When Congress authorizes an agency to regulate transactions involving a designated foreigner's "interest in property," it means what those words have always meant: a legal or equitable right to something that can be owned. All of the traditional textual tools—dictionaries, binding precedent, background law, and interpretations by the other branches—confirm that meaning. For every banned transaction, the agency must be able to identify some property in which a foreigner has rights. Otherwise, the transaction is "purely domestic" and cannot be regulated under this foreign-trade statute. *Regan v. Wald*, 468 U.S. 222, 228 n.8 (1984). The government's alternative approach is supported by zero traditional textual tools. It never defines an "interest in property," except to say that it should be more "capacious" than the key sources say. Red-Br.32.

The government says interests in property include "beneficial interests," but misunderstands what a beneficial interest is. And though the agency's regulations are not entitled to the government's late request for *Chevron* deference, those regulations wouldn't move the needle anyway.

**1.** IEEPA lets the agency take certain measures against transactions that involve foreigners' property interests. Under the Act, the agency can:

> investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or ***prohibit***,
>
> any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or ***transactions*** involving,
>
> ***any property in which any foreign country or a national thereof has any interest***
>
> by any person, or with respect to any property, subject to the jurisdiction of the United States

50 U.S.C. §1702(a)(1)(B) (breaks and emphasis added). The parties agree that "property in which any foreign country or a national thereof has any interest" is the grammatical equivalent of a foreigner's "interest in property," everyone's preferred shorthand. Red-Br.42; Blue-Br.24; *accord Notice of OFAC Sanctions Action*, 87 Fed. Reg. 68,578 (Nov. 15, 2022) (ban applies to foreigners' "interests in property"). The Act confers "no power" to ban a transaction "in the absence of … an interest in property." *Presidential Power to Regulate Domestic Litigation Involving Iranian Assets*, 4A Op. O.L.C. 236, 241 (1980) (cleaned up).

The parties also appear to agree that "interest in property" must be construed in favor of the citizen. The Act "has both criminal and noncriminal applications," so "the rule of lenity applies." *Romero v. DHS*, 20 F.4th 1374, 1383 (11th Cir. 2021); *see* 50 U.S.C. §1705. Under that rule, the Act must be "construed strictly." *Romero*, 20 F.4th at 1383. Among two "plausible" interpretations, the government's must lose. *Pulsifer v. United States*, 144 S. Ct. 718, 727 (2024). The government's only response is that it can over-come lenity because its interpretation leaves "no ambiguity," not that it would win if there were ambiguity. Red-Br.40. If any more is needed, the Act also must be construed against the agency under the major-questions doctrine. The government does not deny that its "read" of the statutory text gives the agency "a breathtaking amount of author-ity" to regulate domestic transactions. *Ala. Ass'n of Realtors v. DHS*, 141 S. Ct. 2485, 2489 (2021) (per curiam); *see also* B.A.-Br.20-21. Congress would have spoken "clearly" if it meant to do that. *Ala. Ass'n of Realtors*, 141 S. Ct. at 2489.

An interest in property is a legal or equitable right to something that can be owned. *See* Blue-Br.24-31. It's "all or part of a legal or equitable claim to or right in property." *In re Constr. Supervision Servs.*, 753 F.3d 124, 128 (4th Cir. 2014). The govern-ment says "no authority supports" this interpretation, Red-Br.32, but it is supported by all the best evidence.

Start with dictionaries. When interpreting a statute, this Court "turn[s] first to the dictionaries." *United States v. Takhalov*, 827 F.3d 1307, 1312 (11th Cir. 2016). All the

dictionaries cited in this case define "interest" as a right. *E.g.*, *Interest*, Black's Law Dictionary 950 (4th ed. 1968) ("any right in the nature of property"); *accord* Blue-Br.25 (collecting definitions). And all the dictionaries define "property" as something that can be owned. *E.g.*, *Property*, Black's Law Dictionary 1382 (4th ed. 1968) ("everything which is the subject of ownership"); *accord* Blue-Br.24-25 (collecting definitions); B.A.-Br.15-16 (same); Andreessen-Br.15-16 (same). So an interest in property is a right to something that can be owned, like a fee simple interest in a house. Blue-Br.25. The government can't win under the dictionary definitions because it does not argue that any foreigner has any such rights. And yet it never acknowledges or refutes these definitions.

The government also loses under binding precedent. This Court, the old Fifth Circuit, and the Supreme Court consistently understand "interest" in "property" to mean a legal or equitable right to something that can be owned. *See* Blue-Br.27-29; *De Cuellar v. Brady*, 881 F.2d 1561, 1565-68 (11th Cir. 1989); *Real v. Simon*, 510 F.2d 557, 565 (5th Cir. 1975); *Dames & Moore v. Regan*, 453 U.S. 654, 675 (1981). The government responds that, although these cases confirm the stringency of the "property" requirement, they don't confirm that an "interest" means a right. Red-Br.39-40. But they do. Their holdings turn on things like whether the foreigners held an "undisputed reversionary interest" in the property, which is the kind of legal right that the government says is irrelevant. *De Cuellar*, 881 F.2d at 1567.

Background law points to the same meaning. Shortly before the Act, the Supreme Court interpreted "[t]he terms 'interest' and 'property'" in a similar federal statute. *Meyer v. United States*, 364 U.S. 410, 413 n.3 (1960). The Court said that "[t]he term 'interest' refers to the extent of ownership, that is, to the estate or the quality and quantum of ownership" and "[t]he term 'property' … includes all objects or rights which are susceptible of ownership." *Meyer*, 364 U.S. at 413 n.3. Later, the Court said that a statute that was "meant to reach every interest in property" reached every "right or interest *protected by law*." *Drye v. United States*, 528 U.S. 49, 54 (1999) (emphasis added). Hundreds of years of legal authorities show that an interest in property always meant a legal or equitable right. *E.g.*, *Shirras v. Caig*, 11 U.S. 34, 47 (1812) (Marshall, C.J.). The government ignores them all.

The "elected branches of Government" agree with Plaintiffs. *NLRB v. Noel Canning*, 573 U.S. 513, 526 (2014). The executive branch itself interpreted the Act to require what it now disavows: an "actual assertion of rights or privileges with respect to property." *Presidential Power to Regulate Domestic Litigation Involving Iranian Assets*, *supra* at 242; *cf.* Red-Br.32. And Congress voted on the promise that the Act "covers nothing but real and personal property belonging to aliens." 87 Cong. Rec. 9861 (1941) (Rep. Gwynne); Blue-Br.11.

It's not every day that all the statutory-interpretation tools point to the same conclusion, but they do here. This Court should interpret an interest in property to mean a legal or equitable right to something that can be owned.

**2.** The government says these authorities are too "technical." Red-Br.30. It seeks to replace the well-established meaning of an interest in property with something more "flexib[le]." Red-Br.32. But law is technical, and statutory text cannot be flexed merely because the government thinks it's a good idea. When words have "established legal meaning," like interest in property does, "[courts] presume that they should be accorded that legal meaning." *Kroner v. Comm'r*, 48 F.4th 1272, 1277 (11th Cir. 2022). The Supreme Court was quite technical when it distinguished between *in personam* lawsuits and *in rem* lawsuits under the Act. *Dames & Moore*, 453 U.S. at 675. And this Court got technical when it parsed a foreigner's "undisputed reversionary interest" to determine that it satisfied the Act. *De Cuellar*, 881 F.2d at 1567. So the ship has sailed on not being "technical."

What is the government's alternative? It remains unclear.

The government never defines "interest" at all. It says an "interest" is "an *interest* of any nature whatsoever, direct or indirect" and that "'any *interest*' really means 'any *interest*.'" Red-Br.34-35 (emphasis added). And it says that interest "is to be accorded its

full and fair scope." Red-Br.33 (cleaned up). Okay, but what *is* an "interest"? The government's definitions are all "circular," so they "explai[n] nothing." *Nationwide Mut. Ins. v. Darden*, 503 U.S. 318, 323 (1992).

The government gives even shorter shrift to "property." It realizes it cannot just ignore this statutory requirement, like the district court did, and yet still never defines it. The government says only that whatever property means, it includes "services." Red-Br.26-27. And then it says that the core software tool itself qualifies as "services" and therefore as property. Red-Br.26. In news to Plaintiffs, the government says there is no "dispute" over its interpretation of property. Red-Br.30-31. But the district court never said that the core software tool was property, *see* Doc.74 at 12; *cf.* Red-Br.31 (inferring that it did), and Plaintiffs certainly dispute the government's argument that it is, *see* Blue-Br.32. The core software tool is just computer code—several lines of letters and characters—published online, abandoned, and impossible for anyone to control, let alone *own. See* Blue-Br.41. It is not "the subject of ownership," and not anybody's property under any definition Plaintiffs are aware of. *Property*, Black's Law Dictionary 1382 (4th ed. 1968).

The government next picks three nonbinding cases to spin up a broader definition of "interest in property." Red-Br.33-36 (relying on *Consarc Corp. v. Iraqi Ministry*, 27 F.3d 695 (D.C. Cir. 1994); *Global Relief Found., Inc. v. O'Neill*, 315 F.3d 748 (7th Cir.

2002); *Holy Land Found. for Relief v. Ashcroft*, 333 F.3d 156 (D.C. Cir. 2003)). The government mistakenly reads "snippets" from those cases like "words in a statute," disregards "the context," and transforms them into something unworkable. *Nealy v. Warner Chappell Music*, 60 F.4th 1325, 1332 (11th Cir. 2023). Its reasoning doesn't hold up.

The nonbinding cases say that property interests go beyond "legal" interests, but not in a way that helps the government. They do so to encompass "beneficial interests," which are a special kind of property right, held by an intended recipient in a contract or similar instrument. *See Drye*, 528 U.S. 49; Blue-Br.36-37. Beneficial interests are not "legal" only in the sense that they are "equitable," which just means they came from the branch of law that originated in courts of equity. *See N.C. Dep't of Rev. v. Kaestner 1992 Family Trust*, 588 U.S. 262, 265, 277 (2019). But the foreigners have no beneficial interest, correctly understood, in any of the transactions here. *See Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 982 (11th Cir. 2005); Blue-Br.36-37.

The holdings of the nonbinding cases, although vaguely reasoned, are also justified by existing rules of property law and equity. Blue-Br.38-39. In contrast to this case, those cases concerned transactions involving physical property and funds over which foreign terrorists exercised contractual rights or literal control. *See Consarc*, 27 F.3d at 701 ($6.4 million fund over which foreigner held contractually guaranteed reversionary interest); *Global Relief Found.*, 315 F.3d at 753 (funds that foreigner "controlled," like its

"subsidiary"); *Holy Land Found.*, 333 F.3d at 162-63 (same). These cases do not anticipate the agency banning transactions over which foreigners have no rights or control.

**3.** Finally, the agency does not get *Chevron* deference to its regulations interpreting "interest" and "property." Red-Br.36 & n.4. Assuming that *Chevron* deference is valid, *but see* Blue-Br.43 n.2; *Loper Bright Enterprises v. Raimondo*, No. 22-451 (U.S.), it doesn't save the government for three independent reasons.

First, deference is pointless because the regulations don't say what the government needs them to. The regulations define "interest" only as "an interest of any nature whatsoever, direct or indirect." 31 C.F.R. §510.313. But an interest (including an indirect interest) is still a legal or equitable right. *E.g.*, 26 C.F.R. §25.2701-6 (explaining that "indirect" interests in property are interests held through a corporation or similar entity). The regulations define "property" to include different types of *legal* property. 31 C.F.R. §510.323. They list "services" in the sense of labor, which no foreigner does in these transactions. *See Service*, Black's Law Dictionary (10th ed. 2014). Nothing in the regulations contradicts Plaintiffs' reading.

Second, binding precedent forecloses deference here. The government has no response to the Supreme Court holding (postdating its cases) that it has "never held that the Government's reading of a criminal statute is entitled to any deference." *United States v. Apel*, 571 U.S. 359, 369 (2014). Nor does it dispute that "*Chevron* leaves the

stage" if either the rule of lenity or major-questions doctrine applies. *See Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 521 (2018).

Third, the government forfeited *Chevron*. It forfeited it below, which it "could" do. *Cf.* Red-Br.36 & n.4; *see Hollyfrontier Cheyenne Ref. v. Renewable Fuels*, 141 S. Ct. 2172, 2180 (2021). Citing cases that happen to mention *Chevron* isn't enough; the government didn't argue *Chevron* or explain how its two steps apply. *See* Doc.57 at 19. And even if it didn't forfeit it below, it forfeits deference to its regulation interpreting "property" again by never asking for it on appeal. *See* Red-Br.36 (seeking deference for "interest" only).

## B. The agency banned transactions in which no designated foreigner has an interest in property.

The government resists the well-established meaning of "interest in property" because it can't satisfy it. The agency banned Americans from sending their own assets back and forth, without involving any foreigners at all. The government does not even try to argue that those transactions involve a foreigners' legal or equitable right to something that can be owned. Instead, it muddies the waters by pointing to transactions with the DAO-affiliated support tools that the foreigners do have control over or can receive payments from. But it knows those transactions are not at issue in this case. Once it gets to the transactions at issue in this case, it points only to attenuated connections, like the district court did. None of those connections satisfies the statutory text.

**1.** If Plaintiffs' interpretation is right, then the government must lose. The government never argues—even in the alternative—that a foreigner has a legal or equitable right to any actual property in the transactions at issue.

The transactions at issue in this case involve only Americans' property. They "consist of [an American] sending [his] crypto asset, such as 0.1 ETH, then [the same American] withdrawing that same 0.1 ETH." Doc.36-2 at 4. The transaction is simple:

American A  [0.1 ETH]  →  Address 1

Address 1  [0.1 ETH]  →  American A

*Id.*; *see* Blue-Br.32; Doc.68-1 at 162-65. The same structure follows for the other challenged addresses, just with different amounts of ETH or other crypto assets. Doc.68-1 at 41-44. Plaintiffs want to engage in this transaction only. *See* Docs.36-2 at 4; 36-3 at 5; 36-4 at 4; 36-5 at 4. And the agency has made this transaction a felony. *See FAQ: Can U.S. Persons Engage in Transactions Involving Identified Tornado Cash Virtual Currency Wallet Addresses Absent a Specific License from OFAC?*, OFAC (Sept. 13, 2022), perma.cc/6WCZ-73BL.

The government's task is to identify a foreigner's interest in property in this transaction, and it cannot. Everyone agrees that no designated foreigner has any control over the crypto asset being sent or received. Doc.68-1 at 161-66. No designated foreigner has control over the address or software that it hosts. *Id.* And no designated foreigner receives any payment of any kind. *See* Blue-Br.40; accord Doc.74 at 15. Under

any plausible reading of the statutory text, prohibiting these transactions goes beyond it.

**2.** The government therefore diverts attention to transactions that are not at issue. The government recites a number of facts about transactions with the DAO-affiliated support tools—they can be controlled by the DAO, generate payments to the DAO through "relayers," or can give away TORN tokens that are "like stock" in those support tools. Red-Br.9-14, 25-26. But everyone agrees that these facts about the DAO-affiliated support tools are not true about transactions with the core software tool. The government elides this distinction by mashing the two categories together, calling them collectively "the Tornado Cash service," and attributing things that are true about only the DAO-affiliated support tools to both of them. *Id.*

But Plaintiffs seek to engage in—and seek relief that would allow—*only* transactions with the core software tool. Blue-Br.40-41; Doc.9 at 41-44. None of those transactions involve the DAO-affiliated support tools, so none of them involve DAO control, none involve a "relayer" payment to the DAO, and none involve the TORN tokens—regardless of whether they are "like stock." Doc.68-1 at 161-66. The district court avoided these red herrings, and this Court should too. *See* Doc.74 at 15.

It also does not matter if the agency thinks one of those DAO-affiliated support tools—relayers—is "essential" to getting the most out of the core software tool. Red-Br.14. Plaintiffs want to use the core software tool without relayers, and their desired

relief will not allow them to use relayers. Anyway, relayers are not essential. The core software tool functioned well for the vast majority of its existence without them. *See* Doc.62 at 18.

No principle allows the government to ban the American-only transactions at issue in this case merely because *other* separate transactions involve foreigners. If that move worked, the statutory dam would break, and the agency could regulate any domestic economic activity by combining it with a foreign activity.

**3**. The government eventually turns to the transactions at issue in this case, but finds nothing resembling a property interest in those transactions. Rephrasing the district court's reasoning, the government says that using the core software tool will cause economic "advantages" for the DAO, in the form of an increase in the value of TORN tokens. Red-Br.37. Specifically, the government says that using the core software tool with a standard crypto asset increases its "effectiveness," which increases the popularity of the DAO-affiliated support tools, which then increases the demand for the separate TORN tokens, which will then increase the price of TORN tokens, which the DAO holds. Red-Br.36-37. The government does not explain why, in the real world, the opposite happened. *See* TORN, CoinMarketCap, perma.cc/Z6YV-WV4A (as the core software tool got more popular from early 2021 to summer 2022 before this ban, TORN token price crashed from $400 to $18). Or why banning all the DAO-affiliated

support tools (as it has done) wouldn't solve the problem by cutting off the causal chain. *See* Blue-Br.7-8.

But the government's fundamental problem is that the prospect of these economic benefits does not create an interest in property. *See* Blue-Br.37. A "benefit will not create a protectible property interest." *Spence v. Zimmerman*, 873 F.2d 256, 258 (11th Cir. 1989). American law has uniformly rejected attempts to derive an interest in property from an economic benefit. *E.g.*, *United States v. Willow River Co.*, 324 U.S. 499, 503 (1945). And the government cites no case where an economic benefit created an interest in property. *See* Red-Br.37. Therefore, as the government itself points out elsewhere, whether the foreigner will "benefit from the blocked action" is irrelevant to whether he has an interest in property. Red-Br.32 (citing *De Cuellar*, 881 F.2d at 1567). Indeed, this Court held that a foreigner lacked an interest in property in the litigation of a claim that would benefit that foreigner with *hundreds of thousands of dollars*. *See Dean Witter Reynolds, Inc. v. Fernandez*, 741 F.2d 355, 361-63 (11th Cir. 1984). If (as the government says) someone has an interest in property in something because it could generate a financial "advantage" to him, then *Fernandez* has to be overruled, which this panel cannot do.

The government adds that the software writers could have a property interest because their "efforts" helped write and promote the core software tool. Red-Br.32. But people can create and support technologies without having legal rights over them.

Blue-Br.41. The government has never found a case suggesting that the software writers' past "efforts" create an interest in property in the banned transactions.

As Plaintiffs explained, the government's arguments about economic effects and past efforts would allow the agency to ban most domestic activities. Blue-Br.35-36. It could ban driving cars because that activity increases the value of foreign oil companies. *See id.* It could ban using every technology ever invented or promoted by foreigners. *See* B.A.-Br.3 (agency's reasoning "could threaten all manner of internet-based tools"). The government cannot distinguish these examples and offers no limiting principle. Its reasoning would give future Presidents a blank check to take down any industry with the stroke of a pen.

Finally, the government cannot combine all of its invalid justifications into a valid one. The agency simply cannot use a statute about foreigners' property interests to regulate transactions involving no foreigner's property interest. No amount of force can cram that square peg into this round hole.

## C. The agency's legitimate foreign policy prerogatives will remain intact.

Plaintiffs asked the government to "identify how Plaintiffs' requested relief will permit trading with the foreign DAO, North Korea, or any other foreign enemies." Blue-Br.44-45. The government has no response. So this Court can be assured that, if it rules for Plaintiffs, it will permit no trading with any foreign enemies.

That conclusion is unavoidable. Plaintiffs' relief is about only Americans, and steers clear of the agency's legitimate foreign-policy concerns. It will remain illegal for anyone to use the addresses necessary to make payments to the designated foreign DAO. *See* Blue-Br.7-8, 17-18. It will remain illegal for anyone to use any addresses over which the foreign DAO has any control. *Id.* And it will remain illegal to use the core software tool to trade with North Korea or other foreign terrorists. *Id.* All that will become legal is Americans using the core software tool. Blue-Br.16-18. As amici explain, Americans used the core software tool for common-sense and legitimate reasons. B.A.-Br.4-12; Andreessen-Br.8-12. And Americans' use of the core software tool does not involve the designated foreigners.

The government has toned down its foreign-policy arguments, but it still makes two.

First, it says that foreign terrorists will take advantage of this case to put "their" own property in "creative new forms" to avoid sanctions. Red-Br.34. The government said the same thing below, but it has never explained what it means. To rule for Plaintiffs, this Court would need to hold only that, if an American transacts using his own property, beyond the control of any foreigner, such that nothing whatsoever goes to any foreigner, then the agency can't ban that transaction. The only way for a foreign terrorist to take advantage of that holding would be to study for the citizenship test and become an American himself.

Second, the government says that the Act should be expanded to cover transactions that use technologies that "could be used" by foreigners. Red-Br.22. So if two Americans transact using email, and email "could be used" by foreign terrorists, then the agency could put any two Americans in prison for using email *among themselves*. *See* Andreessen-Br.19. Thankfully, the Act draws a more sensible line. If foreigners can use a technology, the Act allows the agency to ban those foreigners' uses, not the Americans'.

Of course, in our system of government, these pros and cons are weighed by Congress, not the courts. "Liberty and security can be reconciled; and in our system they are reconciled within the framework of the law." *Abbasi*, 582 U.S. at 143. Congress had the controlling say when it wrote the statute as it stands today, and it will have the controlling say no matter what this Court holds. Treasury has already asked it to eliminate the interest-in-property requirement, apparently anticipating that it faces an uphill battle in this litigation. *See Potential Options to Strengthen Counter-Terrorist Financing Authorities*, *supra* at 3 (requesting statutory authority to ban "blockchain nodes" in which no foreigner has an "interest in property" because of the "Tornado Cash litigation"); *accord* B.A.-Br.3. Congress can decide whether that is a good idea. This Court can only apply the law as written and evaluate the agency's *existing* authority.

## II. The agency violated the First Amendment.

The agency's ban also violated the First Amendment by unnecessarily threatening to punish expressive contributions. It banned John Doe's charitable donations to

help Ukraine, which he makes through the core software tool. Doc.36-3. The First Amendment protects those donations because they "functio[n] as a general expression of support for the recipient and its views." *Cornelius v. NAACP*, 473 U.S. 788, 799 (1985). The government does not appear to dispute that premise, which this Court has made clear. *E.g.*, *Fla. Right to Life v. Lamar*, 273 F.3d 1318, 1329 (11th Cir. 2001). And Ukraine is not a designated foreigner, so the donations are otherwise allowed.

The agency cannot penalize John Doe's expression because alternative means of expression exist. Red-Br.45. For one, John Doe has no other means of donating to Ukraine because Russian hackers will retaliate if he donates without the privacy afforded by the core software tool. Doc.36-3 at 3-5. His donations stopped. *Id.* at 4. Even if he had other means, the First Amendment protects his *chosen* means. *Meyer v. Grant*, 486 U.S. 414 (1988). The government does not deny that if this Court accepts its view of the First Amendment, "the government could ban email because it allows communication by letter, or ban charitable donations by credit card because it allows donations by cash." Blue-Br.46-47. *Grant* rejects that world. 486 U.S. at 424. The government distinguishes *Grant* only by arguing that if its burdens were "incidental," it would have triggered lesser scrutiny. Red-Br.47. But as for the scope of the First Amendment's protection in the first place, *Grant* establishes that expressive activity is protected even when people "remain free to employ other means" to carry it out. *Grant*, 486 U.S. at 424.

Sending John Doe to prison for donating to Ukraine is not like closing a "bank" for its "misconduct." Red-Br.45. The government's own case explains why. It says that someone is entitled to First Amendment protection if his conduct that "drew the legal remedy in the first place"—what he was punished for doing—has an "expressive element." *Arcara v. Cloud Books*, 478 U.S. 697, 706 (1986). The government can close a bank for misconduct because the bank's misconduct has no expressive element. The government can't send John Doe to prison for donating to Ukraine because donating to Ukraine has an expressive element. *See Lamar*, 273 F.3d at 1329.

Nor can the government survive scrutiny. It now argues for intermediate scrutiny, but below it addressed only "exacting scrutiny." Doc.57 at 33; Doc.66 at 23-24. But even under intermediate scrutiny, the agency's restriction must be "no greater than is essential" to accomplish its interest. Red-Br.46. And the agency must "conside[r]" less restrictive alternatives. *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2386 (2021). Here, the agency considered *no* less restrictive alternatives. It did not consider, let alone adopt, obvious alternatives like exempting expressive donations that don't involve any designated foreigners.

## III. The agency acted arbitrarily and capriciously.

When an agency fails to consider a "relevant" aspect of the problem, its decision is arbitrary and capricious. *Bidi Vapor v. FDA*, 47 F.4th 1191, 1202-04 (11th Cir. 2022). The agency here didn't consider the interests of people whose funds were locked at the

challenged addresses without due process. Blue-Br.49. It didn't consider how it sub-jected Americans like Plaintiff David Hoffman to penalties for receiving payments through the banned addresses, even non-volitionally. *Id.* And it didn't consider how it would chill the development of new technology—regardless of whether anyone is still allowed to write it, Red-Br.43—if an agency can shut software down once foreigners use it. *See* Andreessen-Br.25-26; Blue-Br.49.

Until now, everyone agreed that the agency had to consider these aspects of its decision. *See* Doc.57 at 29-30 (not disputing obligation to consider them); Doc.66 at 20-21 (same). If an agency has to consider things like economic costs, *Michigan v. EPA*, 576 U.S. 743, 752 (2015), it certainly has to consider whether the government should freeze people's property without due process or criminalize volitionless conduct. Fundamental rights are "important," so the agency must consider them. *DHS v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1910 (2020). The government argues that the agency didn't have to consider these factors primarily because it says that it acted within its statutory authority. Red-Br.41-43. But of course, "even when an administrative agency did not act in excess of statutory jurisdiction, it still may have acted arbitrarily and capriciously." *In re Gateway Radiology Consultants*, 983 F.3d 1239, 1262 (11th Cir. 2020) (cleaned up).

The government's only way out is to create a new exception to the record rule. Under the record rule, which is older than the APA itself, "'[t]he grounds upon which [agency action] must be judged are those upon which the record discloses that its action

was based.'" *Clement v. U.S. Attorney Gen.*, 75 F.4th 1193, 1199-200 (11th Cir. 2023) (quoting *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943)). The government has found no record support, so it asks the Court to credit its extra-record publications that addressed some of these three aspects. Red-Br.43-44; Blue-Br.49-50.

But this Court has to enforce the record rule. Before the district court, the agency certified that the administrative record was a complete copy of the documents that it considered. The government fought to prevent the district court from considering anything outside of that record, calling it "black letter law" that "a reviewing court may not go outside the administrative record." Doc.25 at 3. The government has now changed its mind, but it cites no cases allowing an agency's action to be upheld based on extra-record documents posted on the agency website but not considered in the decisionmaking. And it makes no argument for why this Court should create a new exception to the "simple but fundamental" record rule. *Calcutt*, 598 U.S. at 624. This Court should not create such an exception. Under the APA, the agency had to consider all three important factors and address them in the record. This Court should enforce that congressional command.

## CONCLUSION

The Court should reverse and remand with instructions to enter summary judgment for Plaintiffs.

Respectfully submitted,

/s/ Cameron T. Norris

J. Abraham Sutherland            Jeffrey M. Harris
106 Connally Street              Cameron T. Norris
Black Mountain, NC 28711         Jeffrey S. Hetzel
(805) 689-4577                   CONSOVOY MCCARTHY PLLC
                                 1600 Wilson Boulevard, Suite 700
                                 Arlington, Virginia 22209
                                 (703) 243-9423
                                 cam@consovoymccarthy.com

*Counsel for Coin Center et al.*

## CERTIFICATE OF COMPLIANCE

This brief complies with Rule 32(a)(7) because it contains 6,385 words, excluding the parts that can be excluded. This brief also complies with Rule 32(a)(5)-(6) because it is prepared in a proportionally spaced face using Microsoft Word 2016 in 14-point Garamond font.

Dated: April 1, 2024                              /s/ Cameron T. Norris

## CERTIFICATE OF SERVICE

I filed this brief on the Court's electronic filing system, which will email everyone requiring notice.

Dated: April 1, 2024                              /s/ Cameron T. Norris